Receipt number AUSFCC-9675089

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) Case No. **24-1017 C** |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

1. This case seeks compensation owed to the State of Alaska due to the United States' decision to cancel oil and gas leases from which the State would have earned hundreds of millions or even billions of dollars in royalties and other revenues.

2. Those oil and gas leases had been issued in compliance with legislation enacted by Congress to finally initiate—after decades of studies and delays—the development of vast mineral resources underlying the Coastal Plain of the Arctic National Wildlife Refuge. Oil and gas production from those leases would have greatly contributed to the nation's energy independence and would have generated significant economic benefits for the State of Alaska and its people.

3. Most directly, by statute Alaska is entitled to a royalty of 8.335% (50% of the statutory royalty rate of 16.67%) of the revenues generated through production of oil and gas under the leases. Based on the Federal Government's own estimates of the Coastal Plain mineral reserves, Alaska's royalties from production of those reserves would amount to billions of dollars in revenue that would have benefitted the education, health, and wellbeing of all Alaskans.

4. The United States made a policy decision to impede, postpone, and thwart the development of minerals underlying the Coastal Plain despite Congress's direction and in a total about-face from the Federal Government's previous policy. This lawsuit does not challenge the legality of that policy reversal. Instead, this lawsuit seeks to compel the United States to face the logical and legal consequences of its policy decision.

5. Oil and gas leases are contracts, and by cancelling the Coastal Plain oil and gas leases, the United States breached those contracts. The State of Alaska, as a beneficiary of those contracts, is entitled to receive compensation from the United States in the form of the State's contract-based damages—namely, the royalty revenues the State would have earned from production under the leases as well as the State's share of the bonus and rentals that were paid or were to be paid under the leases.

6. Additionally, the State's royalty rights for the Coastal Plain minerals are a well-recognized property interest. The United States' policy decision has effectively deprived the State of that property interest by making it valueless. As such, the State is entitled to just compensation pursuant to the Fifth Amendment.

7. The United States' policy decisions have consequences, especially when those decisions lead to a breach of contract. Here, one of the consequences of the United States' cancellation of the Coastal Plain oil and gas leases was to deprive the State of billions of dollars in statutorily-provided revenues. The United States has chosen to breach; now it must address the results of that policy by providing all compensation required by law to the State of Alaska.

## PARTIES

8. The Plaintiff State of Alaska is a sovereign state, with an interest as owner of a royalty interest in produced oil and gas from the Coastal Plain leases and as an intended third-

party beneficiary of those leases through the royalty payments and other expected and relied upon revenue from the "adjusted bonus, rental, and royalty receipts derived from the oil and gas program." Tax Cuts and Jobs Act ("Tax Act") § 20001(b)(5)(A), Pub. L. 115-97, 131 Stat. 2054, 2235–37 (2017).

9. Defendant United States, through the Department of the Interior ("DOI") and other federal agencies, is the lessor of the oil and gas leases that give rise to the State's claims. The United States is also responsible for managing the exploration and development of oil and gas resources on federal lands, including resources in the Coastal Plain.

**JURISDICTION**

10. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1491(a), because this action presents a claim against the United States which is founded upon statutes and the Constitution of the United States and includes a claim of over $10,000.00 in damages.

11. "A plaintiff lacking privity of contract [with the United States] can nonetheless sue for damages under that contract if it qualifies as an intended third-party beneficiary." *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1056 (Fed. Cir. 2012).

12. A plaintiff can also bring a claim in this Court as a third-party beneficiary for breaches of the implied covenant of good faith and fair dealing, which arises out of a contract with the United States. *Kenney Orthopedic, LLC v. United States*, 88 Fed. Cl. 688, 703–04 (Fed. Cl. 2009).

13. Additionally, a takings claim under the Fifth Amendment to the United States Constitution constitutes a "money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

## ALLEGATIONS

14. The Coastal Plain contains one of the largest untapped reserves of oil and gas in the world, with billions of barrels of recoverable oil below its surface.

15. The Coastal Plain, also known as the "Section 1002 Area," is located within the Arctic National Wildlife Refuge. *See* Fig. 1 below (depicting leased tracts within the Section 1002 Area). Originally established in 1960 as the Arctic National Wildlife Range, in 1980 Congress expanded and redesignated the Range as the Arctic National Wildlife Refuge through the Alaska National Interest Lands Conservation Act ("ANILCA").

16. Through ANILCA, Congress designated much of the Refuge as wilderness, withdrawing that land from potential oil and gas development.

17. Congress, however, expressly excluded a 1.56-million-acre area on Alaska's northern coast from the wilderness designation, as that area had the greatest potential for hydrocarbon development. *See* 16 U.S.C. § 3142 (ANILCA § 1002); *see also* 163 Cong. Rec. S8101 (daily ed. Dec. 19, 2017) (statement of Sen. Lisa Murkowski) ("[T]he 1002 [Area] was never in wilderness [and] is not in wilderness.").



**Figure 1 - ANILCA § 1002 Area (highlighting tracts leased)**

18.     In ANILCA, Congress directed the study of the Coastal Plain's resources and preparation of a report by the Secretary of the Interior regarding "further exploration for, and the development and production of, oil and gas within the coastal plain." 16 U.S.C. § 3142(h)(6).

19.     DOI completed its report in 1987, recommending energy development. *See* DOI, Fish and Wildlife Service, Geological Survey, and BLM, Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment, Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement (1987).

20. Despite DOI's 1987 report, oil and gas leasing remained prohibited in the Coastal Plain until further authorization by Congress was enacted. *See* 16 U.S.C. § 3143 (ANILCA § 1003).

21. Thirty years later, Congress provided the needed authorization. In 2017, as part of the Tax Act, Congress directed DOI to initiate an oil and gas leasing and development program in the Coastal Plain. *See* Tax Act § 20001(b)(2)(A). Congress granted this authorization, *inter alia*, to offset the revenues lost from the tax cuts made in the Tax Act and to help reduce the federal government's deficit. *See, e.g.*, 163 Cong. Rec. S7697 (daily ed. Dec. 1, 2017) (statement of Sen. Thomas Carper) (explaining that "open[ing] . . . the 1002 Area[] to oil and gas development" would help "reduce[] the deficit"). During debates surrounding the Tax Act, the Congressional Budget Office estimated that oil and gas leasing within the Coastal Plain would increase net offsetting receipts by approximately $1.1 billion over the 2018–2027 period. *Cong. Budget Off.*, *Cost Estimate, A Legislative Proposal Related to the Arctic National Wildlife Refuge* (Nov. 8, 2017), available at https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/anwrreconciliation.pdf. As such, the Act directed that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Tax Act § 20001(b)(2)(A).

22. Congress also directed the Secretary of the Interior to conduct at least two lease sales of at least 400,000 acres each, the first to occur no later than December 22, 2021. Tax Act § 20001(c)(1). The second lease must occur no later than December 22, 2024. *Id.*

23. The Coastal Plain oil and gas leasing program was directed by Congress to be administered "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976." Tax Act § 20001(b)(3).

24. The Tax Act establishes a 16.67% royalty rate for leases within the Coastal Plain. Tax Act § 20001(b)(4). The Tax Act further provides the State of Alaska the right to receive 50 percent of all bonus, rental, and royalty receipts derived from the Coastal Plain leases. *Id.* § 20001(b)(5)(A). As such, the State holds an 8.335% royalty interest in production from all leases within the Coastal Plain. *Id.* § 20001(b)(4), (b)(5)(A).

25. DOI, through the Bureau of Land Management ("BLM"), spent years conducting environmental reviews of the Coastal Plain oil and gas leasing program in accordance with applicable statutes and regulations. After these years of robust study, countless stakeholder meetings, and responding to millions of public comments, on August 17, 2020, the Secretary of the Interior issued a Record of Decision establishing a carefully crafted oil and gas development plan within the Coastal Plain.

26. Four months later, in December 2020, BLM published a notice of competitive sale for oil and gas leases on the Coastal Plain.

27. BLM conducted the first Coastal Plain lease sale on January 6, 2021. Three entities successfully pursued bids over nine separate tracts. *See* Fig. 1 (*supra*).

28. The Alaska Industrial Development and Export Authority ("AIDEA") was one of those successful bidders, securing lease agreements for seven tracts with BLM. (Attached hereto as Ex. A.) These seven tracts totaled 365,755 acres within the Coastal Plain for an initial term of 10 years, effective January 1, 2021. Pursuant to these leases, AIDEA paid approximately $14.4 million in lease bonuses to the United States. And under the Tax Act, the State was entitled to

receive 50 percent of the AIDEA bonuses, totaling approximately $7.2 million. The State was also entitled to 50 percent of the first-year rentals for these tracts, which lessees pay prior to lease issuance, here totaling approximately $5.5 million, meaning the State received approximately $2.75 million of the first year's lease rentals.

29.     Two other entities each secured one lease within the Coastal Plain: Knik Arm Services, LLC ("Knik Arm") and Regenerate Alaska, Inc. ("Regenerate Alaska") (Attached hereto as Exs. B & C.) The State was entitled to 50 percent of bonuses for the Knik Arm and Regenerate Alaska leases, as well as 50 percent of the first-year rentals. The State's portion of the Knik Arm bonus totaled approximately $800,000, and the State's portion of the first-year lease rentals totaled approximately $240,000. The State's share of the Regenerate Alaska bonus totaled approximately $390,000, and the State's share of the first-year rentals totaled approximately $120,000.

30.     In sum, from the Knik Arm, Regenerate Alaska, and AIDEA leases, the State was entitled to approximately $8.39 million in bonuses and $3.1 million in first-year rentals.

31.     The Tax Act also provides that the State is entitled to 50% of future annual rentals and 50% of the royalties paid to the United States on all future production revenues pursuant to the leases.

32.     Two weeks after the first lease sale, Joseph R. Biden, Jr. was inaugurated as President of the United States.

33.     Within hours of taking office on January 20, 2021, President Biden issued Executive Order 13990 (the "Executive Order"). Section 4(a) of the Executive Order directed the Secretary of the Interior to "place a temporary moratorium on all activities" related to the implementation of the oil and gas leasing program (the "Moratorium"). The Executive Order

directed the Secretary to review the leasing program and "conduct a new, comprehensive analysis" of the potential environmental impacts, requiring, in essence, a Supplemental Environmental Impact Statement ("SEIS").

34. In June 2021, the Secretary issued Secretarial Order 3401 (the "Secretarial Order"), which purported to temporarily halt "all [a]ctivities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program."

35. On the same day that the Secretary released the Secretarial Order, DOI's Principal Deputy Assistant Secretary for Land and Minerals Management issued a notice to leaseholders of a Suspension of Operations and Production (the "Suspension") of the leases. (Attached hereto as Ex. D.) The Suspension took effect that day and provided that the additional environmental analysis would "determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures."

36. On August 4, 2021, BLM published a notice of intent to prepare an SEIS for the Coastal Plain leasing program. 86 Fed. Reg. 41,989 (Aug. 4, 2021).

37. On April 28, 2022, and August 16, 2022, Regenerate Alaska and Knik Arm, respectively, entered into agreements with the United States to rescind their leases and refund their payments. No party consulted with the State of Alaska before executing these agreements. The United States has erroneously called these recissions "relinquishments."

38. Even assuming that the United States properly characterized the recissions, the United States improperly "clawed back" payments already made to the State in order to reimburse the lessees' bonus and rental payments.

39. Relinquishment is a contractual right under certain circumstances. Importantly, relinquishment does not provide for any refund to a lessee, especially not a refund retroactive to

9

the effective date of the lease. Relinquishment specifically requires lease terms to remain in force, including obligations to pay rents that are already due at the time of relinquishment. 43 C.F.R. § 3136.1.

40. The regulation implementing Naval Petroleum Reserves Production Act permits government-initiated lease termination only for those leases "on which there is no well capable of producing oil or gas in paying quantities" and only if a lessee fails to pay its annual rent after receiving notice of and time to cure the delinquency. *Id.* § 3136.2. Similarly, the regulations permit cancellation of a lease without a producing well only if a lessee fails to comply with the requirements of statute or regulation, and does not remedy its lack of compliance after receiving notice. *Id*. § 3136.3(a). As for producing leases or those with known oil and gas deposits, cancellation can only occur by court order. *Id*. § 3136.3(b). None of these situations are applicable here.

41. Section 10 of each of the 1002 Area leases contains a provision allowing the lessee to relinquish all or part of the lease "by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety **to pay all accrued rentals and royalties**." (emphasis added); (*see* Exs. A–C.)  This language mirrors the requirements for relinquishment set out in 43 C.F.R. § 3136.1.

42. Despite the State's efforts to clarify the status of the leases and verify the United States' accounting, the United States has refused to cooperate and has provided no transparency regarding its decisions.

43. Instead, the Office of Natural Resources Revenue ("ONRR") has used setoffs from other, unrelated royalty payments to the State to "claw back" from the State revenues the State had received related to all leases signed with Knik Arm, Regenerate Alaska, and AIDEA.

44. Additionally, in 2021, AIDEA sued the President and relevant federal executive agencies, challenging the Executive Order and DOI's implementation of the Moratorium (the "AIDEA Litigation"). *Alaska Indus. Dev. & Exp. Auth. v. Biden*, No. 3:21-cv-00245-SLG (D. Alaska). The State joined AIDEA's suit.[1] Because Knik Arm and Regenerate Alaska entered into agreements with BLM in which BLM cancelled and rescinded their leases and refunded their bid and initial rental payments, they were not parties to the AIDEA Litigation.

45. In August 2023, the U.S. District Court for the District of Alaska denied AIDEA's and the State's Motions for Summary Judgment. *Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813 (D. Alaska 2023). In its summary judgment order, the Court held that the United States had not violated the law when conducting its "temporary" moratorium of all oil and gas leases within the Coastal Plain. *Id.* at 831–32. The Court emphasized the moratorium's "temporary duration and limited scope," calling it "inaccurate" to refer to the moratorium as an "indefinite[]" suspension of oil and gas leasing in the Coastal Plain. *Id.*

46. Within 30 days following the district court's decision, on September 6, 2023, the Deputy Secretary of the Interior unilaterally cancelled the remaining leases in a seven-page letter. (Attached hereto as Ex. E.)

---

[1] The AIDEA Litigation did not assert breach of contract, breach of the of the covenant of good faith and fair dealing, or takings claims, as this suit does, but instead focused on the legality of the government's temporary moratorium of all oil and gas lease sales on the Coastal Plain. Lease cancellation had not yet occurred before the Court published its decision, with the Court relying on the fact that the leases had not been cancelled to support its holding that the temporary moratorium was lawful. *See Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813, 831–32 (D. Alaska 2023).

47. The Deputy Secretary explained that DOI will refund AIDEA for its lease sale bonus bids and first year rentals from its seven leases, totaling approximately $12.8 million.

48. The Deputy Secretary informed AIDEA that his decision constitutes a final decision for DOI and is not subject to appeal.[2]

49. The unilateral cancellation of the leases by the United States has detrimentally harmed the State of Alaska. The total economic ramifications of the lease cancellations for the State and its people and economy are incalculable. But a portion of the State's damages—the portion sought in this lawsuit—is discrete, quantifiable, and based on the express rights Congress granted to the State in the Tax Act, as further defined by contract in the leases, and the federal government's own estimations of recoverable oil in the 1002 Area.

50. Specifically, because of the cancellation of the leases, the State is unable to earn its 50 percent share of "adjusted bonus, rental, and royalty receipts derived from the oil and gas program" it is statutorily entitled to receive from the leases. Tax Act § 20001(b)(5)(A).

51. The State has already lost over $10 million from the AIDEA, Knik Arm, and Regenerate Alaska leases because of the lease cancellations due to lost lease bonuses and rental payments. These lost revenues, however, are only the tip of the iceberg for the State's damages.

52. As described above, Congress mandated a royalty rate of 16.67% for all Coastal Plain leases. Tax Act § 20001(b)(4). The State receives 50% of the 16.67% royalty, meaning it is entitled to an 8.335% royalty on production from all Coastal Plain leases. Tax Act § 20001(b)(5)(A).

---

[2] AIDEA has brought suit challenging the cancellation of its leases under the Administrative Procedure Act. *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 3:24-cv-0051-SLG (D. Alaska). The State has not joined that case.

53. The leases covered some of the most oil and gas rich portions of the Coastal Plain, as the Tax Act required. In the leasing program's Final Environmental Impact Statement, the United States determined that there is an estimated mean of 7.687 billion barrels of technically recoverable oil. The U.S. Energy Information Administration estimated a total mean of approximately 3.4 billion barrels of oil would be produced by 2050.[3]

54. Even if only 3.4 billion barrels of oil could be recovered from the Coastal Plain, by cancelling the leases and effectively ending the lease program, the United States has deprived Alaska of billions of dollars of production revenue. At June 24, 2024, prices for ANS West Coast oil – $86.68 a barrel – the State would earn $24.56 billion in royalty revenue for just the oil estimated to be produced from the Coastal Plain. The cancelled leases comprise a significant portion of the estimated recoverable oil; the State's damages from just these cancellations are a significant portion of the total losses the State will incur if no oil is produced from the Coastal Plain.

55. Subject to further development and expert testimony, the State has suffered at least hundreds of millions of dollars, and perhaps tens of billions of dollars, in damages from the United States' unilateral cancellation of oil development in the Coastal Plain.

56. The United States' cancellation of the Coastal Plain leases has had a material and detrimental impact on the State's fiscal resources that help provide vital services and benefits. Alaska's state budget was $13.9 billion for fiscal year 2025. Alaska imposes no individual income tax. Instead, it provides for its people through other means, including by obtaining revenues from oil and gas and other minerals development. These revenues help fund the State's

---

[3] These estimates do not take into account the natural gas reserves also barred from further development due to the lease cancellations, which could generate significant additional royalty revenue for the State.

13

schools, build its roads, care for its Alaska Native communities, and otherwise provide healthcare services, rural development, and other vital services that Alaskans depend on.

57. Even if the United States at some point in the future resumes the leasing program and allows development of mineral resources in the Coastal Plain,[4] the State has been significantly harmed by being deprived of the benefits of the leases now.

58. Other oil and gas development in Alaska is maturing and declining. Today, the Trans-Alaska Pipeline is transporting only half of what it did 35 years ago. And production of oil and gas from Alaska's North Slope, not far from the Coastal Plain, is declining and predicted to continue doing so. Notably, the recently approved Willow Project will provide only a fraction of the potential of the Coastal Plain, as it is estimated to produce 600 million barrels of oil in the next 30 years, compared to the Coastal Plain's mean estimate of *3.4 billion* barrels.

59. Faced with these damages and the detrimental effect they will have on the State and its people, Alaska has no choice but to ensure the United States pays the compensation the law and Constitution requires for breach of the leases and for depriving the State of the value of its royalty and other revenue rights with respect to oil and gas development from the Coastal Plain.

## COUNT I - BREACH OF CONTRACT

60. Plaintiff incorporates the preceding paragraphs as though full set forth at length herein.

---

[4] It is likely that future lease stipulations would be more restrictive of development, potentially reducing the amount of oil technically recoverable. Additionally, although it is unknown what chilling effect the instant lease cancellations would have on future lease sales, it is fair to say that leasing interest will be diminished as a result of the United States' lease cancellation, again casting doubt on the eventual production and total recovery of oil from the Coastal Plain.

61. The Coastal Plain lease agreements were valid contracts between the United States and AIDEA (in the case of seven leases), between the United States and Knik Arm (in the case of one lease), and between the United States and Regenerate Alaska (in the case of one lease). BLM had the authority to enter into the leases on behalf of the United States.

62. The Tax Act establishes a 16.67% royalty rate for leases within the Coastal Plain. Tax Act § 20001(b)(5). It also provides that 50 percent "of the amount of adjusted bonus, rental, and receipts derived from the oil and gas program and operations on Federal land authorized under [Section 20001(b)(5)(A)] . . . shall be paid to the State of Alaska." Tax Act § 20001(b)(5)(A).

63. As such, pursuant to the Tax Act, the State is entitled to a royalty of 8.335% of the revenues generated through production of oil and gas under the leases. Tax Act § 20001(b)(4), (b)(5)(A).

64. The State is an intended third-party beneficiary of all lease agreements between the United States and AIDEA, Knik Arm, and Regenerate Alaska because, among other reasons, the Tax Act expressly identifies the State as a beneficiary of all new Coastal Plain leases.

65. AIDEA, Knik Arm, and Regenerate Alaska, and the United States each provided consideration for their respective leases. AIDEA promised compensation for the right to explore, produce, and sell oil and gas within the 365,755 acres it leased from United States. Upon information and belief, AIDEA had complied in all material respects with the terms of its leases and was fully ready and able to perform its duties under its lease agreements before the United States' unilateral cancellation. Knik Arm and Regenerate Alaska also promised compensation for the right to explore, produce, and sell oil and gas leased by the United States. Before rescinding their leases, upon information and belief, Knik Arm and Regenerate Alaska had complied in all

material respects with the terms of their respective leases and were fully ready and able to perform their duties under their lease agreements before the United States' unilateral cancellations.

66. The United States cancelled AIDEA's, Knik Arm's, and Regenerate Alaska's right to explore for, produce, and sell oil and gas as has been provided under the Coastal Plain leases.

67. The United States breached its contracts when it cancelled the leases with AIDEA, Knik Arm, and Regenerate Alaska. By breaching the contracts, the United States breached its obligations to the State as an intended third-party beneficiary.

68. As a result of the breach of these nine leases by the United States, the State has suffered and will continue to suffer damages, including its loss of reasonable expectancy from its 50 percent share of the adjusted bonus, rental, and royalty receipts derived from the leases.

69. The lease cancellations have also injured the State in additional ways, including through loss of expected revenue derived from corporate income taxes as well as local taxes stemming from the construction and implementation of oil and gas activities pursuant to the leases.

**COUNT II - BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

70. Plaintiff incorporates the preceding paragraphs as though full set forth at length herein.

71. Once an oil and gas lease is issued, the United States, as owner of the executive rights, owes a duty of utmost good faith to third-party beneficiaries of the lease.

72. As a third-party beneficiary, the State was owed a duty of good faith and fair dealing in the United States' performance of its contracts with leaseholders in the Coastal Plain.

73. The United States breached its duty of good faith and fair dealing to the State through its cancellation of the leases as well as other conduct, as described above, that interfered with the lessees' ability to perform their respective obligations and interfered with the States' ability to obtain the intended benefits of the Leases.

## COUNT III - TAKING

74. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

75. Under the Fifth Amendment to the United States Constitution, the Takings Clause prohibits the federal government from taking property for public use without just compensation.

76. A statutory share of a royalty interest in an oil and gas lease constitutes property, the taking of which entitles the interest holder to just compensation for the value thereof.

77. By cancelling the leases and otherwise impeding and preventing development of oil and gas pursuant to Coastal Plain leases, the United States has deprived the State of all value and use that it otherwise would derive from its royalty interest and other revenue interests in the Coastal Plain oil and gas.

78. As such, the United States has committed a taking that entitles the State to just compensation for the value thereof.

## PRAYER FOR RELIEF

79. WHEREFORE, the State requests the Court order the following relief:

80. Award damages for breach of contract, breach of the covenant of good faith and fair dealing, and just compensation for the taking of the State's property;

81. Award costs and reasonable attorneys' fees to the maximum extent allowed by law; and

82. Grant any other relief available that is just or proper.

Submitted this 2nd day of July.

/s/ *Mark E. Champoux*
Mark E. Champoux, Attorney of Record
Kathleen C. Schroder, Of Counsel
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Mark.Champoux@davisgraham.com
Katie.Schroder@davisgraham.com
Tele: (303) 892-9400

TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl, Of Counsel
Ryan Farnsworth, Of Counsel
Assistant Attorneys General
Department of Law
State of Alaska
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
ron.opsahl@alaska.gov
ryan.farnsworth@alaska.gov

*Attorneys for the State of Alaska*