IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATE OF ALASKA,         )
                          )
         Plaintiff,      )
                          )     No. 24-1017C
         v.            )
                          )     (Senior Judge Bruggink)
UNITED STATES,         )
                          )
         Defendant.     )

## DEFENDANT'S MOTION TO STAY PROCEEDINGS

Pursuant to Rule 7(b) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests that this Court stay proceedings in the above-captioned case pending final resolution (including any appeals) of the following cases: *Alaska Industrial Development and Export Authority v. Biden*, No. 3:21-cv-00245-SLG (D. Alaska) (*AIDEA I*); and *Alaska Industrial Development and Export Authority v. Dep't of Interior*, No. 3:24-cv-00051-SLG (D. Alaska) (*AIDEA II*). Plaintiff, the state of Alaska, has represented that it opposes a stay. In support of our motion to stay, we state as follows:

This lawsuit arises out of the United States Department of the Interior's (DOI) cancellation of certain oil and gas leases in the Coastal Plain of the Arctic National Wildlife Refuge (Arctic Refuge). *See* Compl. ¶¶ 15, 46, Exh. E. In 2021, DOI issued seven leases to the Alaska Industrial Development and Export Authority (AIDEA)[1]. Compl. Exh. E at 2. AIDEA is a public corporation of the State of Alaska, created by statute in order to promote, develop, and advance the prosperity and economic welfare of the state. *See* AS §§ 44.88.020, 44.88.070. Plaintiff alleges that, under those leases, it was entitled to a share of payments and/or royalties,

---

[1] DOI also issued one lease each to two other entities, which have since been voluntarily relinquished and canceled at the request of those lessees. *See* Compl. ¶ 29.

including certain bonus bids and first-year rental payments.  Compl. ¶¶ 28-29.  Shortly after issuance of the leases, the President of the United States issued an executive order directing DOI to—as appropriate and consistent with applicable law—place a temporary moratorium on activities related to the Arctic Refuge oil and gas leasing program and instructing DOI to review the legal sufficiency of the leasing program.  *Id*. Exh. D at 1.  On June 1, 2021, DOI issued an order identifying certain legal errors in the oil and gas leasing program and suspending lease operations and production pending additional environmental analysis.  *Id.* Exh. D.  On September 6, 2023, DOI issued a decision cancelling the leases, stating that they had been improperly issued due to pre-leasing legal defects and finding that cancellation was appropriate "based on the seriousness of the pre-leasing legal errors given the special legal and factual circumstances of the original leasing decisions and on the minimal disruptive consequences from cancellation."  *Id.* Exh. E.

In 2021, subsequent to DOI's order suspending lease operations, AIDEA—along with certain other plaintiffs—filed suit in the District Court for the District of Alaska challenging both the President's executive order and DOI's lease suspension order.  *AIDEA v. Biden*, 685 F. Supp. 3d 813, 827 (D. Alaska 2023).  The state of Alaska joined this suit as a plaintiff-intervenor.  Compl. ¶ 44.  The district court granted summary judgment in favor of the Government, and plaintiffs have appealed this decision to the Court of Appeals for the Ninth Circuit, where the matter is still pending.  *See Alaska Industrial Development and Export Authority v. Biden*, No. 2024-2533 (9th Cir.).  In 2023, after the lease cancellations, AIDEA filed suit in the District Court for the District of Columbia challenging the cancellation of the leases, seeking invalidation of the cancellation and reinstatement of the leases.  *AIDEA II* Compl., ECF No. 1.  That action was then transferred to the District of Alaska, and is currently pending.  *Id.*, ECF No. 27.  Both

*AIDEA I* and *AIDEA II* have progressed substantially further than the present case, with *AIDEA I* currently on appeal to the Ninth Circuit and *AIDEA II* currently expected to complete substantive briefing by September 13, 2024.

We request that this case be stayed, including the deadline for defendant's answer, which is currently due on September 3, 2024, until both *AIDEA I* and *AIDEA II* have reached final resolution (including any appeals). "[A] court has broad discretion to stay proceedings before it." *Coast Fed. Bank v. United States*, 49 Fed. Cl. 11, 15 (2001). The "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *UnionBanCal Corp. & Subsidiaries v. United States*, 93 Fed. Cl. 166, 167 (2010) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)). "The orderly course of justice and judicial economy is served when granting a stay simplifies the 'issues, proof, and questions of law which could be expected to result from a stay.'" *Id.* (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

Judicial economy will certainly be served by staying this case, as the ultimate resolution in *AIDEA I* and *AIDEA II* will simplify the issues, proof, and questions of law in the present case. Indeed, while we disagree that plaintiffs' claims in those cases have merit, should plaintiffs obtain the relief they seek—particularly with regard to *AIDEA II*—the present case is likely to become moot, given that AIDEA has requested that the district court order reinstatement of the leases at issue in this case. And, even should the Government prevail and this case not become entirely mooted, the resolution of *AIDEA I* and *AIDEA II* will simplify the issues in this case, given that all three cases are based on the same operative facts and involve the same or similar parties. *See AIDEA I* 2nd Amended Compl. (attached as Exh. A), *AIDEA II* Amended Compl.

3

(attached as Exh. B).  In addition, as DOI has acknowledged in both *AIDEA I* and *AIDEA II*, the

Tax Cuts and Jobs Act of 2017 (Tax Act) requires DOI to offer a second lease sale by December

22, 2024.  *See, e.g., AIDEA I* Govt. Opp. to MSJ at 3, ECF No. 63 ("The Secretary 'shall offer'

the initial lease sale not later than December 22, 2021, and the second lease sale not later than

December 22, 2024.") (citing Tax Act, Pub. L. No. 115-97, § 20001(c)(1)(B)(ii)).  While the

precise timing and scope of that second lease sale remain undetermined, the results of that sale

could partially or completely moot the issues in this case.

      For these reasons, the Court should grant a stay of proceedings in this case.  We request

that, should the Court grant the stay, the parties file a joint status report within 21 days after final

resolution of the latter of *AIDEA I* and *AIDEA II*, proposing how they believe the present case

should proceed.  Should the Court deny the stay, we are likely to file a motion to dismiss

plaintiff's complaint pursuant to 28 U.S.C. § 1500, and request that the Court allow us to file

such a motion within 30 days of the Court's order on this motion.

                              Respectfully submitted,

                              BRIAN M. BOYNTON
                              Principal Deputy Assistant Attorney General

                              PATRICIA M. McCARTHY
                              Director

                              <u>s/ Steven J. Gillingham (by Deborah A. Bynum)</u>
                              STEPHEN J. GILLINGHAM
                              Assistant Director

                              <u>s/ Sosun Bae</u>
                              SOSUN BAE
                              Senior Trial Counsel
                              Commercial Litigation Branch
                              Civil Division, Department of Justice
                              P.O. Box 480, Ben Franklin Station

Washington, D.C. 20044
Telephone: (202) 305-7568
Facsimile: (202) 514-8640
E-mail: sosun.bae@usdoj.gov

Dated August 28, 2024                    *Attorneys for Defendant*

# EXHIBIT A

Kyle W. Parker, ABA No. 9212124
William G. Cason, ABA No. 2009083
HOLLAND & HART LLP
1029 W. 3rd Avenue, Suite 550
Anchorage, Alaska 99501
Telephone:    (907) 865-2600
Facsimile:    (907) 865-2680
kwparker@hollandhart.com
wgcason@hollandhart.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, NORTH SLOPE BOROUGH, ARCTIC SLOPE REGIONAL CORPORATION, and KAKTOVIK IÑUPIAT CORPORATION <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, UNITED STATES DEPARTMENT OF THE INTERIOR, DEB HAALAND, in her official capacity as Secretary of the Department of Interior, LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, and THOMAS HEINLEIN, in his official capacity as Director of the Bureau of Land Management Alaska Office, <br><br> *Defendants*. | Case No. 3:21-cv-00245-SLG <br><br> **SECOND AMENDED COMPLAINT** |

Plaintiffs Alaska Industrial Development and Export Authority ("AIDEA"), North Slope Borough ("Borough"), Arctic Slope Regional Corporation ("ASRC"), and Kaktovik Iñupiat Corporation ("KIC") hereby bring this civil action against the above-listed Defendants for declaratory and injunctive relief.  Plaintiffs allege as follows:

## INTRODUCTION

1.       Defendants have defied a direct congressional mandate to facilitate development of oil and gas resources on the Coastal Plain of Alaska.  Rather than follow the law and the science, Defendants have engaged in a politically driven, systematic campaign to prevent any Coastal Plain development.

2.       After decades of debate and with the widespread support of Alaskans, Congress passed legislation in 2017, which the President signed into law, directing the Secretary of the Interior to implement the specific provisions of the Alaska National Interest Lands Conservation Act authorizing oil and gas leasing and exploration and development activities on discrete lands within the Coastal Plain.  Congress expressly directed the Secretary to conduct at least two Coastal Plain lease sales, including one by December 22, 2021, and to issue any rights-of-way or easements necessary to carry out oil and gas operations on the Coastal Plain.

3.       In August 2020, the Bureau of Land Management completed an extensive environmental review process for the congressionally mandated Coastal Plain Oil and Gas Leasing Program ("Leasing Program").

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 2 of 43

4.     In January 2021, the Bureau of Land Management finalized the first of the congressionally mandated Coastal Plain lease sales.

5.     AIDEA was the successful bidder for the majority of the leases sold in the January 2021 Coastal Plain lease sale.

6.     On his first day in office, January 20, 2021, President Biden issued an executive order directing the Secretary of the Interior to "place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program."  Executive Order 13990, § 4(a).

7.     Invoking that Executive Order, the Secretary of the Interior ordered "a temporary halt on all Department [of the Interior] activities related to the [Coastal Plain] Program."  Secretarial Order 3401.  The Secretary further directed the Department of the Interior, including the Bureau of Land Management, not to "take any action to authorize any aspect of the Program" until the Department conducts a comprehensive environmental review process that is estimated to take well over a year.  The Secretary's order constitutes a moratorium, issued via administrative fiat, on all federal approvals of oil and gas operations on the Coastal Plain.

8.     Executive Order 13990, Secretarial Order 3401, and the subsequent actions of the Department of the Interior, directly contravene Congress's mandate on development of the Coastal Plain's oil and gas resources.  First, the President's order for a moratorium on all federal approvals of oil and gas operations on the Coastal Plain was ultra vires.

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 3 of 43

Second, by issuing and implementing this unlawful moratorium, the Department of the Interior has violated, and continues to violate, the Administrative Procedure Act, Alaska National Interests Land Conservation Act, and the Tax Cuts and Jobs Act of 2017.

9.      Accordingly, as a result, Section 4(a) of Executive Order 13990, Secretarial Order 3401, and all federal actions in furtherance thereof, must be vacated and enjoined. In addition, the Department of the Interior, including the Bureau of Land Management, must be ordered to carry out its congressionally prescribed duties to facilitate development of the Coastal Plain's oil and gas resources.

## PARTIES

10.      Plaintiff AIDEA is a public corporation of the State of Alaska.  AIDEA was created in 1967 to "promote, develop and advance the general prosperity and economic welfare of the people of Alaska, to relieve problems of unemployment, and to create additional employment."  A.S. § 44.88.070.  Through its development project finance programs, AIDEA leverages valuable public resources to support significant private-sector investment, catalyzing enterprise growth to protect the long-term economic health of the State and its citizens.  From its inception, AIDEA has worked with Alaska Native Corporations, tribal organizations and indigenous village communities to increase job opportunities and encourage the economic growth of the State, particularly in rural and remote areas, including the North Slope region of Alaska.  AIDEA is specifically authorized by the Alaska Legislature to promote and provide financing for Arctic

infrastructure development and to enter into lease agreements with government entities necessary to fulfill these purposes (A.S. § 44.88.070).

11.     The North Slope Borough ("Borough) is a Home Rule Borough that serves as the regional government for eight villages spread across northern Alaska.   The Borough's jurisdiction stretches from the United States-Canada border across to the western border of Alaska, and its coastline extends across the Beaufort and Chukchi Seas. The Borough's jurisdiction includes roughly 18,500 square miles within the Arctic National Wildlife Refuge ("ANWR"), including the entire Coastal Plain and the city and village of Kaktovik, which is the only permanent settlement within ANWR.   The Borough's authority is analogous to, or greater than, that of county governments in other states.   Pursuant to Alaska Statute § 29.04.010, Home Rule Boroughs are municipal corporations incorporated under the laws of the State of Alaska and political subdivisions with "all legislative powers not prohibited by law or charter."  As such, the Borough has authority over the planning, platting, permitting, and zoning of lands within its boundaries, and for directing appropriate development in a manner that promotes the public health, safety, welfare, and economic stability of Borough residents and communities.   This includes protecting access to subsistence resources, managing fish and wildlife species, and mitigating the impacts of development activity on wildlife and the natural environment. With this authority, the Borough has successfully managed oil and gas activities on the North Slope for over 40 years.   Through its Planning Department, the Borough has

permitted, zoned, and approved every oil and gas project on the North Slope.  This permitting process involves substantial input from the Borough's Wildlife Department biologists and subsistence resource experts, as well as from other Borough personnel and local residents, resulting in significant remedial measures that protect the Arctic's residents, environment, and wildlife.  Over 74 percent of Borough residents are Native Alaskan Iñupiat.  The Iñupiat and other indigenous peoples of the region have depended on the subsistence resources of ANWR's lands and waters for their physical health, cultural well-being, and survival for many generations.

12.    Plaintiff Arctic Slope Regional Corporation is one of twelve land-owning regional Alaska Native Corporations established pursuant to the Alaska Native Claims Settlement Act of 1971 ("ANCSA").  43 U.S.C. § 1601 *et seq*.  Under ANCSA, Congress created Native corporations, including ASRC, "to provide benefits to its shareholders who are Natives or descendants of Natives or to its shareholders' immediate family members who are Natives or descendants of Natives to promote the health, education or welfare of such shareholders or family members."  43 U.S.C. § 1606(r).  ASRC's region is the North Slope of Alaska, which spans 55 million acres and is the northernmost region of the United States.  Within the North Slope region, ASRC also holds title to approximately five million acres of land conveyed to it under ANCSA for the purpose of development and use on behalf of its shareholders, much of it with energy, mineral and other resource potential. Among many other efforts, ASRC, on behalf of its shareholders, pursues and benefits from

natural resource development on and near its lands.  Its shareholders also depend on subsistence resources from the land as well as the rivers and ocean, as they have for millennia.

13.     ASRC also represents the business interests of the Iñupiat of the Arctic Slope and is the largest Alaskan-owned and operated company, spanning six major business segments.  ASRC is committed both to providing sound financial returns to its shareholders in the form of jobs and dividends, and to preserving the Iñupiat way of life, culture and traditions, including   the preservation of a subsistence way of life to ensure the communities are able to support its shareholders.  A portion of ASRC's revenues is invested in initiatives that promote and support an educated shareholder base, healthy communities, and sustainable local economies.  ASRC's perspective is based on the dual realities that its Iñupiat culture and communities depend upon a healthy ecosystem and subsistence resources as well as natural resource development as the foundation of a sustained North Slope economy.

14.     Plaintiff KIC is the Village Corporation established pursuant to ANCSA for the Native Village of Kaktovik.  Through Section 11(a)(1) of ANCSA, KIC received 92,000 acres of surface lands pursuant to its village entitlement within the Coastal Plain of ANWR.  For KIC and its shareholders, ANWR and its Coastal Plain are not wilderness; they are the ancestral land of KIC's people and have been continuously used for thousands and thousands of years. KIC's people have depended on the subsistence resources of

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 7 of 43

ANWR's lands and waters for physical health, cultural well-being, and survival for many generations. KIC's children are born within the Coastal Plain of ANWR, and its ancestors are buried within the Coastal Plain of ANWR.

15.     In 2017, KIC fought to open the 1002 Area of the Coastal Plain to oil and gas leasing to finally realize on the promise of ANSCA.  It actively participated in the Leasing Program Environmental Impact Statement from 2018 to 2020.  KIC is currently a subcontractor on the AIDEA seismic program, providing cultural and subsistence oversight to the program.  Defendants' unlawful halting of the Leasing Program is creating financial hardship to KIC.

16.     KIC has an interest in the implementation of the Leasing Program and the prompt and favorable resolution of this litigation not only due to the economic opportunity of the AIDEA seismic program, but also because the seismic program, which will be completed using state-of-the-art, low impact seismic technology, will provide new information critical to evaluating the resource potential of the Coastal Plain.  While the Leasing Program does not cover KIC's 92,000 acres of land, this data could provide valuable information with respect to potential gas reserves on the adjacent KIC lands. Access to clean-burning natural gas would allow Kaktovik to transition away from using diesel for generating electricity thereby improving air quality in the community.  It would also eliminate the need for barging and offloading bulk supplies of diesel fuel during the open water season thereby reducing the risk of a fuel spill during inclement weather.

Further, exploration of the AIDEA Leases could help KIC achieve a level of economic self-determination for its community, provide jobs, develop local business, and evaluate KIC's lands for local energy.  KIC has six active subsidiaries, excluding joint ventures, conducting business in the areas of oil field support, environmental remediation, construction, power generation, and equipment rental in Kaktovik, elsewhere in Alaska, and nationwide. KIC has 258 shareholders, 158 of whom live in Kaktovik. All KIC shareholders receive dividends from the corporation based on positive cash flow.  Most KIC shareholders are also ASRC shareholders and receive a dividend therefrom.

17.    Defendant Joseph R. Biden, Jr., is the President of the United States.  He is sued in his official capacity.

18.    Defendant United States Department of the Interior ("DOI") is an agency within the executive branch of the United States government.

19.    Defendant Deb Haaland is the Secretary of the Interior ("Secretary").  She is sued in her official capacity.

20.    Defendant Laura Daniel-Davis is the Principal Deputy Assistant Secretary for Lands and Minerals Management, DOI.  She is sued in her official capacity.

21.    Defendant Bureau of Land Management ("BLM") is an agency within DOI.

22.    Defendant Tracy Stone-Manning is the Director of BLM.  She is sued in her official capacity.

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 9 of 43

23.     Defendant Thomas Heinlein is the Acting Director of the BLM Alaska Office.  He is sued in his official capacity.

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States.  *See* 28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701-706.

25.     Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities, Plaintiffs are residents of this District, and a substantial part of the events or omissions giving rise to the Complaint occurred within this District.  *See* 28 U.S.C. § 1391(e)(1).

## BACKGROUND

I.     **RELEVANT STATUTORY PROVISIONS**

A.     **Administrative Procedure Act**

26.     The Administrative Procedure Act ("APA") provides that persons "adversely affected or aggrieved by agency action" are entitled to judicial review thereof.  5 U.S.C. § 702.

27.     "[R]egulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in" the APA. *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).

28.     Pursuant to the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 10 of 43

29.     If the reviewing court finds that an agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court must hold the action unlawful and set it aside.  5 U.S.C. § 706(2)(A).

30.     If the reviewing court finds that an agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," the court must hold the action unlawful and set it aside.  5 U.S.C. § 706(2)(C).

31.     If the reviewing court finds that an agency action is "without observance of procedure required by law," the court must hold the action unlawful and set it aside.  5 U.S.C. § 706(2)(D).

32.     Before issuing a substantive rule, an agency must follow specific procedures, including (1) publication of notice of the proposed rule in the Federal Register, (2) providing a period for interested individuals to comment on the proposed rule, and (3) publication of the adopted rule not less than thirty days before its effective date.  5 U.S.C. § 553.  These procedures are commonly referred to as notice-and-comment requirements.

33.     The notice-and-comment requirements do not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," or when the agency makes a written finding and reasoned explanation that the notice-and-comment procedure is "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553 (b)(3).  However, these exceptions to the APA's notice-and-comment

requirements are "narrowly construed and only reluctantly countenanced." *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984).

34.     "Interpretive rules simply clarify or explain existing law or regulations.  They do not conclusively affect the rights of private parties.  Substantive rules, in contrast, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Yesler Terrace Comm. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994) (internal citation omitted).

35.     "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alterations in original; internal quotations and citation omitted).  If a policy "narrowly limits administrative discretion" or establishes a "binding norm," it is a substantive rule subject to the notice-and-comment requirements. *Id.*; *see also Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law.").

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 12 of 43

**B.      Alaska National Interest Lands Conservation Act**

36.      In 1960, President Eisenhower designated 8.9 million acres in northeastern Alaska as a federally protected wildlife refuge, initially named the Arctic National Wildlife Range and later the Arctic National Wildlife Refuge ("ANWR").

37.      In 1980, Congress passed the Alaska National Interest Lands Conservation Act, Pub. Law 96-487, 94 Stat. 2390 ("ANILCA").

38.      ANILCA was intended to strike a balance between conservation interests and the future economic and social needs of Alaska and its residents. Section 101(d) of ANILCA states that the "designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." PL 96-487, § 101(d); 16 U.S.C. § 3101(d).

39.      Congress sought to protect the balance struck by ANILCA by providing that any executive action that "withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska," is not effective "until notice is provided in the Federal Register and to both Houses of Congress." PL 96-487, § 1326(a), 16 U.S.C. § 3213(a).

40.      In keeping with its broad policy objectives, ANILCA dramatically expanded ANWR from 8.9 million acres to 19.3 million acres; designating 8 million acres as wilderness, and setting aside a small portion (approximately 1.5 million acres) for potential

oil and gas development.  PL 96-487, § 702(3), 16 U.S.C. 1132; PL 96-487, § 1002, 16 U.S.C. § 3142.

41.    These 1.5 million acres, which comprise less than 10 percent of the expanded refuge, are identified in Section 1002 of ANILCA, and are commonly referred to as either the Coastal Plain or the "1002 Area." PL 96-487, § 1002; 16 U.S.C. § 3142.

42.    Under section 1002(h), Congress required the Department of Interior to prepare a report assessing the impacts of possible oil and gas exploration on the Coastal Plain within five years. PL 96-487, § 1002(h); 16 U.S.C. § 3142(h).  Following completion of the 1002(h) report, Congressional authorization is required prior to any oil and gas leasing, exploration or development activities in the 1002 Area.  PL 96-487, § 1003; 16 U.S.C. § 3143.

43.    The Department's report (referred to as the "Legislative Environmental Impact Statement" or "LEIS") was completed on April 20, 1987, and "culminate[d] more than 5 years of biological baseline studies, surface geological studies, and two seasons of seismic exploration surveys." Informed by extensive scientific study, it concluded that "[i]mpacts predicted for exploration and development drilling were minor or negligible on all wildlife resources on the 1002 area," and that production of oil would be "expected to directly affect only 12,650 acres or 0.8 percent of the 1002 area."

44.     As a result of the Department's findings, Secretary Hodel recommended that Congress enact legislation to authorize the Department to conduct "an orderly oil and gas leasing program for the entire 1.5- million- acre 1002 area."

### C.     Tax Cuts and Jobs Act of 2017

45.     After decades of debate and public scrutiny, Congress lifted ANILCA's Section 1003 prohibition and expressly opened the Coastal Plain up for oil and gas development in 2017.  This legislation was part of the Tax Cuts and Jobs Act of 2017, Public Law 115-97 ("2017 Tax Act"), which President Trump signed into law on December 22, 2017.

46.     The 2017 Tax Act expressly provides that "Section 1003 of [ANILCA] shall not apply to the Coastal Plain," thereby repealing ANILCA's temporary prohibition of oil and gas development.  PL 115-97, § 20001(b)(1).

47.     Section 20001(b)(2)(A) of the 2017 Tax Act provides: "The Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."  PL 115-97, § 20001(b)(2)(A).

48.     Section 20001(b)(2) of the 2017 Tax Act amended Section 303(2)(B) of ANILCA to provide a fifth purpose for ANWR:  "to provide for an oil and gas program on the Coastal Plain."  PL 115-97, § 20001(b)(2).

49.     Through the 2017 Tax Act, Congress mandated that the Secretary take various steps to promote the exploration and development of oil and gas resources within the Coastal Plain.

50.     Section 20001(c) of the 2017 Tax Act directs the Secretary to conduct at least two Coastal Plain lease sales by December 22, 2024, including the first by December 22, 2021, and provides that each sale must include at least 400,000 acres of the highest hydrocarbon potential lands within the Coastal Plain.  PL 115-97, § 20001(c).

51.     Section 20001(c) further provides:

> (2) RIGHTS-OF-WAY.—The Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section.

PL 115-97, § 20001(c)(2).  This provision is a directive; such rights-of-way and easements are not at the Secretary's discretion.

52.     Section 20001(c) further provides:

> (3) SURFACE DEVELOPMENT.—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

PL 115-97, § 20001(c)(3).

53.     Except as otherwise provided in Section 20001, "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 16 of 43

lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)."  PL 115-97, § 20001(b)(3).

D.     **Federal Land Policy and Management Act**

54.     The Federal Land Policy and Management Act ("FLPMA") authorizes the Secretary of the Interior to withdraw small tracts (less than 5,000 acres) of public lands and temporarily withdraw large tracts of land.  43 U.S.C. § 1714(c), (d).

55.     For a withdrawal of either a large or a small tract, the Secretary must publish notice of the proposed withdrawal in the Federal Register, afford an opportunity for notice and comment, and obtain the consent of any other department or agency involved in the administration of the lands proposed for withdrawal.  43 U.S.C. § 1714(b), (h), (i).

56.     Congress imposed additional requirements for temporary large-tract withdrawals. Such withdrawals are limited to no more than 20 years.  In addition, no later than the effective date of the withdrawal, the Secretary must provide Congress a detailed report addressing twelve separate elements related to the withdrawal.  43 U.S.C. § 1714(c)(2).

II.     **FACTUAL BACKGROUND**

A.     **The Coastal Plain's Oil and Gas Resources**

57.     Those who live in and around the Coastal Plain have a uniquely important voice regarding the future use of the area.  Notably, the Alaska Native residents who live in and around the Coastal Plain support oil and gas development.  The Native Village of Kaktovik ("Kaktovik") is the only federally recognized community on the Coastal Plain,

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 17 of 43

and it participated in the environmental review process as a cooperating agency alongside BLM. Kaktovik, along with more than twenty other Alaska Native organizations and corporations in and around the Coastal Plain, has consistently advocated for responsible oil and gas development on Alaska's North Slope (which includes the Coastal Plain). These organizations include: KIC, City of Kaktovik, the Borough, Arctic Slope Native Association, City of Anaktuvuk Pass, City of Point Hope, Native Village of Atqasuk, Olgoonik Corporation, City of Atqasuk, City of Wainwright, Native Village of Point Lay, Tikigaq Corporation, Atqasuk Corporation, City of Utqiaġvik, Iḷisaġvik College, Ukpeaġvik Iñupiat Corporation, Nunamiut Corporation, Native Village of Point Hope, ASRC, Wainwright Tribal Council, Iñupiat Community of the Arctic Slope, Native Village of Barrow, and North Slope Borough School District.

58.     Support for the responsible development of the Coastal Plain's oil and gas resources is not limited to Alaska Natives. Recent statewide polling indicates that 65 percent of all Alaskans support oil and gas exploration and production on the Coastal Plain. Reflective of this widespread public support, Alaska Governor Mike Dunleavy, all members of Alaska's congressional delegation, and a majority of the members the Alaska Legislature support responsible development of the Coastal Plain.

59.     Alaskans on the North Slope benefit greatly from the development of the North Slope's oil and gas resources. This development has sparked tremendous economic growth in the area over the last several decades. Coinciding with North Slope

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 18 of 43

development, between 1980 and 2014, the life expectancy of North Slope residents increased at a rate far surpassing the national average over the same period.  Laura Dwyer-Lindgren, MPH, *et al.*, "Inequalities in Life Expectancy Among US Counties," 1980-2014, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION (May 8, 2017), *available at* https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2626194.

60.     The United States Geological Survey estimated that approximately 7.687 billion barrels of recoverable oil and 7.04 trillion cubic feet of recoverable natural gas are contained within the Department's Leasing Program area.

61.     The House Committee on Natural Resources has estimated that development of the Coastal Plain will create 55,000 to 130,000 jobs.

62.     By increasing royalties, income taxes, production taxes, and property taxes, oil and gas development on the Coastal Plain will result in increased revenues for the North Slope Borough, the State of Alaska, and the federal government (estimated up to $50 billion in total future royalties, according to the nonpartisan Congressional Budget Office).

63.     Oil production from the Coastal Plain leases will promote new infrastructure development and sustain existing federally identified critical energy infrastructure, including the Trans-Alaska Pipeline System.

64.     Oil and gas development on the Coastal Plain will result in increased economic activity in the community of Kaktovik, a "disadvantaged community" as defined by Executive Order 14008.

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 19 of 43

65.     Oil and gas development on the Coastal Plain will result in increased revenues and economic activity for Alaska Native corporations and the people they represent.

**B.      Methods to Assess Hydrocarbon Potential**

66.     The United States Geological Survey developed its estimate of the Coastal Plain's hydrocarbon potential based upon the geology of the area, identifying ten petroleum "plays" which have geologic parameters that are associated with petroleum potential.  The United States Geological Survey then made probabilistic assumptions regarding the geological attributes of each play.

67.     To assess the actual hydrocarbon potential of any portion of the Coastal Plain, additional site-specific exploration is required to test the assumptions made in the United States Geological Survey estimate.

68.     Site-specific exploration geophysical methods to assess the hydrocarbon potential of a given tract or area include seismic surveys, remote sensing, geochemical analyses, magnetic surveys, and gravity surveys.

**C.      Initial Implementation of Congress's Mandate to Facilitate Development of the Coastal Plain**

69.     Following the enactment of the 2017 Tax Act and pursuant to Congress's mandate, DOI, through BLM, initiated a thorough environmental review of the Leasing Program.  As part of this process, BLM held a 60-day scoping period, issued a Draft Environmental Impact Statement ("DEIS"), and then held another 75-day comment period

on the DEIS.  During the scoping and public comment periods, BLM received over 1.8 million public comments on more than 8,000 discrete topics.  BLM also held several public meetings and met with representatives of various stakeholders, including local and state governments, tribes, local indigenous communities, Alaska Native corporations, industry organizations, and environmental organizations.  In developing the Leasing Program and analyzing its environmental impacts, BLM also carefully coordinated with other government agencies and entities, including the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and the State of Alaska.

70.    BLM modified the DEIS based on the comments received, and in September 2019, BLM issued a robust 515-page Final Environmental Impact Statement ("FEIS") for the Leasing Program.  This FEIS includes BLM's responses to comments regarding the DEIS.

71.    BLM subsequently received and considered comments in response to the FEIS.

72.    In August 2020, BLM issued an 88-page Record of Decision approving the Leasing Program and responding to comments regarding the FEIS.  The Record of Decision acknowledges that Section 20001 of the 2017 Tax Act "require[s] the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM), to establish and administer a competitive oil and gas program for the 'leasing, development,

production, and transportation of oil and gas in and from the Coastal Plain.'"  The Record

of Decision further acknowledges that Section 20001 "also includes additional mandates

to the Secretary, acting through the BLM, to expedite and provide certainty toward

establishment and development of the program in order to meet the statute's revenue-

generating purpose."

73.     The Record of Decision summarizes Congress's mandate in the 2017 Tax

Act as follows:

> In summary, exercising its plenary authority over the
> management of federal lands, Congress's enactment of Section
> 20001 of PL 115-97 decided the question of whether activities
> related to leasing, exploration, development, production and
> transportation of oil and gas would take place on the Coastal
> Plain.  In doing so, Congress, among other things: (1) directed
> the Secretary, acting through the BLM, to "establish and
> administer a competitive oil and gas program for the leasing,
> development, production, and transportation of oil and gas in
> and from the Coastal Plain"; (2) included a Coastal Plain oil
> and gas program as a refuge purpose on equal footing with the
> other refuge purposes; (3) directed the Secretary, acting
> through the BLM, to manage the program in a manner similar
> to the administration of lease sales on the National Petroleum
> Reserve-Alaska (the NPR-A); (4) directed the Secretary, acting
> through the BLM, to issue rights-of-way or easements "for the
> exploration, development, production, or transportation
> necessary" to carry out the program; and (5) directed the
> Secretary, acting through the BLM, to authorize up to 2,000
> surface acres to be covered by production and support
> facilities.

74.     The Record of Decision notes the uncertainty of the impacts of future

exploration and development on the Coastal Plain.  As a result, the Record of Decision

explains that "[a]t some future stage in the administration of the oil and gas program where impacts from proposed actions are actually reasonably foreseen, *i.e.*, if and when the BLM is presented with proposals for exploration or development, those decisions by the BLM for specific authorizations will also be subject to project-specific analysis, including compliance with NEPA and other laws."  The Record of Decision further clarifies that future on-the-ground actions may be subject to additional project-specific terms and conditions, in addition to the terms and conditions of the governing lease.

75.    The Record of Decision expressly acknowledges the five statutory purposes of ANWR and carefully ensures that the purpose of oil and gas development "does not defeat the other four" purposes.

76.    The Record of Decision also acknowledges that the "plain language of" Section 20001(c)(2) of the 2017 Tax Act requires BLM to authorize rights-of-way necessary to carry out the Coastal Plain oil and gas program.  Such authorization is not "at the BLM's discretion."

77.    The Record of Decision analyzes four alternatives (A, B, C, and D) in detail. These alternatives focus on (i) which areas of the Coastal Plain to make available for oil and gas leasing, and (ii) what terms and conditions to apply in order to avoid, minimize, and mitigate adverse environmental impacts.  BLM ultimately selected Alternative B, which opens all of the Coastal Plain to potential leasing and imposes numerous lease

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 23 of 43

stipulations and required operating procedures aimed at protecting ANWR's resources and uses set forth in ANILCA.

78.    The Record of Decision states that "making all of the 'program area' available for leasing provides maximum flexibility for future decision-making and innovation for project proposals by potential lessees" and further explained that "[u]ntil exploration drilling occurs, the BLM cannot reasonably foresee which areas of the Coastal Plan have the highest prospects for oil and gas discoveries."  The Record of Decision further states that "given the limited geophysical information that currently exists for the Coastal Plain, the BLM has determined that making the entire program area available for leasing is the ***only*** way to ensure that the areas having the highest potential for the discovery of oil and gas can be offered in the first two lease[] sales, as required by Section 20001(c)(1)(B)(i)(II) of PL 115-97." (Emphasis added.)

       **D.    AIDEA's Lease Purchases**

79.    On December 7, 2020, BLM published in the Federal Register a Detailed Statement of Sale for the Leasing Program.  On December 18, 2020, after receipt and consideration of over 40,000 comments, BLM published an amended Detailed Statement of Sale, which removed Tracts 1-8, Tract 11 and Tract 12 totaling nearly 475,000 acres from the lease sale process.  BLM accepted bids between December 21, 2020, and December 31, 2020.

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 24 of 43

80.     BLM opened the submitted bids for the Coastal Plain lease sale on January 6, 2021.

81.     AIDEA was the successful bidder on nine of eleven tracts for which bids were submitted.

82.     AIDEA secured lease agreements with BLM for seven tracts, collectively covering 365,775 acres within the Coastal Plain.  All of these lease agreements are for an initial term of ten years with an effective date of January 1, 2021.

83.     AIDEA chose to participate in the Coastal Plain lease sale to further its mission to increase job opportunities and otherwise encourage the State's economic growth, including access to and development of its natural resources.  AIDEA anticipates multiple benefits related to the timely exploration and development of its Coastal Plain leases, including direct employment for exploration and development of oil and gas resources; indirect employment related to exploration and development activities; revenues paid to local and state governments, Alaska Native corporations, and native villages; and profits to AIDEA from its development investment and re-investment of those profits into future economic development projects in Alaska.

84.     Inclusive of the first year's lease payments, AIDEA has initially incurred over $13.4 million in costs in acquiring its Coastal Plain leases, and the BLM has continued to accept additional annual lease payments from AIDEA despite the Secretary of the

Interior's issuance of Order No. 3401 and the resulting moratorium on all federal approvals of oil and gas operations on the Coastal Plain, as further described herein.

   **E.    Defendants' Violation of Congress's Mandate to Facilitate Development of the Coastal Plain.**

85.    On January 20, 2021, President Biden was sworn into office and immediately took action to unlawfully thwart Congress's mandate to facilitate oil and gas development on the Coastal Plain.

86.    On his first day in office, President Biden issued Executive Order 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7037 (Jan. 25, 2021).  Section 4(a) of Executive Order 13990 states:

> In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge.  The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

87.    Executive Order 13990 provides no explanation of the vaguely stated "alleged legal deficiencies underlying the [Leasing Program]," nor does this Executive Order provide an explanation of how or why the President determined that such "alleged legal deficiencies" warrant a moratorium on the implementation of the Leasing Program.

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 26 of 43

Likewise, Executive Order 13990 provides no explanation of why the "alleged legal deficiencies" warrant a comprehensive environmental review analysis, even though BLM had already completed such an analysis and Defendants had already taken the position in other litigation that such analysis fully complied with NEPA.

88.     On June 1, 2021, the Secretary of the Interior issued Order No. 3401 (the "Secretarial Order").  The Secretarial Order expressly states that it "is taken in furtherance of Section 4(a) of [Executive Order 13990]."

89.     The Secretarial Order states that the Secretary "has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act)."  The Secretarial Order provides no further elaboration on the alleged shortcomings of the alternatives analysis or on the nature of the allegedly improper interpretation of Section 20001.

90.     The Secretarial Order provides that the Department of the Interior "will conduct a new, comprehensive analysis of the potential environmental impacts of the [Leasing] Program and address the identified legal deficiencies.  While that analysis is pending, I direct a temporary halt on all Department activities related to the [Leasing] Program in the Arctic Refuge."

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 27 of 43

91.    The Secretarial Order directs the Assistant Secretary for Land and Minerals Management, in conjunction with the Assistant Secretary for Fish and Wildlife and Parks and the Solicitor's Office, to publish, within 60 days, a notice of intent in the Federal Register to "initiate the process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies."

92.    The Secretarial Order provides that until the analysis referenced in Paragraph 77 is complete, "the Directors of the [BLM] and the U.S. Fish and Wildlife Service shall not take any action to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation, and shall not process any pending or future applications for such activities."

93.    The Secretarial Order strips DOI (including BLM) officials of discretion and imposes an unconditional mandate not to process any leases or applications for oil and gas operations on the Coastal Plain.

94.    The Secretarial Order constitutes a moratorium on all federal approvals of oil and gas operations on the Coastal Plain (the "Moratorium").   The Moratorium is a substantive rule because it has the force of law and is binding on agency personnel.

95.    The Moratorium did not undergo the mandatory notice-and-comment requirements.  5 U.S.C. § 553.  Moreover, the Secretary made no finding, let alone provide the necessary statement of purpose and need, that the notice-and-comment procedures are inapplicable to the Moratorium.  *See* 5 U.S.C. § 553(a)(3)(B).

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 28 of 43

96.     On June 2, 2021 (the day following issuance of the Secretarial Order), the DOI's Principal Deputy Assistant Secretary for Land and Minerals Management sent AIDEA a notice, dated June 1, 2021, of Suspension of Operations and Production ("SOP"). This SOP provides that it is effective as of June 1, 2021, and states that "[w]hile this SOP is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended."

97.     The SOP implements and furthers the Moratorium issued by the Secretary.

98.     Both the Secretarial Order and the SOP are final agency actions under the APA because they "mark the consummation of the agency's decision making process" and "legal consequences" will flow from them.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

99.     The Secretarial Order and the SOP directly contravene Congress's mandate to conduct the first lease sale by December 22, 2021, and to "issue **any** rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out" Section 20001 of the 2017 Tax Act.  PL 115-97, § 20001(c)(2) (emphasis added).

100.    In August 2021, BLM notified multiple contractors for AIDEA that BLM would delay the processing of the contractors' permit applications to complete archeological surveys on AIDEA's Coastal Plain leases until the Supplemental EIS process is complete.  These notifications expressly referenced the Secretarial Order as the basis for

refusing to process permit applications.   While completing archeological surveys is a necessary first step in any exploration program, including making application for "any rights-of-way or easements," archeological surveys are not "lease operations" and no BLM lease is required to undertake such surveys.   BLM's categorical refusal to process applications for undertaking archeological surveys – surveys for which no BLM lease is required – implements the Secretary's moratorium and directly contravenes Congress's mandated that the Secretary take steps to promote the exploration and development of oil and gas resources within the Coastal Plain.

101.   BLM's categorical refusal to process applications constitutes final agency action.   In addition, this categorical refusal implements the Secretary's Moratorium and directly contravenes Congress's mandate to conduct the first lease sale by December 22, 2021, and to "issue *any* rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out" Section 20001 of the 2017 Tax Act.  PL 115-97, § 20001(c)(2) (emphasis added).

102.   Despite implementing the Moratorium through the SOP and categorically refusing to process applications in furtherance of AIDEA's Coastal Plain leases, DOI has continued to accept over $3.6 million in annual lease payments from AIDEA.  AIDEA has also incurred to-date approximately $1.1 million in encumbered expenses related to planning and permitting for its Coastal Plain exploration program, as well as $6,000 dollars

in costs related to the extension of bonding required under its Coastal Plain leases through 2022.

103.    The Moratorium, and DOI's (including BLM's) implementation thereof, preclude the actions, such as geological and geophysical surveys, necessary to determine "those areas that have the highest potential for the discovery of hydrocarbons," as required by Section 20001(c)(1)(B)(i)(II) of the 2017 Tax Act.  PL 115-97, § 20001(c)(1)(B)(i)(II).

104.    The Moratorium, and DOI's (including BLM's) implementation thereof, preclude AIDEA from developing its lawfully acquired leases, in contravention of Congress's mandate in the 2017 Tax Act.

### F.    Supplemental Environmental Review Process

105.    On August 4, 2021, BLM published in the Federal Register a Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program ("Notice of Intent").

106.    The Notice of Intent demonstrates the Defendants' intent to re-open the January 2021 Lease Sale by examining alternatives that could impact the validity of, or alter the terms of, the leases that were issued in that lease sale.  The alternatives include "[d]esignat[ing] certain areas of the Coastal Plain as open or closed to leasing; permit[ting] less than 2,000 acres of surface development throughout the Coastal Plain; prohibit[ing] surface infrastructure in sensitive areas, and otherwise avoid[ing] or mitigate[ing] impacts from oil and gas activities."

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 31 of 43

107.   The Notice of Intent provides a scoping period that closed on October 4, 2021.  AIDEA submitted scoping comments on October 4, 2021.

108.   The Notice of Intent states that BLM estimates it will complete a Draft Supplemental EIS ("Draft SEIS") approximately six to eight months after the scoping period ends.

109.   The Notice of Intent states that a public comment period of at least 45 days will follow the issuance of the Draft SEIS.

110.   The Notice of Intent states that BLM will complete a Final Supplement Environmental Impact Statement ("Final SEIS") approximately six months after the Draft SEIS comment period ends.

111.   The Notice of Intent provides that a Record of Decision "selecting a program alternative from the Final Supplemental SEIS" will be issued no sooner than 30 days after issuance of the Final SEIS.

112.   Taken together, the Notice of Intent provides that the supplemental environmental review process will last an indefinite time, estimated at well over a year.

113.   Pursuant to BLM's own statements, the Final SEIS will not be issued until after Congress's December 22, 2021, deadline for conducting the first lease sale on the Coastal Plain.

114.   Because BLM has stated its intent to consider alternatives that could affect the validity of or change the terms of previously issued leases, the January 2021 lease sale

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 32 of 43

cannot be considered final in compliance with the 2017 Tax Act until, at the earliest, BLM's supplemental environmental review process is complete and a new "program alternative" has been selected in a new Record of Decision.

## G.   DOI's Reversal on the Adequacy of the Initial Environmental Review Process

115.    Various organizations filed suit challenging the August 2020 Record of Decision approving the Leasing Program.

116.    In the various lawsuits challenging the Record of Decision, Defendants took the position that the environmental analysis underlying the Record of Decision was legally adequate and fully compliant with the requirements of NEPA.

117.    In the Secretarial Order, the Secretary provided no basis for DOI's reversal of its position regarding the adequacy of the Record of Decision.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (in changing its position, an agency must: (1) display awareness of its changing position, (2) show the new policy is permissible under the law, (3) believe the new policy is better, and (4) provide "good reasons" for the new policy); *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 833 (5th

Cir. 2010) ("An agency may not reconsider its own decision if to do so would be arbitrary, capricious, or an abuse of discretion.").

118.    In its June 1, 2021 SOP to AIDEA, DOI provided no basis for the reversal of its position regarding the adequacy of the Record of Decision.

## COUNT ONE
### SECRETARY'S MORATORIUM: VIOLATION OF THE APA FOR FAILURE TO FOLLOW NOTICE-AND-COMMENT REQUIREMENTS

119.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

120.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

121.    The Moratorium is a substantive rule that was issued without the notice-and-comment procedures required by 5 U.S.C. § 553.

122.    The Moratorium does not fit an exception to the notice-and-comment requirements in 5 U.S.C. § 553.

123.    As a result, the Moratorium was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The Moratorium therefore must be vacated and enjoined.

## COUNT TWO
### SECRETARY'S MORATORIUM: VIOLATION OF THE APA FOR ACTION CONTRARY TO LAW

124.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

125.   A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. §§ 706(2)(A), (C).

126.   "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

127.   Congress did not grant DOI the authority to issue or implement a moratorium on all federal approvals of oil and gas operations on the Coastal Plain.  Indeed, the Secretary's Moratorium, and DOI's implementation thereof, directly contravene Congress's mandate to issue lease sales, including one by December 22, 2021, and to issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary" by prohibiting all access for oil and gas activities during the moratorium.  PL 115-97, § 20001(c)(2).

128.   Congress did not grant DOI unfettered discretion to determine which lands within the Coastal Plain to make available to oil and gas development.  Rather, Congress directed the Secretary to develop the lands with "the highest potential for the discovery of hydrocarbons," which BLM has already stated cannot be determined based upon currently available geophysical data.  PL 115-97, § 20001(c)(1)(B)(i)(II).

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 35 of 43

129.    In ANILCA Congress required the President or the Secretary to undertake specific steps to provide notice to the public and Congress prior to effecting any withdrawal over 5,000 acres.

130.    The Moratorium is a withdrawal within the meaning of ANILCA and is greater than 5,000 acres.

131.    On information and belief, the Defendants did not comply with ANILCA's statutorily mandated steps prior to announcing the Moratorium.

132.    In FLPMA, Congress required the Secretary to undertake specific steps, including providing opportunity for public notice and comment and providing a detailed report to Congress, prior to implementing any temporary withdrawal of a tract larger than 5,000 acres.

133.    The Moratorium is a temporary large-tract withdrawal within the meaning of FLPMA.

134.    On information and belief, the Defendants did not comply with these statutorily mandated steps prior to announcing the Moratorium.

135.    Because the Moratorium is not in accordance with law and is in excess of statutory jurisdiction, authority, and limitations, it must be vacated and enjoined.

## COUNT THREE
**DOI's Actions Implementing the Secretary's Moratorium: Violation of the APA for Action Contrary to Law**

136.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

137.   Because DOI's (including BLM's) actions in furtherance of the Moratorium, including the SOP, the categorical refusal to process AIDEA's contractors' applications, and the reopening of the January 2021 lease sale are not in accordance with law and are in excess of statutory jurisdiction, authority, and limitations, such actions must be vacated and enjoined.

## COUNT FOUR
### SECRETARY'S MORATORIUM: VIOLATION OF THE APA FOR AGENCY ACTION UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED

138.   Plaintiffs hereby incorporate and restate all preceding paragraphs.

139.   A "reviewing court shall [] compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

140.   In issuing the Moratorium, the Secretary has unreasonably and unlawfully withheld and delayed the issuance of leases, rights-of-way, and easements for the exploration, development, production, and transportation necessary to carry out Section 20001 of the 2017 Tax Act.

141.   DOI has stated that the Moratorium will remain in place until the supplemental environmental review process is complete, which BLM estimates will take well over a year.  Thus, the Moratorium is scheduled to remain in effect for an indefinite period that will run well past Congress's deadline of December 22, 2021, to conduct the first lease sale on the Coastal Plain.

142.    This Court should invalidate the Moratorium as an unlawful withholding and unreasonable delay of congressionally mandated action.

## COUNT FIVE
### DOI's Actions Implementing the Secretary's Moratorium: Violation of the APA for Agency Action Unlawfully Withheld or Unreasonably Delayed

143.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

144.    Acting in reliance on the Secretarial Order, DOI (including BLM) has unlawfully and unreasonably withheld and delayed the issuance of leases, rights-of-way, and easements for the exploration, development, production, and transportation necessary to carry out Section 20001 of the 2017 Tax Act.

145.    DOI's SOP, which expressly suspends the existing Coastal Plain leases, is scheduled to remain in effect well past Congress's December 22, 2021 deadline to conduct the first Coastal Plain lease sale.

146.    This Court should invalidate DOI's (including BLM's) actions in furtherance of the Moratorium, including the SOP and the categorical refusal to process AIDEA's contractors' applications, as an unlawful withholding and unreasonable delay of congressionally mandated action.

## COUNT SIX
### Secretary's Moratorium: Violation of the Administrative Procedure Act for Arbitrary and Capricious Action

147.    Plaintiffs hereby incorporate and restate all preceding paragraphs.

148.   In prior litigation, Defendants took the position that the environmental review process for the Leasing Program satisfied the requirements of NEPA.

149.   The Moratorium is based on the Secretary's conclusion that the Leasing Program environmental review is marked by legal deficiencies that violate NEPA.  Thus, the Moratorium constitutes a reversal of the position DOI has previously taken.

150.   DOI has failed to articulate any basis for reversing its prior finding that the Leasing Program environmental review was fully compliant with the law.  Instead, DOI's reversal appears to be the direct result of the President's unlawful instructions in Executive Order 13990.  As a result, DOI's reversal in position is arbitrary and capricious.

151.   The Secretary's vague reference to alleged "deficiencies" in the original environmental review process does not identify any basis for reversing DOI's prior findings and provides no reasoned basis for agency action.  For these additional reasons, DOI's reversal in position is arbitrary and capricious.

152.   As a result of such arbitrary and capricious action, the Secretary's Moratorium should be vacated and enjoined.

## COUNT SEVEN
### EXECUTIVE ORDER 13990: ULTRA VIRES ACTION BEYOND THE AUTHORITY CONFERRED BY CONGRESS

153.   Plaintiffs hereby incorporate and restate all preceding paragraphs.

154.   Through Section 4(a) of Executive Order 13990, the President directed the Secretary of the Interior to "place a temporary moratorium on all activities of the Federal

Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program."

155.   No act of Congress authorizes the President to unilaterally impose a moratorium, or to direct federal agencies to impose a moratorium, on all federal approvals of oil and gas operations on the Coastal Plain.  In fact, the Moratorium—demanded by Executive Order 13990 and issued by the Secretary—directly contravenes Congress's mandate to conduct lease sales, including one by December 22, 2021, and to issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary."  PL 115-97, § 20001(c)(2).  As a result, Section 4(a) of Executive Order 13990 is ultra vires as it is beyond the President's authority and should be set aside as unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue:

a.     A declaratory judgment holding that Section 4(a) of Executive Order 13990 is ultra vires;

b.     A declaratory judgment holding that the Moratorium issued by the Secretary is procedurally invalid under the APA because the Secretary failed to promulgate the Moratorium pursuant to the APA's notice-and-comment requirements;

c.     A declaratory judgment holding that the Moratorium is contrary to ANILCA and the 2017 Tax Act;

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 40 of 43

d.      A declaratory judgment holding that the Moratorium constitutes an unlawful withholding and unreasonable delay of agency action, in violation of the APA, ANILCA, and the 2017 Tax Act;

e.      A declaratory judgment holding that the Moratorium is arbitrary and capricious under the APA;

f.      A declaratory judgment holding that DOI's (including BLM's) actions in furtherance of the Moratorium are contrary to ANILCA and the 2017 Tax Act;

g.      A declaratory judgment holding that DOI's (including BLM's) actions in furtherance of the Moratorium constitute an unlawful withholding and unreasonable delay of agency action, in violation of the APA, ANILCA, and the 2017 Tax Act;

h.      A permanent injunction vacating Section 4(a) of Executive Order 13990;

i.      A permanent injunction vacating the Moratorium;

j.      A permanent injunction vacating DOI's (including BLM's) actions in furtherance of the Moratorium, including the SOP and the categorical refusal to process AIDEA's contractors' applications;

k.      A permanent injunction prohibiting Defendants from taking any actions based on Section 4(a) of Executive Order 13990, the Moratorium, or the SOP;

l.      An order compelling Defendants to proceed with leasing and development as prescribed by Congress in ANILCA and the 2017 Tax Act;

    m.     All other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

    Dated this 18th day of March, 2022

<div style="margin-left:40%">

HOLLAND & HART LLP
Attorneys for Alaska Industrial Development
and Export Authority, North Slope Borough,
Arctic Slope Regional Corporation, and
Kaktovik Iñupiat Corporation


_/s/ Kyle W. Parker_
Kyle W. Parker, ABA No. 9212124
William G. Cason, Alaska Bar No. 2009083
1029 W. 3rd Avenue, Suite 550
Anchorage, Alaska 99501
Telephone:    (907) 865-2600
Facsimile:    (907) 865-2680
kwparker@hollandhart.com
wgcason@hollandhart.com

</div>

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 42 of 43

## CERTIFICATE OF SERVICE

I hereby certify on March 18, 2022, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification and electronic service of the same to all counsel of record.

HOLLAND & HART LLP

*/s/ Kyle W. Parker*

18357034_v3

SECOND AMENDED COMPLAINT
*AIDEA v. US Dept. of Interior, et al,* Case No. 3:21-cv-00245-SLG
Page 43 of 43

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,  813 West Northern Lights Blvd., Anchorage, AK  99503, | ) ) ) ) ) | Case No.:  1:23-cv-03126-JMC |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Department of Interior; BUREAU OF LAND MANAGEMENT; and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) | |
| _____ | ) | |

## AMENDED COMPLAINT

Plaintiff Alaska Industrial Development and Export Authority ("AIDEA") brings this

civil action against the above-listed Defendants.  Plaintiff alleges as follows:

### INTRODUCTION

1.      This case challenges under the Administrative Procedure Act and applicable

law the unilateral termination by the Department of the Interior ("DOI") and its Bureau of

Land Management ("BLM") (collectively "DOI") of oil and gas leases entered into by BLM

and Plaintiff Alaska Industrial Development and Export Authority ("AIDEA").  An Act of

Congress directs DOI to facilitate the development of oil and gas resources on the Coastal

Plan of Alaska within the Arctic National Wildlife Refuge ("ANWR" and the "Leasing Program" or "Coastal Plain Program") by awarding leases for the production of such resources and taking additional steps to further the Leasing Program.   P.L. 115-97 § 20001 ("Tax Act").  The Act requires that DOI issues a lease or leases covering at least 400,000 acres for exploration by December, 2021.  DOI (including BLM) is no longer in compliance with that statute.   In January, 2021, DOI issued leases under the Leasing Program to Plaintiff AIDEA (as well as to other parties who subsequently agreed to the voluntary termination of their leases).  On September 6, 2023, without providing Plaintiff AIDEA with the opportunity to defend the validity of it leases as required by due process, and before DOI even completed its ongoing environmental review of the Leasing Program or received public comment in that review, DOI unilaterally terminated AIDEA's leases (the only leases in the Leasing Program still in effect) on the alleged basis that DOI itself violated the law in issuing these Congressionally-mandated leases (the "Lease Cancellation Decision").

2.      DOI's termination of AIDEA's seven lease agreements is unlawful.  First, AIDEA's leases were and are entirely legal, indeed they are Congressionally-mandated. Second, DOI's recent determination its Lease Cancellation Decision that DOI had erred in previous environmental analysis in its 2019 Final Environmental Impact Statement ("FEIS") and its 2020 Record of Decision ("ROD") concerns operational rules for the Coastal Plain Program, such as the number of surface acres that can be occupied by oil production and support facilities, or how best to protect subsistence hunting and fishing. Those operational rules do not implicate the validity of the Congressionally-mandated leases that DOI issued to AIDEA.  DOI failed to provide AIDEA the opportunity to keep its

leases and abide by any corrective operational rules that DOI might impose.  Third, DOI did not err in the 2019 FEIS and 2020 ROD as DOI now claims it did.  Fourth, DOI's decision to terminate the leases was inadequately reasoned, unsupported by facts, and a pretext for DOI's real goal of never allowing drilling in the Coastal Plan to occur.  It frustrates Congress's directive in the Tax Act to hold an initial sale and issue leases for oil and gas production and development by 2021, making the lease cancellation decision arbitrary and capricious. Fifth, DOI's unilateral decision to cancel the leases violates AIDEA's constitutional and statutory due process rights, because DOI failed to provide AIDEA with an administrative process in which it could defend the validity of its leases, before DOI terminated them.  Sixth, because the leased lands are known to contain valuable deposits of oil, a fact recognized by the U.S. Geological Survey, DOI's procedural rules required that DOI obtain a court order authorizing termination of the leases, and DOI failed to obtain any such court order.

**PARTIES**

3.      Plaintiff AIDEA is a public corporation of the State of Alaska. AIDEA was created in 1967 for an important purpose: to "promote, develop and advance the general prosperity and economic welfare of the people of [Alaska], to relieve problems of unemployment, and to create additional employment…." Alaska Statutes § 44.88.070. Through its development project finance programs, AIDEA leverages valuable public resources to support significant private-sector investment, catalyzing enterprise growth to protect the long-term economic health of the State and its citizens. From its inception, AIDEA has worked with Alaska Native Corporations, tribal organizations and indigenous village communities to increase job opportunities and encourage the economic growth of the State, particularly in rural and remote areas, including the North Slope region of Alaska.

3

AIDEA is specifically authorized by the Alaska Legislature to promote and provide financing for Arctic infrastructure development and to enter into lease agreements with government entities necessary to fulfill these purposes.  Alaska Statutes § 44.88.070.

4.     Defendant United States Department of the Interior ("DOI") is an agency within the executive branch of the United States government.

5.     Defendant Deb Haaland is the Secretary of the Interior ("Secretary"). She is sued in her official capacity.

6.     Defendant Bureau of Land Management ("BLM") is an agency within DOI. Accordingly, references to DOI are to both BLM and the Department of Interior.

7.     Defendant Tracy Stone-Manning is the Director of BLM. She is sued in her official capacity.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States.  *See* 28 U.S.C. §§ 1331, 1367(a), 2201; 5 U.S.C. §§ 701-706.

9.     Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities and a substantial part of the events or omissions giving rise to the Complaint occurred within this District. *See* 28 U.S.C. § 1391(e)(1).

10.     DOI's decision to issue the Lease Cancellation Decision was made at DOI headquarters in Washington, DC.  DOI issued the Lease Cancellation Decision and its associated press release from Washington headquarters.

11.     DOI Secretary Haaland personally announced the Lease Cancellation Decision at a press event held on or about September 6, 2023 and DOI Deputy Secretary Beaudreau signed the decision.   Both worked from DOI's Washington, DC headquarters.

**LAW AND FACTS**

A. <u>Congress Directs DOI to Establish and Oil and Gas Program in ANWR</u>.

12.     In 2017, after decades of debate over oil and gas development within ANWR, Congress expressly opened the Coastal Plain of ANWR up for oil and gas development. Section 20001(b)(2)(A) of Pub. Law No. 115-97, known as the "Tax Act," provides: "The Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."

13.     Through the Tax Act, Congress mandated that the Secretary of the Interior take various steps to promote the exploration and development of oil and gas resources within the Coastal Plain, including directing the sale of leases in the Coastal Plain.

14.     Section 20001(c) of the Tax Act directs the Secretary to conduct at least two 400,000-acre Coastal Plain lease sales by December 22, 2024, with the first sale to be completed by December 22, 2021 and the second by December 22, 2024.   PL 115-97, § 20001(c).

15.     Section 20001(c) also provides that "[t]he Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." PL 115-97, § 20001(c)(2).

16.     Section 20001(c) also states that "in administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be

covered by production and support facilities…. during the term of the leases under the oil and gas program under this section."  PL 115-97, § 20001(c)(3).

17.     Finally, the Tax Act borrows the statute and rules governing the nearby National Petroleum Reserve Alaska ("NPRA"), making the NPRA's regulatory structure applicable to the Tax Act, except where inconsistent with a provision of the Tax Act: "Except as otherwise provided in this section, the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." PL 115-97, § 20001(b)(3).

### B. DOI Issues Leases to AIDEA in January, 2021 for the Portions of the Coastal Plain Most Economically Valuable for Oil Production.

18.     After enactment of Tax Act § 20001, DOI began work to implement it. In September 2019, after taking public comment on a draft Environmental Impact Statement ("EIS") DOI issued the 2019 FEIS.   In August, 2020, DOI published its 2020 ROD finalizing the structure of the Coastal Plain oil and gas program.  The 2020 ROD also contains a thorough analysis and review of the Leasing Program's environmental impacts, addresses possible alternative forms of action that DOI could have taken to implement the program, and evaluates the proposed Leasing Program's compliance with other statutory requirements such as assessing the impacts that the Leasing Program may have on subsistence uses of the Coastal Plain under Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. Law No. 96-487.

19.     On December 7, 2020, DOI published in the Federal Register a Notice of Coastal Plain Oil and Gas Lease Sale.  85 Fed. Reg. 78865.  The notice called for the submission of competitive bids for the available leases.  During the open period, AIDEA

submitted bids for the eleven tracts of land DOI had opened to the leasing process.  DOI reviewed the bids and announced on January 6, 2021 that AIDEA was the high bidder and awarded the opportunity to enter into lease agreements on nine of the tracts.

20.    On January 13, 2021, AIDEA entered into oil and gas lease agreements with DOI (specifically BLM) for seven tracts of Coastal Plain land, covering 365,775 acres, more than one fifth of the 1.5 million acres in the Coastal Plain a/k/a the "1002 Area."

21.    The 365,775 acres leased by AIDEA included substantial oil deposits that were both technically and economically recoverable, and thus valuable.  Oil is technically recoverable if technology exists to recover it.    Oil is economically recoverable if the revenues that can be earned by selling it exceeds the costs of obtaining and transporting it.

22.    In Fact Sheet 0028-01, originally issued in 1998 and updated in 2001, the United States Geological Survey ("USGS") found that the Coastal Plain was 95% certain to have at least 4.3 billion barrels of technically recoverable oil.[1]  In the same document USGS found that "nearly 80 percent of the oil" would likely be "in the western part of" the ANWR Coastal Plain, "which is closest to the existing infrastructure" serving Prudhoe Bay and adjacent oil production facilities.[2]  USGS based this conclusion in part on the geology of the western portion of the ANWR Coastal Plan.  It specifically identified this location as the Undeformed Area to the northwest of the March Creek anticline, where the formation rocks are generally horizontal. USCS also noted the presence just to the west and

---

[1]    Fact Sheet, p. 4, available at https://.pubs.usgs.gov/fs/fs-0028-01/fs-0028-01.pdf

[2]    USGS Fact Sheet FS-0028-01, p. 4.

7

northwest of the Coastal Plain of locations where recoverable oil has actually been located within State onshore and offshore leases. [3]

23.     USGS further found that oil in the ANWR Coastal Plain was economically and technically recoverable, to a 95% degree of certainty, so long as the market price for oil exceeded just $19 per barrel.[4]   USGS determined that 3.6 billion barrels of oil were economically recoverable from the Coastal Plain if oil prices reached $40 per barrel.[5]

24.     In September, 2023, when DOI cancelled the leases, the market price for oil was in the mid-to-high $80s or low $90s per barrel.[6]   In January, 2021, when DOI issued AIDEA's leases, the market price was in the mid $40s to low $50s per barrel.[7]

25.     AIDEA was aware of USGS's findings when it bid on selected portions of the ANWR Coastal Plain in January, 2021.  The 365,755 acres leased by AIDEA (more than one fifth of the entire Coastal Plain) covered much of western end of the Coastal Plain, and all or almost all of the portion of the Coastal Plain along ANWR's western and northwestern boundaries, which are the areas nearest to the proven wells on adjacent State land (both onshore and offshore).   Until the Tax Act, drilling within ANWR was prohibited, which is why drilling has not been performed.

26.     Including both the winning bid and payments for rent pursuant to the lease agreement, AIDEA in or about January, 2021 paid over $13 million to DOI to acquire the Coastal Plains lease agreements, which granted the exclusive rights to develop oil and

---

[3]   *Id.,* pp. 1-6 and Figure 2.

[4]   *Id*., p. 6, Figure 6.

[5]   *Id*.

[6]   https://www.eia.gov/dnav/pet/pet_pri_spt_s1_d.htm (viewed October 10, 2023).

[7]   https://www.eia.gov/dnav/pet/hist/RWTCD.htm  (viewed October 10, 2023).

gas production on those lands.  AIDEA then paid approximately $3 million more in rent to DOI.

27.     AIDEA participated in the Coastal Plains Program and incurred such significant expenses in order to further its mission of increasing job opportunities and encouraging economic growth throughout Alaska by accessing and developing the State's natural resources.  Work performed on the leased lands for exploration and development advancing the Coastal Plains oil and gas project would result in numerous benefits to AIDEA and the State of Alaska; such benefits include the creation of new employment opportunities for work both directly and indirectly necessary to develop and initiate oil and gas production; direct revenue from the management and sale of such resources that will be paid to local and State governments, Alaska Native corporations, and Native Villages; and the direct revenue and profits AIDEA will receive from the development of the leased tracts which can then be reinvested into future economic development projects in Alaska.

28.     Cancellation of the lease agreements eliminates AIDEA's property rights in exploring and developing these leases and prevents all of the expected benefits that would have come from developing an oil and gas program on these lands, seriously harming AIDEA.   If there is another lease sale, cancellation puts AIDEA at risk of being outbid by another bidder for the most economically valuable land, the western portion of the Coastal Plain, when AIDEA had already taken the risk of submitting winning bids for that area.

C.  **DOI Suspends AIDEA's Leases, Initiates Supplemental NEPA Proceedings, and Leads AIDEA to Believe it can Defend the Validity of its Leases by Filing Comments in Those Supplemental NEPA Proceedings.**

29.     On January 20, 2021, on the first day of his term, President Biden issued Executive Order 13990, directing DOI to "place a temporary moratorium on all activities of the Federal Government relating to the implementation" of the Coastal Plain Program.

30.     On June 1, 2021, Secretary of the Interior Haaland, issued Order No. 3401 ("SO 3401") in furtherance of the presidential directive articulated in EO 13990. In SO 3401, Haaland directed her Department to "conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies." While that analysis was pending, Haaland directed "a temporary halt on all Department activities related to the Program in the Arctic Refuge."  DOI implemented that halt by, among other things, refusing to process applications by AIDEA and its contractors, for permission to conduct preliminary archeological and seismic surveys.

31.     Also on June 1, 2021, Laura Daniel-Davis, DOI's Principal Deputy Assistant Secretary, sent AIDEA a letter entitled "Decision" which cited SO 3401 and explained that "it is necessary to suspend [AIDEA's] leases and complete further environmental analysis under NEPA," i.e. the National Environmental Policy Act, 42 U.S.C. § 4321, et seq.  Daniel-Davis explained that "the BLM will undertake this additional ***NEPA*** analysis to determine whether the leases should be reaffirmed, voided, or subject to additional mitigation measures," and that when this additional NEPA analysis is "complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the Leases."  (Emphasis added).  NEPA requires the agency to seek comment on a draft EIS, including a draft SEIS, before releasing a final EIS and ROD.  40 CFR 1502.9, 1503.1, and 1503.4; *see* 42 U.S.C. § 4336a(c).   Thus, by informing AIDEA that DOI would use a NEPA process to evaluate the lawfulness of the leases that DOI had already issued to

10

AIDEA, DOI effectively assured AIDEA that it would have an opportunity to submit comments defending its leases.

32.     On August 4, 2021, following SO 3401, DOI began that NEPA process by publishing in the Federal Register a "Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program" ("Scoping Notice").  The Scoping Notice stated that DOI would first take public comments to refine the list of issues to be analyzed in a draft Supplemental Environmental Impact Statement ("SEIS") DOI would develop.  86 Fed.Reg. 41989.  The Scoping Notice specified that "[t]he purpose of this public scoping process is to determine the scope of issues to be addressed and to identify the significant issues, including any legal deficiencies in the Final EIS, related to an oil and gas leasing program within the Coastal Plain. Information received during this process will influence the development of the Supplemental EIS and guide the scope of the environmental analysis." *Id*.  In other words, the Notice solicited public comment only as to the *scope* of the issues to be addressed in the proceeding, not the merits of the identified and to be identified issues.  Confirming that the public could comment on the merits of the issues later, the Scoping Notice explained that DOI would develop a Draft SEIS "which will be made available for public comment for at least 45 days," before DOI made final decisions.  86 Fed.Reg. at 41990.

33.     The Scoping Notice did not invite or require AIDEA to immediately submit comments on whether AIDEA's leases should be invalidated for illegality, or otherwise.  In fact, the Scoping Notice did not mention the possibility that AIDEA's leases might be invalidated for purported illegality.  Responding to the Scoping Notice as DOI invited,

AIDEA submitted timely comments, which it called "scoping comments," addressing the scope of issues to be addressed.

34.     Subsequently, on August 19, 2022, DOI through Ms. Daniel-Davis distributed another letter, entitled "Addendum to Suspension of Operations and Production," which purported to identify another potential "legal defect" in the Coastal Plain EIS.  Once more, Ms. Daniel-Davis assured AIDEA that BLM would use "additional NEPA analysis to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures," meaning that AIDEA would have the benefit of NEPA-required public input opportunities to comment on a draft SEIS.

   **D**. **The Lease Moratorium Litigation.**

35.     On November 4, 2021, Plaintiff AIDEA filed suit against Defendants in *Alaska Industrial Development and Export Authority v. Biden,* Case No. 3:21-cv-00245SLG (USDC Alaska), seeking judicial review of Defendants' suspension of AIDEA leases and its halt of activities to implement the Coastal Plain program (the "Moratorium Litigation").

36.     Throughout the course of the Moratorium Litigation, DOI characterized its halting of the Coastal Plain Program and its suspension of AIDEA's leases as being temporary actions.   DOI described itself as having undertaken "the preparation of a supplemental NEPA analysis, and… a temporary halt on Department activities related to the Program pending completion of that supplemental analysis."  DOI contended "there is a disconnect between the injuries Plaintiffs claim to suffer – temporary inability to obtain economic benefits and information through surveys – and an order directing Defendants to cease the temporary suspension of efforts to implement the Program." Case No. 3:21-cv-00245-SLG, Docket Entry 63 at 18.

37.    DOI's representations as to the temporary nature of the suspension of the lease and Program implementation activities played a central role in the Court's decision to enter judgment in favor of Defendants in the Moratorium Litigation:

> As an initial matter underlying the Moratorium's legality, the Court highlights what are perhaps the Moratorium's most critical elements: its temporary duration and limited scope. Plaintiffs and the State characterize the Moratorium as "indefinitely" suspending the ROD prepared in conjunction with the Program. This characterization is inaccurate. EO 13990 expressly directs only a "*temporary* moratorium," and Secretarial Order 3401 orders a "*temporary* halt on all Department activities related to the Program." The SOP Letter also connotes temporality: "*While this SOP is in place,* no lease operations may transpire on the leases, the terms of the leases are *tolled,* and the lease rentals are *suspended.*"[8]

38.    The Court emphasized that DOIS's decisional documents "contain no statement or suggestion that the Program, including the ROD, is terminated or that AIDEA's leases are cancelled. Agency Defendants have instead evidenced an intent to continue implementing the Program.  The supplemental NEPA review is the current stage of that implementation."[9]  Having so framed the case as being about a temporary lease suspension only, the Court granted summary judgment to DOI and the other Defendants on August 7, 2023.

**E.    DOI Abruptly Shifts From Lease Suspension to Lease Cancellation**.

39.    On September 6, 2023, just 30 days after the Court's August 7, 2023 decision discussed above upholding lease suspension, DOI through its Deputy Secretary Beaudreau issued a lengthy letter, the Lease Cancellation Decision, stating that DOI "has

---

[8]    Case No. 3:21-cv-00245-SLG, Docket Entry 72 at 16-18 (USDC Alaska, Aug. 7, 2023). (emphasis added).

[9]    *Id.* at 17.  The Court emphasized that DOI had not cancelled AIDEA's leases and that "the validity of" any such future lease cancellation "is not before the Court.  *Id.* at n. 66.

determined that the leases were improperly issued due to pre-leasing legal defects…
and... the Department has determined that cancellation is appropriate."

40.     Deputy Secretary Beaudreau asserted that DOI had failed in its 2019 EIS
and its 2020 ROD to "analyze any alternative… that involved fewer than 2,000 acres of
surface development" and had "failed to provide a quantitative estimate of downstream
GHG [Greenhouse Gas] emissions resulting from reduced foreign consumption or
adequately explain why it could not."   Further, in a wholly conclusory fashion, Beaudreau
stated that the ANILCA § 810 analysis of subsistence hunting impact was deficient.  Based
on these purported errors by DOI in proceedings relating to the issuance of AIDEA's
leases, Beaudreau declared AIDEA's leases to be terminated.

41.     Although DOI's suspension decision and other documents issued by DOI
from June, 2021 through August, 2022, reviewed above, had assured AIDEA that the issue
of possible termination of AIDEA's leases would be addressed in a NEPA analysis, and
DOI in the Scoping Notice commencing the NEPA process had assured AIDEA and the
public that DOI would provide an opportunity to comment on a Draft SEIS before DOI took
final action, DOI terminated AIDEA's leases without actually providing AIDEA with that
public comment opportunity.   On September 6, 2023, DOI released both the Lease
Cancellation Decision and the Draft SEIS, thus depriving AIDEA of the chance to file
comments defending the legality of its leases, before DOI acted to terminate the leases.

14

Case 3:24-cv-00051-SLG   Document 11   Filed 01/16/24   Page 14 of 32

42.     During a call with reporters on September 6, 2023, Secretary Haaland explained that she had authorized the lease termination and she stated that "with today's action no one will have rights to drill oil in one of the most sensitive landscapes on Earth."[10]

43.     Despite the sudden cancellation of AIDEA's leases, Secretary Haaland's subordinates told the media on about September 6, 2023 that they "intend to comply with the law" as to the Tax Act's mandate to hold another lease sale by December 2024.[11] Further, in the Lease Cancellation Decision, DOI stated that it is considering taking acreage that had been included in AIDEA's leases and offering it to bidders in a lease sale in 2024.[12] This subjects AIDEA to the risk that other bidders will obtain the acreage for which AIDEA bid, paid, and was subsequently awarded.  Other bidders might outbid AIDEA for the most economically valuable western portion of the Coastal Plain.  Further, Defendants are subjecting AIDEA to the risk that they will not offer to any bidder the acreage that AIDEA bid upon and was awarded in the January, 2021 lease sale.

44.     In the Lease Cancellation Decision, DOI informed AIDEA that the decision to cancel AIDEA's leases was "the final decision of the Department [of the Interior] and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Department Regulations at 43 C.F.R. Part 4."  Thus, there are no administrative remedies that AIDEA must exhaust before bringing this lawsuit.

---

[10] A media report by National Public Radio containing this quotation is available at: https://www.npr.org/2023/09/06/1197945859/anwr-alaska-drilling-oil-gas-leases-environment-energy-climate-change#:~:text=The%20administration%20is%20required%20to,lease%20sale%20by%20December%202024

[11] *See id.*

[12] Lease Cancellation Decision, p. 6.

45.   (a). DOI has announced its intent to hold the second ANWR Coastal Plain lease sale that the Tax Act requires be held by December, 2024, but has not yet publicly released final details establishing the number of acres it will make available in the second lease sale or the location of such tracts of land.   (b).  Based on information and belief, DOI intends to include at least 400,000 acres but less than 800,000 acres in that lease sale.  (c). Alternatively, DOI intends to include at least 800,000 acres in that lease sale.   (d). All of the leases that DOI issued in January, 2021, in the first lease sale required by the Tax Act have been cancelled.  (e).   On information and belief, DOI does not intend to conduct a replacement lease sale (a replacement for the January, 2021 lease sale)  in light of those lease cancellations.  (f). Alternatively, DOI does intend to conduct a replacement lease sale in light of those lease cancellations. [13]

### COUNT I
### THE CANCELLATION OF AIDEA'S LEASES WAS UNJUSTIFIED AND VIOLATES SECTION 20001(C) OF THE TAX ACT

46.   The preceding paragraphs are incorporated by reference.

47.   In Section 20001(c)(1)(B)(ii) of the Tax Act, Congress mandated that DOI hold an initial lease sale under the Coastal Plain Program no later than December 22, 2021.

48.   DOI's decision to cancel the leases it previously issued to AIDEA directly contradicts and frustrates the Tax Act's Congressional mandate.  Because DOI has now

---

[13]   Allegation 45(c) is pleaded as an alternative to allegation 45(b). Allegation 45(f) is pleaded as an alternative to allegation 45(e).

16

terminated or cancelled every Coastal Plain lease issued in the initial sale, DOI has not effectively complied with Congress's mandate to hold an initial lease sale.

49.     DOI in its Lease Cancellation Decision justifies the cancellation of AIDEA's leases based on alleged errors by DOI in its NEPA analysis in the 2019 FEIS and 2020 ROD, its ANILCA § 810 subsistence analysis, and its alleged mis-interpretation of the Tax Act's 2000-acre surface occupancy provision, P.L. 115-97, § 20001(c)(3).    These justifications are flawed.   With respect to NEPA and ANILCA § 810, DOI's asserted justification fails at the threshold, because both statutes exist to inform discretionary agency decision-making.   But the issuance of leases was Congressionally-mandated by the Tax Act, rather than discretionary.  *Dept. of Transportation v. Public Citizen*, 541 U.S. 752, 766-68 (2004); *see also,* 42 U.S.C. § 4336e(10)(B)(vii).   With respect to all these issues identified by DOI in its Lease Cancellation Decision, DOI did not err in its prior decision-making, as is discussed further in Count II below.

50.     Even more fundamentally, there is a complete disconnect between the errors DOI asserts it made and the grossly excessive and unjustified remedy of lease termination. DOI's alleged error in the 2019 FEIS and 2020 ROD involve the details of how operations under the leases will proceed in the future.   This includes how many acres of surface can be occupied by production and support facilities, and steps to be taken in the future to avoid impact on subsistence hunting and fishing.   Whether the leases themselves are legal presents an entirely different question from how lease implementation operational steps should proceed going forward.   Even if the Tax Act *arguendo* leaves room for interpretation by DOI as to some implementation details, the Tax Act imposes a non-discretionary duty

17

on DOI to issue leases by December, 2021 allowing exploration for oil in at least 400,000 acres within the Costal Plain.  Pub. Law No.  115-97, § 20001(c).

51.     The leases are unquestionably legal because Congress directed DOI to issue them.  Even if DOI erred in some manner at to the issues it identified in the Lease Cancellation Decision, DOI's proper course of action was to correct any unlawful program terms and apply the corrected terms to future activities under the leases.  For example, if DOI erred in the 2020 ROD in interpreting the 2,000-acre surface disturbance provision (it did not), DOI should have applied the corrected acreage limitation to operations under AIDEA's leases, such as through imposing permit conditions when AIDEA files applications for permits to construct surface facilities.    By instead invalidating Congressionally-mandated leases, DOI committed one wrong to right another asserted wrong, and put itself out of compliance with the December, 2021 due date set in the Tax Act for selling leases.  As of the present (October 2023), there are no such leases.  DOI also failed to offer AIDEA the opportunity to keep its leases and abide by any changes in Coastal Plain Program rules necessary to correct any errors DOI perceived it had made.

52.     When DOI determines to terminate an oil and gas lease for alleged illegality in the inception, such action is "subject to judicial review."  *Boesche v. Udall*, 373 U.S. 472, 486 (1963) (cited by DOI in the Lease Cancellation Decision).  DOI's excessive and unnecessary action to terminate AIDEA's Congressionally-mandated leases on account of DOI's own alleged errors in its analysis concerning various issues ancillary to the non-discretionary issuance of the leases was "arbitrary, capricious, an abuse of discretion, or not in accordance with law," and so must be set aside.  5 U.S.C. § 706(2).

## COUNT II

## THE LEASE TERMINATION WAS CONTRARY TO THE LAW

18

### AND ARBITRARY AND CAPRICIOUS

53.     The previous paragraphs are incorporated by reference.

54.     For additional reasons, the law and facts do not support DOI's unilateral decision to terminate the leases for alleged illegality at the inception.

### (A).  AIDEA's Leases were not Illegal.

55.     The alleged legal defects DOI relies upon in cancelling AIDEA's leases do not support DOI's conclusion that the leases were illegal, and the explanation in the Lease Cancellation Decision does not support the decision to terminate leases. As a consequence, the Lease Cancellation Decision was contrary to law and arbitrary and capricious.  Any "inherent authority" the Secretary of the Interior has to manage federal lands only conveys authority to administratively cancel oil and gas leases if those leases were invalid at their inception.  *Boesche,* 373 U.S. at 476.[14]  "[T]he existence of a legal defect is a necessary precondition to the Secretary exercising her authority to administratively cancel the lease."  *Solenex, LLC v. Haaland*, 626 F.Supp.3d 110, 119 (D.D.C. 2022).  AIDEA's leases with DOI were valid at their inception and not illegal.

56.     The issue of how to interpret the Tax Act's clause allowing "up to" 2,000 acres of production and support facilities (Tax Act § 20001(c)(3)) did not justify cancellation of AIDEA leases for purported illegality at the inception of the leases.  DOI in the 2020 ROD correctly interpreted the 2,000-acre clause. The clause allows the leaseholder(s) to construct production and support facilities covering "up to" 2,000 acres, leaving the

---

[14]     As discussed in Count IV below, any such inherent authority to administratively terminate oil and gas leases for illegality in the inception is subject to additional constraints that may be imposed by statute or agency regulation and such additional constraints are present here.

leaseholders discretion to utilize less acreage.  Thus, the statutory discretion to disturb less than 2,000 surface acres in the phrase "up to" lies with AIDEA or other Lessees, not DOI.  The "up to" language of the clause cannot be read as allowing DOI the discretion to defeat the Congressionally-mandated oil and gas program through DOI capping the leaseholder(s) at some arbitrary figure substantially less than 2,000 acres.  Moreover, no provision in the leases addresses interpretation of the 2,000-acre clause.

57.     The issue of the downstream effect of greenhouse gasses also does not justify termination of AIDEA leases.  Among other flaws in DOI's new conclusions, the cases cited by DOI in its unilateral Lease Cancellation Decision, *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020), concern leasing on the Outer Continental Shelf, a location where DOI has substantial discretionary control over whether to allow oil and gas projects proceed. *See* 43 U.S.C. § 1344(a)(1).[15]  By contrast, the Tax Act mandates DOI administer an oil and gas program and issue leases, and does not employ any such balancing language.   Tax Act § 20001(b)(2)(A).   Where DOI has discretion to block an activity by declining to issue leases for particular projects, as under the statute governing the Outer Continental Shelf oil and gas drilling program, there might arguably be a reason to require it to conduct a NEPA analysis concerning greenhouse gas effects that could be avoided by declining to issue leases.  But the Tax Act mandates that DOI issue the Coastal Plain Program oil and gas leases.  Accordingly, there was no opportunity for DOI to avoid the alleged greenhouse gas effects through declining to issue

---

[15]     Under that Outer Continental Shelf statute, DOI "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resources values of the outer Continental Shelf and the marine, coastal, and human environments."  43 U.S.C. § 1344(a)(1)

leases.  Based on this, any alleged shortcoming in the NEPA analysis regarding that issue is not an agency error.     *Public Citizen*, 541 U.S. at 76-78; *see* 42 U.S.C. § 4336e(10)(B)(vii).

58.     The other alleged deficiencies in the 2020 ROD and 2020 EIS, including alleged deficiencies in analysis of the claimed impacts on subsistence hunting and fishing, are also not grounds for termination of the AIDEA leases for illegality.  DOI's discussion of these subjects in the Lease Cancellation Decision is conclusory, unsupported, and arbitrary and capricious.  BLM also considered ANILCA section § 810's required analysis of impacts to subsistence hunting and fishing in both Appendix E of the FEIS and again in its ROD.  2020 ROD, pp.  24.  Moreover, DOI in the 2020 ROD cautioned that further NEPA and ANILCA § 810 analysis would need to be conducted before actual oil and gas ground-disturbing operations would be approved, when the leaseholder submitted follow-up applications for permission to engage in exploration and drilling activities.  *Id*., pp. 2, 27.  This is another reason that issuing the leases did not violate NEPA or ANILCA § 810.

59.     Further, the lease cancellation decision also was a change of agency position, as compared to DOI's position in 2020, when DOI found it proper and lawful to issue the leases to AIDEA.  Although agencies can change positions from their prior stances, such changes must include reasoned explanations for the change must be supported by the record before the agency. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  These requirements were not met here.

60.     Finally, as discussed in Count I above, none of DOI's purported errors in the 2019 FEIS, 2020 ROD, and related documents justify the grossly excessive remedy of unilaterally terminating the Congressionally-mandated leases.   This is particularly true

when the lesser remedy of correcting any alleged deficiencies in program rules was available to DOI, and would not have made DOI out of compliance with the statutory mandate to offer leases by December, 2021.

### (B).   DOI's Stated Reasons for Lease Termination Were Pretextual.

61.     The stated grounds for both the earlier lease suspension and the subsequent lease termination were pretextual.  DOI's decisions to suspend and then cancel AIDEA's Coastal Plains leases arose from President Biden's directives in Executive Order 13990, issued on his first day in office.  In campaigning for office, then-Candidate Biden stated unequivocally on the record that he would never allow oil and gas drilling in ANWR.  Asked "[h]ow do you feel about drilling in the Arctic National Wildlife Refuge," he responded on the record: "[t]otally opposed to it.  Completely, totally opposed to it … No more drilling on federal lands period."[16]  Later, in a press conference on September 6, 2023, announcing the lease cancellation, DOI Secretary Haaland stated that she would not allow drilling in ANWR.  She did not state that she was temporarily halting drilling so that issues could be studied before more leases were issued.  Instead, she said (future tense) that drilling will not occur: "no one will have rights to drill for oil in [ANWR]."  Development of the facts will likely reveal additional pronouncements by President Biden, Secretary Haaland, and other senior officials showing that, although DOI might go through the motions of issuing documents and holding proceedings purporting to implement the Tax Act's Coastal Plains Program, the President and Secretary will never allow drilling in ANWR to actually occur.

---

[16]     https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge   (Feb. 9, 2020).

DOI's assertions of pre-lease legal defects (both at the time of lease suspension and at the time of lease cancellation) were a pretext to paper over a predetermined political decision to defeat AIDEA leases and to never allow drilling.  Additionally, given the very short period of time between the August 7, 2023 ruling in the Moratorium Litigation upholding lease suspension and the lengthy September 6, 2023 Lease Cancellation Decision, development of the facts will likely reveal that DOI had already determined to issues the Lease Cancellation Decision while it was representing in the Moratorium Litigation that it was only temporarily suspending AIDEA's leases while it evaluated whether it lawfully issued those leases.

62.    Agency action must be taken with reasoned explanation and genuine justifications.  Although judicial review is sometimes limited to an agency's stated reasons for the action, courts have authority to scrutinize those justifications to evaluate whether the stated reasons are pretextual or mere distractions, and to remand with vacatur agency decision where pretext is established.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019).  Here, President Biden's and Secretary Haaland's pronouncements that they will never allow oil and gas drilling in ANWR contradict rather than compliment their subordinates' statements in the Lease Cancellation Decision and accompanying draft SEIS that the Leasing Program may resume after more environmental analysis is completed and certain alleged errors fixed.  That contradiction distinguishes this case from the more typical case in which an agency's stated reason for an action align with agency leadership's political preferences.  Because the reasons stated for lease termination in the Lease Cancellation Decision were pretextual, the court should vacate that decision and remand it to DOI.  5 U.S.C. § 706(2); *Dep' of Com.*, 139 S.Ct  at 2576.

***

63.     DOI's cancellation of AIDEA's valid lease agreements is not authorized by law and was an abuse of discretion and was arbitrary and capricious decision-making. The court should set aside the lease cancellation.  5 U.S.C. § 706(2).

## COUNT III
## DOI FAILED TO PROVIDE AIDEA WITH DUE PROCESS

64.     The preceding paragraphs are incorporated by reference.

65.     DOI asserts in its Lease Cancellation Decision that it has authority to administratively terminate oil and gas leases for illegality at their inception.  If so, the Supreme Court has indicated that this authority comes with an essential safeguard, specifically, DOI must provide the leaseholder with "full rights of participation" in the administrative proceeding by which DOI decides whether or not there was illegality in the inception of the lease.  *See Boesche*, 373 U.S. at 486 (pointing to this safeguard provided by DOI in that case as supporting the Court's ruling).   Additionally, the due process clause of the Constitution ensures that adequate procedural protections are followed prior to the deprivation of a protected right, such as a leasehold interest.  U.S. Const. Art. V.  In the context of agency adjudicatory and licensing decisions, due process "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976) (quotation omitted).  The "laws under which… agencies operate prescribe the fundamentals of fair play.  They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion." *Fed. Commc'ns Comm'n v. Pottsville Broad. Co.,* 309 U.S. 134, 143 (1940).  Under these principles, a party who is adversely affected by an administrative decision must be afforded

24

proper notice of the action that is contemplated; he must be afforded a meaningful opportunity to participate in the decision-making proceeding, and the action ultimately rendered must express a reasoned conclusion.  The agency must also actually provide any procedural participation opportunities required by statute or rule or that an agency announces it will provide.

66.     DOI's cancellation of AIDEA's leases occurred without DOI first providing AIDEA with an administrative summons, invitation to comment, or other administrative process affording AIDEA an opportunity to defend its leases, including to defend them against allegations that DOI's purported improprieties in issuing the leases should result in the termination of the leases for illegality.  Thus, DOI both failed to comply with the procedural safeguards recognized in *Boesche,* and deprived AIDEA of due process of law.

67.     Moreover, DOI led AIDEA to believe AIDEA would have an opportunity to defend the legality of its leases by submitting comments on a Draft SEIS that DOI was preparing.  DOI then surprised AIDEA by unilaterally terminating AIDEA leases on the same day DOI sought comment on the Draft SEIS.  As discussed above, in June and August, 2021 DOI informed AIDEA of its decision to prepare a SEIS to evaluate whether or not to terminate AIDEA's leases for alleged illegalities involving DOI's prior NEPA analysis.  A procedural requirement for the use of a SEIS in decision-making is the publication of a draft SEIS, an invitation to the public to comment on the draft SEIS, and agency consideration of that comment before reaching a final decision.  40 CFR 1502.9, 1503.1, and 1503.4; *see* 42 U.S.C. § 4336a(c).  As discussed above, DOI confirmed in its Scoping Notice in August, 2021 that it would provide that public comment opportunity on the draft SEIS.  Thus, DOI was obligated to actually provide that process to AIDEA.

25

Instead, DOI abruptly terminated the leases for illegality, just as the public comment opportunity on the draft SEIS began, and before AIDEA could submit argument and evidence in defense of its leases.

68.     A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions [made] … without observance of procedure required by law…" 5 U.S.C. § 706(2).  Because DOI failed to comply with the procedural safeguards recognized in *Boesche* and failed to provide AIDEA with due process before terminating its leases, the Lease Cancellation Decision must be set aside.

## COUNT IV

### DOI'S CANCELLATION OF AIDEA'S LEASES VIOLATED DOI'S REGULATIONS GOVERNING THE LEASE TERMINATION PROCESS

69.     The previous paragraphs are incorporated by reference.

70.     Congress may "withdraw[ ]" the inherent authority of DOI to administratively cancel oil and gas leases for alleged illegality at the inception, *Boesche*, 373 U.S. at 476. Accordingly, Congress and DOI may take lesser steps to restrict or constrain the use of that authority, as has occurred here.  The regulations implementing the Naval Petroleum Reserves Production Act of 1976 ("NPRA") that Congress applied to the ANWR Coastal Plain in the Tax Act include 43 C.F.R. § 3136.3, which governs the cancellation of leases. *See* Tax Act, Pub. Law 115-97, § 20001(b)(3).  That adopted NPRA regulation provides: "Producing leases **or** leases known to contain valuable deposits of oil or gas may be canceled **only** by court order."  § 3136.3(b) (emphasis added).  Although AIDEA's leases were not yet producing leases, they were "leases known to contain valuable deposits of oil or gas," as discussed above and below, and could only be terminated by court order and could not be terminated administratively by DOI.

26

71.     Under DOI and judicial precedent, AIDEA is not required to show that it or anyone else has successfully drilled for oil on the leased land in order for the leased lands to qualify as lands known to contain valuable deposits of leasable resource.  It is enough that the facts engender a belief on the part of a reasonable person that valuable oil is present:

> The meaning of the statutory phrase "known to contain valuable deposits [of a leasable substance]" can be understood from decisions of the Supreme Court defining the phrase "known to be valuable [for a leasable substance]." Actual discovery of … deposits … on the land sought is not required in order that the land may be regarded as "known to contain valuable deposits" …. Competent evidence may consist of proof of the existence of the mineral on adjacent lands as well as proof of geological and other surrounding and external conditions, and all that is required is that the evidence show that the known conditions were plainly such as reasonably to engender the belief that the lands contain the mineral in such quantity and of such quality as to render its extraction profitable and justify expenditures to that end.

*Delta Chemical Co*., 76 IBLA 111, 1983 WL 35057 (Dept. Interior Bd. of Land Appeals, 1983) (citing *U.S. v. Southern Pacific Co*., 251 U.S. 1, 13-14 (1919), *Diamond Coal Co. v. U.S*., 233 U.S. 236, 239-40 (1914), and *U.S. v. U.S. Borax Co*., 58 I.D. 426, 433 (1943)).

72.     As discussed above, USGS found that: (a) the vast majority of oil within the ANWR Coastal Plain is in the western portion of the Plain, which is the non-deformed area, (b) this oil exists in sufficient quantities and situation to be both technically and economically recoverable at current market prices, (c) oil has been actually been found in wells drilled on State lands just to the west and north of the western end of the Coastal Plain, and (d) the western end of the Coastal Plain is the portion closes to the existing oil and gas infrastructure centered around Prudhoe Bay.   AIDEA's leases from DOI covered much of the western portion of the ANWR Coastal Plain, including all or almost all of the land inside ANWR adjacent to the oil discoveries just outside ANWR. In light of these facts,

27

AIDEA reasonably spent substantial sums to lease the favorable locations at the western end of the Coastal Plain.  These and other facts establish a belief on the part of reasonable person that the lands in the western Coastal Plain that AIDEA leased likely contain valuable oil, which satisfies the standards set forth in *Delta Chemical Co., U.S. v. Southern Pacific Co*., and *U.S. v. U.S. Borax Co., supra*, to qualify as land known to contain valuable deposits of a leasable resource.

73.     Because AIDEA's leases were for land known to contain valuable deposits of oil, they can only be terminated by court order. 43 CFR § 3.136.3(b); *see* Pub. Law 115-97, § 20001(b)(3).  DOI's administrative termination of AIDEA's lease without a court order was contrary to law, made without observance of proper procedure, and must be set aside. 5 U.S.C. § 706(2).

## COUNT V
## DOI FAILED TO COMPLY WITH 5 U.S.C.  § 558

74.     DOI has contended that AIDEA's leases, in addition to being leases, were also "licenses" as the term "license" is defined in the APA.[17] The APA broadly defines the term "license" to include any form of "permission" from any federal regulatory agency to engage in regulated activity of any type, whether or not real estate or oil and gas is involved.    5 U.S.C. § 551(8).

---

[17]   In its summary judgment brief in the Lease Moratorium Case, DOI stated:  "The APA definition of 'licensing' … includes 'agency process respecting the grant, renewal, denial, revocation, suspension . . . or conditioning of a license[.]' 5 U.S.C. § 551(9); *see also id*. (8) (stating 'license' includes 'the whole or a part of an agency permit, certificate, approval . . . or other form of permission'). ***The leases fall squarely within these definitions***, and are neither issued nor suspended through rule making."   DOI summary judgment brief, p. 29, n. 10 (Case No. 3:21-cv-00245-SLG, USDC Alaska, Dkt. Entry 63) (emphasis added).

75.      In real estate and substantive oil and gas law, the term "license" more narrowly refers to a non-exclusive, permissive authorization to use the land of another that is revocable and does not rise to the level of being a lease, and so is not an interest in land.  Because AIDEA's leases, were called "leases," by DOI; were issued by DOI based on a directive from Congress expressly requiring DOI to conduct at least two 400,000-acre "lease sales" by December 22, 2024; were issued in exchange for valuable consideration paid by AIDEA; provided for a non-revocable and extendable ten-year term; and conferred many exclusive rights, benefits and obligations upon the parties; AIDEA contends that these conveyances were unequivocally "leases" as that term is ordinarily used in real estate and substantive oil and gas law.   Any other interpretation is strained and unsupported.  However, because DOI now asserts that these conveyances were "licenses," AIDEA alternatively pleads that DOI has not even followed the proper legal requirements for termination of licenses.

76.      If DOI is correct that AIDEA's leases were APA licenses, DOI failed to comply with the procedural and substantive safeguards the APA requires an agency to provide to a licensee before the agency cancels or revokes an APA license.  5 U.S.C. § 558.

77.       Specifically, before "the institution of proceedings" to cancel an APA license, an agency must provide the licensee with both (1) notice of the reasons for which the agency is contemplating cancelling the license, and (2) an opportunity to respond and defend the license.  5 U.S.C.  § 558(c)(1) and (2).    DOI did not provide AIDEA with sufficient notice of the reasons why DOI was considering cancellation of AIDEA's leases / APA licenses and DOI did not provide AIDEA with an opportunity to respond before

29

instituting proceedings to cancel.  Worse, as discussed above, DOI informed AIDEA that it would be using a supplemental EIS process under NEPA to evaluate the legality of AIDEA's leases, meaning that AIDEA would have an opportunity to comment on a draft SEIS before DOI made a final decision. Then, however  DOI unexpectedly and without notice issued the Lease Cancellation Decision on the very same day that it issued a draft SEIS and sought public comment, and thus before AIDEA could file comments. DOI led AIDEA to believe it would have an opportunity for AIDEA to fully respond in comments on the to-be-issued draft SEIS to DOI's concerns regarding AIDEA's leases / APA licenses, but failed to provide that opportunity.

78.     Additionally, § 558 also requires that the agency, before instituting proceedings to cancel an APA license, must provide the holder of the APA license with the "opportunity to … achieve compliance with lawful requirements," i.e. to cure any matters that might otherwise justify cancellation of the APA license.  5 U.S.C. § 558(c)(2).  The matters DOI in its Lease Cancellation Decision stated justified lease cancellation were purported defects in how DOI in its 2020 ROD and 2019 EIS had analyzed the environmental impact and subsistence hunting and fishing impact of oil and gas development in ANWR.   As discussed in Count II above, those defects were purported rather than real.  But if the defects were real, they were entirely curable through DOI fixing its own errors as regulator through imposing additional restrictions on AIDEA's activities under the leases, to further protect the environment and subsistence hunting and fishing. AIDEA as the holder of the leases / APA licenses could then complete any cure that might be required, by complying with any such supplemental restrictions lawfully ordered by DOI. Instead of providing an opportunity to cure as required by § 558(c)(2), DOI canceled the

AIDEA leases / APA licenses for purported defects that, if real, were curable, and so DOI failed to comply with APA § 558(c)(2).

79.      DOI's cancellation of AIDEA's leases / APA licenses contravened 5 U.S.C. § 558, and so must be set aside, 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue:

1.      A declaratory judgment invalidating DOI's cancellation of AIDEA's leases;

2.      An order directing, on a preliminary and final basis, that Defendants proceed with leasing, exploration, and development of the ANWR Coastal Plain as prescribed in the Tax Act, § 20001; and

3.      All other relief within the Court's jurisdiction to grant which this Court deems just, equitable, and according to law; including but not limited to attorneys' fees and costs.

DATED this 16th day of January, 2024.


BIRCH HORTON BITTNER & CHEROT

Attorneys for Plaintiff ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY

Of Counsel:                                      By:

David Karl Gross, ABA #9611065*      /s/ James H. Lister
Zoe A. Eisberg, ABA #1911094*         James H. Lister, DC Bar 447878
Brian V. Gerd, DC Bar #9001929        Birch Horton Bittner & Cherot
Birch Horton Bittner & Cherot          Suite 350, 1150 Connecticut Ave.
510 L Street, Suite 700                   Washington, DC.  20036
Anchorage, AK  99501                     202-862-8368 (phone)
907-276-1550 (phone)                     202-659-1027(fax)
907-276-3680 (fax)                         jlister@bhb.com
dgross@bhb.com
zeisberg@bhb.com
bgerd@bhb.com

31

*\* Pro Hac Vice Motions are being Prepared*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,  813 West Northern Lights Blvd., Anchorage, AK  99503, )<br><br>Plaintiff, )<br><br>vs. )<br><br>U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Department of Interior; BUREAU OF LAND MANAGEMENT; and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; )<br><br>Defendants. )  | Case No.:  1:23-cv-03126-JMC |

~~COMPLAINT~~

AMENDED COMPLAINT

Plaintiff Alaska Industrial Development and Export Authority ("AIDEA") brings this civil action against the above-listed Defendants.  Plaintiff alleges as follows:

INTRODUCTION

1.      This case challenges under the Administrative Procedure Act and applicable law the unilateral termination by the Department of the Interior ("DOI") and its Bureau of Land Management ("BLM") (collectively "DOI") of oil and gas leases entered into by BLM and Plaintiff Alaska Industrial Development and Export Authority ("AIDEA").  An Act of

1

Congress directs DOI to facilitate the development of oil and gas resources on the Coastal Plan of Alaska within the Arctic National Wildlife Refuge ("ANWR" and the "Leasing Program" or "Coastal Plain Program") by awarding leases for the production of such resources and taking additional steps to further the Leasing Program.    P.L. 115-97 § 20001 ("Tax Act").  The Act requires that DOI issues a lease or leases covering at least 400,000 acres for exploration by December, 2021.  DOI (including BLM) is no longer in compliance with that statute.  In January, 2021, DOI issued leases under the Leasing Program to Plaintiff AIDEA (as well as to other parties who subsequently agreed to the voluntary termination of their leases).  On September 6, 2023, without providing Plaintiff AIDEA with the opportunity to defend the validity of it leases as required by due process, and before DOI even completed its ongoing environmental review of the Leasing Program or received public comment in that review, DOI unilaterally terminated AIDEA's leases (the only leases in the Leasing Program still in effect) on the alleged basis that DOI itself violated the law in issuing these Congressionally-mandated leases (the "Lease Cancellation Decision").

2.     DOI's termination of AIDEA's seven lease agreements is unlawful.  First, AIDEA's leases were and are entirely legal, indeed they are Congressionally-mandated. Second, DOI's recent determination its Lease Cancellation Decision that DOI had erred in previous environmental analysis in its 2019 Final Environmental Impact Statement ("FEIS") and its 2020 Record of Decision ("ROD") concerns operational rules for the Coastal Plain Program, such as the number of surface acres that can be occupied by oil production and support facilities, or how best to protect subsistence hunting and fishing. Those operational rules do not implicate the validity of the Congressionally-mandated

2

leases that DOI issued to AIDEA.  DOI failed to provide AIDEA the opportunity to keep its leases and abide by any corrective operational rules that DOI might impose.  Third, DOI did not err in the 2019 FEIS and 2020 ROD as DOI now claims it did.  Fourth, DOI's decision to terminate the leases was inadequately reasoned, unsupported by facts, and a pretext for DOI's real goal of never allowing drilling in the Coastal Plan to occur.  It frustrates Congress's directive in the Tax Act to hold an initial sale and issue leases for oil and gas production and development by 2021, making the lease cancellation decision arbitrary and capricious. Fifth, DOI's unilateral decision to cancel the leases violates AIDEA's constitutional and statutory due process rights, because DOI failed to provide AIDEA with an administrative process in which it could defend the validity of its leases, before DOI terminated them.  Sixth, because the leased lands are known to contain valuable deposits of oil, a fact recognized by the U.S. Geological Survey, DOI's procedural rules required that DOI obtain a court order authorizing termination of the leases, and DOI failed to obtain any such court order.

## PARTIES

3.     Plaintiff AIDEA is a public corporation of the State of Alaska. AIDEA was created in 1967 for an important purpose: to "promote, develop and advance the general prosperity and economic welfare of the people of [Alaska], to relieve problems of unemployment, and to create additional employment…." Alaska Statutes § 44.88.070. Through its development project finance programs, AIDEA leverages valuable public resources to support significant private-sector investment, catalyzing enterprise growth to protect the long-term economic health of the State and its citizens. From its inception, AIDEA has worked with Alaska Native Corporations, tribal organizations and indigenous village communities to increase job opportunities and encourage the economic growth of

3

the State, particularly in rural and remote areas, including the North Slope region of Alaska. AIDEA is specifically authorized by the Alaska Legislature to promote and provide financing for Arctic infrastructure development and to enter into lease agreements with government entities necessary to fulfill these purposes.  Alaska Statutes § 44.88.070.

4.      Defendant United States Department of the Interior ("DOI") is an agency within the executive branch of the United States government.

5.      Defendant Deb Haaland is the Secretary of the Interior ("Secretary"). She is sued in her official capacity.

6.      Defendant Bureau of Land Management ("BLM") is an agency within DOI. Accordingly, references to DOI are to both BLM and the Department of Interior.

7.      Defendant Tracy Stone-Manning is the Director of BLM. She is sued in her official capacity.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States.  *See* 28 U.S.C. §§ 1331, 1367(a), 2201; 5 U.S.C. §§ 701-706.

9.      Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities and a substantial part of the events or omissions giving rise to the Complaint occurred within this District. *See* 28 U.S.C. § 1391(e)(1).

10.     DOI's decision to issue the Lease Cancellation Decision was made at DOI headquarters in Washington, DC.  DOI issued the Lease Cancellation Decision and its associated press release from Washington headquarters.

4

11.     DOI Secretary Haaland personally announced the Lease Cancellation Decision at a press event held on or about September 6, 2023 and DOI Deputy Secretary Beaudreau signed the decision.   Both worked from DOI's Washington, DC headquarters.

## LAW AND FACTS

### A. Congress Directs DOI to Establish and Oil and Gas Program in ANWR.

12.     In 2017, after decades of debate over oil and gas development within ANWR, Congress expressly opened the Coastal Plain of ANWR up for oil and gas development. Section 20001(b)(2)(A) of Pub. Law No. 115-97, known as the "Tax Act," provides: "The Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."

13.     Through the Tax Act, Congress mandated that the Secretary of the Interior take various steps to promote the exploration and development of oil and gas resources within the Coastal Plain, including directing the sale of leases in the Coastal Plain.

14.     Section 20001(c) of the Tax Act directs the Secretary to conduct at least two 400,000-acre Coastal Plain lease sales by December 22, 2024, with the first sale to be completed by December 22, 2021 and the second by December 22, 2024.  PL 115-97, § 20001(c).

15.     Section 20001(c) also provides that "[t]he Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." PL 115-97, § 20001(c)(2).

5

16.     Section 20001(c) also states that "in administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities…. during the term of the leases under the oil and gas program under this section."  PL 115-97, § 20001(c)(3).

17.     Finally, the Tax Act borrows the statute and rules governing the nearby National Petroleum Reserve Alaska ("NPRA"), making the NPRA's regulatory structure applicable to the Tax Act, except where inconsistent with a provision of the Tax Act: "Except as otherwise provided in this section, the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." PL 115-97, § 20001(b)(3).

### B. DOI Issues Leases to AIDEA in January, 2021 for the Portions of the Coastal Plain Most Economically Valuable for Oil Production.

18.     After enactment of Tax Act § 20001, DOI began work to implement it. In September 2019, after taking public comment on a draft Environmental Impact Statement ("EIS") DOI issued the 2019 FEIS.   In August, 2020, DOI published its 2020 ROD finalizing the structure of the Coastal Plain oil and gas program.  The 2020 ROD also contains a thorough analysis and review of the Leasing Program's environmental impacts, addresses possible alternative forms of action that DOI could have taken to implement the program, and evaluates the proposed Leasing Program's compliance with other statutory requirements such as assessing the impacts that the Leasing Program may have on subsistence uses of the Coastal Plain under Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. Law No. 96-487.

1566210.V3

19.    On December 7, 2020, DOI published in the Federal Register a Notice of Coastal Plain Oil and Gas Lease Sale.  85 Fed. Reg. 78865.  The notice called for the submission of competitive bids for the available leases.  During the open period, AIDEA submitted bids for the eleven tracts of land DOI had opened to the leasing process.  DOI reviewed the bids and announced on January 6, 2021 that AIDEA was the high bidder and awarded the opportunity to enter into lease agreements on nine of the tracts.

20.    On January 13, 2021, AIDEA entered into oil and gas lease agreements with DOI (specifically BLM) for seven tracts of Coastal Plain land, covering 365,775 acres, more than one fifth of the 1.5 million acres in the Coastal Plain a/k/a the "1002 Area."

21.    The 365,775 acres leased by AIDEA included substantial oil deposits that were both technically and economically recoverable, and thus valuable.  Oil is technically recoverable if technology exists to recover it.   Oil is economically recoverable if the revenues that can be earned by selling it exceeds the costs of obtaining and transporting it.

22.    In Fact Sheet 0028-01, originally issued in 1998 and updated in 2001, the United States Geological Survey ("USGS") found that the Coastal Plain was 95% certain to have at least 4.3 billion barrels of technically recoverable oil.[1]  In the same document USGS found that "nearly 80 percent of the oil" would likely be "in the western part of" the ANWR Coastal Plain, "which is closest to the existing infrastructure" serving Prudhoe Bay and adjacent oil production facilities.[2]   USGS based this conclusion in part on the geology of the western portion of the ANWR Coastal Plan.  It specifically identified this location as

---

[1]    Fact Sheet, p. 4, available at https://.pubs.usgs.gov/fs/fs-0028-01/fs-0028-01.pdf

[2]    USGS Fact Sheet FS-0028-01, p. 4.

7

the Undeformed Area to the northwest of the March Creek anticline, where the formation rocks are generally horizontal. USCS also noted the presence just to the west and northwest of the Coastal Plain of locations where recoverable oil has actually been located within State onshore and offshore leases. [3]

23.    USGS further found that oil in the ANWR Coastal Plain was economically and technically recoverable, to a 95% degree of certainty, so long as the market price for oil exceeded just $19 per barrel.[4]   USGS determined that 3.6 billion barrels of oil were economically recoverable from the Coastal Plain if oil prices reached $40 per barrel.[5]

24.    In September, 2023, when DOI cancelled the leases, the market price for oil was in the mid-to-high $80s or low $90s per barrel.[6]   In January, 2021, when DOI issued AIDEA's leases, the market price was in the mid $40s to low $50s per barrel.[7]

25.    AIDEA was aware of USGS's findings when it bid on selected portions of the ANWR Coastal Plain in January, 2021.  The 365,755 acres leased by AIDEA (more than one fifth of the entire Coastal Plain) covered much of western end of the Coastal Plain, and all or almost all of the portion of the Coastal Plain along ANWR's western and northwestern boundaries, which are the areas nearest to the proven wells on adjacent State land (both onshore and offshore).   Until the Tax Act, drilling within ANWR was prohibited, which is why drilling has not been performed.

---

[3]   *Id.,* pp. 1-6 and Figure 2.

[4]   *Id*., p. 6, Figure 6.

[5]   *Id*.

[6]   https://www.eia.gov/dnav/pet/pet_pri_spt_s1_d.htm (viewed October 10, 2023).

[7]   https://www.eia.gov/dnav/pet/hist/RWTCD.htm  (viewed October 10, 2023).

1566210.V3

26.     Including both the winning bid and payments for rent pursuant to the lease agreement, AIDEA in or about January, 2021 paid over $13 million to DOI to acquire the Coastal Plains lease agreements, which granted the exclusive rights to develop oil and gas production on those lands.  AIDEA then paid approximately $3 million more in rent to DOI.

27.     AIDEA participated in the Coastal Plains Program and incurred such significant expenses in order to further its mission of increasing job opportunities and encouraging economic growth throughout Alaska by accessing and developing the State's natural resources.  Work performed on the leased lands for exploration and development advancing the Coastal Plains oil and gas project would result in numerous benefits to AIDEA and the State of Alaska; such benefits include the creation of new employment opportunities for work both directly and indirectly necessary to develop and initiate oil and gas production; direct revenue from the management and sale of such resources that will be paid to local and State governments, Alaska Native corporations, and Native Villages; and the direct revenue and profits AIDEA will receive from the development of the leased tracts which can then be reinvested into future economic development projects in Alaska.

28.     Cancellation of the lease agreements eliminates AIDEA's property rights in exploring and developing these leases and prevents all of the expected benefits that would have come from developing an oil and gas program on these lands, seriously harming AIDEA.   If there is another lease sale, cancellation puts AIDEA at risk of being outbid by another bidder for the most economically valuable land, the western portion of the Coastal Plain, when AIDEA had already taken the risk of submitting winning bids for that area.

**C. <u>DOI Suspends AIDEA's Leases, Initiates Supplemental NEPA Proceedings, and Leads AIDEA to Believe it can Defend the Validity of</u>**

1566210.V3

**its Leases by Filing Comments in Those Supplemental NEPA Proceedings.**

29.    On January 20, 2021, on the first day of his term, President Biden issued Executive Order 13990, directing DOI to "place a temporary moratorium on all activities of the Federal Government relating to the implementation" of the Coastal Plain Program.

30.    On June 1, 2021, Secretary of the Interior Haaland, issued Order No. 3401 ("SO 3401") in furtherance of the presidential directive articulated in EO 13990. In SO 3401, Haaland directed her Department to "conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies." While that analysis was pending, Haaland directed "a temporary halt on all Department activities related to the Program in the Arctic Refuge."  DOI implemented that halt by, among other things, refusing to process applications by AIDEA and its contractors, for permission to conduct preliminary archeological and seismic surveys.

31.    Also on June 1, 2021, Laura Daniel-Davis, DOI's Principal Deputy Assistant Secretary, sent AIDEA a letter entitled "Decision" which cited SO 3401 and explained that "it is necessary to suspend [AIDEA's] leases and complete further environmental analysis under NEPA," i.e. the National Environmental Policy Act, 42 U.S.C. § 4321, et seq.  Daniel-Davis explained that "the BLM will undertake this additional *NEPA* analysis to determine whether the leases should be reaffirmed, voided, or subject to additional mitigation measures," and that when this additional NEPA analysis is "complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the Leases."  (Emphasis added).  NEPA requires the agency to seek comment on a draft EIS, including a draft SEIS, before releasing a final EIS and ROD.  40 CFR 1502.9, 1503.1, and 1503.4; *see* 42 U.S.C. § 4336a(c).   Thus, by informing AIDEA that DOI would use a

1566210.V3

NEPA process to evaluate the lawfulness of the leases that DOI had already issued to AIDEA, DOI effectively assured AIDEA that it would have an opportunity to submit comments defending its leases.

32.    On August 4, 2021, following SO 3401, DOI began that NEPA process by publishing in the Federal Register a "Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program" ("Scoping Notice").  The Scoping Notice stated that DOI would first take public comments to refine the list of issues to be analyzed in a draft Supplemental Environmental Impact Statement ("SEIS") DOI would develop.  86 Fed.Reg. 41989.   The Scoping Notice specified that "[t]he purpose of this public scoping process is to determine the scope of issues to be addressed and to identify the significant issues, including any legal deficiencies in the Final EIS, related to an oil and gas leasing program within the Coastal Plain. Information received during this process will influence the development of the Supplemental EIS and guide the scope of the environmental analysis." *Id*.  In other words, the Notice solicited public comment only as to the *scope* of the issues to be addressed in the proceeding, not the merits of the identified and to be identified issues.  Confirming that the public could comment on the merits of the issues later, the Scoping Notice explained that DOI would develop a Draft SEIS "which will be made available for public comment for at least 45 days," before DOI made final decisions.  86 Fed.Reg. at 41990.

33.    The Scoping Notice did not invite or require AIDEA to immediately submit comments on whether AIDEA's leases should be invalidated for illegality, or otherwise.  In fact, the Scoping Notice did not mention the possibility that AIDEA's leases might be invalidated for purported illegality.  Responding to the Scoping Notice as DOI invited,

AIDEA submitted timely comments, which it called "scoping comments," addressing the scope of issues to be addressed.

34.     Subsequently, on August 19, 2022, DOI through Ms. Daniel-Davis distributed another letter, entitled "Addendum to Suspension of Operations and Production," which purported to identify another potential "legal defect" in the Coastal Plain EIS.  Once more, Ms. Daniel-Davis assured AIDEA that BLM would use "additional NEPA analysis to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures," meaning that AIDEA would have the benefit of NEPA-required public input opportunities to comment on a draft SEIS.

### D. __The Lease Moratorium Litigation.__

35.     On November 4, 2021, Plaintiff AIDEA filed suit against Defendants in *Alaska Industrial Development and Export Authority v. Biden,* Case No. 3:21-cv-00245SLG (USDC Alaska), seeking judicial review of Defendants' suspension of AIDEA leases and its halt of activities to implement the Coastal Plain program (the "Moratorium Litigation").

36.     Throughout the course of the Moratorium Litigation, DOI characterized its halting of the Coastal Plain Program and its suspension of AIDEA's leases as being temporary actions.  DOI described itself as having undertaken "the preparation of a supplemental NEPA analysis, and… a temporary halt on Department activities related to the Program pending completion of that supplemental analysis."  DOI contended "there is a disconnect between the injuries Plaintiffs claim to suffer – temporary inability to obtain economic benefits and information through surveys – and an order directing Defendants to cease the temporary suspension of efforts to implement the Program." Case No. 3:21-cv-00245-SLG, Docket Entry 63 at 18.

12

37.     DOI's representations as to the temporary nature of the suspension of the lease and Program implementation activities played a central role in the Court's decision to enter judgment in favor of Defendants in the Moratorium Litigation:

> As an initial matter underlying the Moratorium's legality, the Court highlights what are perhaps the Moratorium's most critical elements: its temporary duration and limited scope. Plaintiffs and the State characterize the Moratorium as "indefinitely" suspending the ROD prepared in conjunction with the Program. This characterization is inaccurate. EO 13990 expressly directs only a "*temporary* moratorium," and Secretarial Order 3401 orders a "*temporary* halt on all Department activities related to the Program." The SOP Letter also connotes temporality: "*While this SOP is in place,* no lease operations may transpire on the leases, the terms of the leases are *tolled,* and the lease rentals are *suspended."*[8]

38.     The Court emphasized that DOIS's decisional documents "contain no statement or suggestion that the Program, including the ROD, is terminated or that AIDEA's leases are cancelled. Agency Defendants have instead evidenced an intent to continue implementing the Program.  The supplemental NEPA review is the current stage of that implementation."[9]  Having so framed the case as being about a temporary lease suspension only, the Court granted summary judgment to DOI and the other Defendants on August 7, 2023.

**E.     DOI Abruptly Shifts From Lease Suspension to Lease Cancellation**.

39.     On September 6, 2023, just 30 days after the Court's August 7, 2023 decision discussed above upholding lease suspension, DOI through its Deputy Secretary Beaudreau issued a lengthy letter, the Lease Cancellation Decision, stating that DOI "has

---

[8]     Case No. 3:21-cv-00245-SLG, Docket Entry 72 at 16-18 (USDC Alaska, Aug. 7, 2023). (emphasis added).

[9]     *Id*. at 17.  The Court emphasized that DOI had not cancelled AIDEA's leases and that "the validity of" any such future lease cancellation "is not before the Court.  *Id*. at n. 66.

determined that the leases were improperly issued due to pre-leasing legal defects… and... the Department has determined that cancellation is appropriate."

40.    Deputy Secretary Beaudreau asserted that DOI had failed in its 2019 EIS and its 2020 ROD to "analyze any alternative… that involved fewer than 2,000 acres of surface development" and had "failed to provide a quantitative estimate of downstream GHG [Greenhouse Gas] emissions resulting from reduced foreign consumption or adequately explain why it could not."   Further, in a wholly conclusory fashion, Beaudreau stated that the ANILCA § 810 analysis of subsistence hunting impact was deficient.  Based on these purported errors by DOI in proceedings relating to the issuance of AIDEA's leases, Beaudreau declared AIDEA's leases to be terminated.

41.    Although DOI's suspension decision and other documents issued by DOI from June, 2021 through August, 2022, reviewed above, had assured AIDEA that the issue of possible termination of AIDEA's leases would be addressed in a NEPA analysis, and DOI in the Scoping Notice commencing the NEPA process had assured AIDEA and the public that DOI would provide an opportunity to comment on a Draft SEIS before DOI took final action, DOI terminated AIDEA's leases without actually providing AIDEA with that public comment opportunity.   On September 6, 2023, DOI released both the Lease Cancellation Decision and the Draft SEIS, thus depriving AIDEA of the chance to file comments defending the legality of its leases, before DOI acted to terminate the leases.

14

Case 1:24-cv-01017-EGB   Document 5   Filed 08/28/24   Page 97 of 114

42.     During a call with reporters on September 6, 2023, Secretary Haaland explained that she had authorized the lease termination and she stated that "with today's action no one will have rights to drill oil in one of the most sensitive landscapes on Earth."[10]

43.     Despite the sudden cancellation of AIDEA's leases, Secretary Haaland's subordinates told the media on about September 6, 2023 that they "intend to comply with the law" as to the Tax Act's mandate to hold another lease sale by December 2024.[11] Further, in the Lease Cancellation Decision, DOI stated that it is considering taking acreage that had been included in AIDEA's leases and offering it to bidders in a lease sale in 2024.[12]  This subjects AIDEA to the risk that other bidders will obtain the acreage for which AIDEA bid, paid, and was subsequently awarded.  Other bidders might outbid AIDEA for the most economically valuable western portion of the Coastal Plain.  Further, Defendants are subjecting AIDEA to the risk that they will not offer to any bidder the acreage that AIDEA bid upon and was awarded in the January, 2021 lease sale.

44.     In the Lease Cancellation Decision, DOI informed AIDEA that the decision to cancel AIDEA's leases was "the final decision of the Department [of the Interior] and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Department Regulations at 43 C.F.R. Part 4."  Thus, there are no administrative remedies that AIDEA must exhaust before bringing this lawsuit.

---

[10] A media report by National Public Radio containing this quotation is available at: https://www.npr.org/2023/09/06/1197945859/anwr-alaska-drilling-oil-gas-leases-environment-energy-climate-change#:~:text=The%20administration%20is%20required%20to,lease%20sale%20by%20December%202024

[11] *See id.*

[12] Lease Cancellation Decision, p. 6.

15

Case 3:24-cv-00051-SLG   Document 11-1   Filed 01/16/24   Page 15 of 32

45.     ~~DOI has not sought to hold a replacement lease sale to make up for the termination of the leases issued in the January, 2021 sale.~~

45.     (a). DOI has announced its intent to hold the second ANWR Coastal Plain lease sale that the Tax Act requires be held by December, 2024, but has not yet publicly released final details establishing the number of acres it will make available in the second lease sale or the location of such tracts of land.  (b).  Based on information and belief, DOI intends to include at least 400,000 acres but less than 800,000 acres in that lease sale.  (c). Alternatively, DOI intends to include at least 800,000 acres in that lease sale.   (d). All of the leases that DOI issued in January, 2021, in the first lease sale required by the Tax Act have been cancelled.  (e).  On information and belief, DOI does not intend to conduct a replacement lease sale (a replacement for the January, 2021 lease sale)  in light of those lease cancellations.  (f). Alternatively, DOI does intend to conduct a replacement lease sale in light of those lease cancellations.[13]

### COUNT I
### THE CANCELLATION OF AIDEA'S LEASES WAS UNJUSTIFIED
### AND VIOLATES SECTION 20001(C) OF THE TAX ACT

46.     The preceding paragraphs are incorporated by reference.

47.     In Section 20001(c)(1)(B)(ii) of the Tax Act, Congress mandated that DOI hold an initial lease sale under the Coastal Plain Program no later than December 22, 2021.

---

[13]     Allegation 45(c) is pleaded as an alternative to allegation 45(b). Allegation 45(f) is pleaded as an alternative to allegation 45(e).

16

48.     DOI's decision to cancel the leases it previously issued to AIDEA directly contradicts and frustrates the Tax Act's Congressional mandate.  Because DOI has now terminated or cancelled every Coastal Plain lease issued in the initial sale, DOI has not effectively complied with Congress's mandate to hold an initial lease sale.

49.     DOI in its Lease Cancellation Decision justifies the cancellation of AIDEA's leases based on alleged errors by DOI in its NEPA analysis in the 2019 FEIS and 2020 ROD, its ANILCA § 810 subsistence analysis, and its alleged mis-interpretation of the Tax Act's 2000-acre surface occupancy provision, P.L. 115-97, § 20001(c)(3).   These justifications are flawed.  With respect to NEPA and ANILCA § 810, DOI's asserted justification fails at the threshold, because both statutes exist to inform discretionary agency decision-making.  But the issuance of leases was Congressionally-mandated by the Tax Act, rather than discretionary.  *Dept. of Transportation v. Public Citizen*, 541 U.S. 752, 766-68 (2004); *see also,* 42 U.S.C. § 4336e(10)(B)(vii).  With respect to all these issues identified by DOI in its Lease Cancellation Decision, DOI did not err in its prior decision-making, as is discussed further in Count II below.

50.     Even more fundamentally, there is a complete disconnect between the errors DOI asserts it made and the grossly excessive and unjustified remedy of lease termination. DOI's alleged error in the 2019 FEIS and 2020 ROD involve the details of how operations under the leases will proceed in the future.  This includes how many acres of surface can be occupied by production and support facilities, and steps to be taken in the future to avoid impact on subsistence hunting and fishing.  Whether the leases themselves are legal presents an entirely different question from how lease implementation operational steps should proceed going forward.  Even if the Tax Act *arguendo* leaves room for interpretation

17

by DOI as to some implementation details, the Tax Act imposes a non-discretionary duty on DOI to issue leases by December, 2021 allowing exploration for oil in at least 400,000 acres within the Costal Plain.  Pub. Law No.  115-97, § 20001(c).

51.     The leases are unquestionably legal because Congress directed DOI to issue them.  Even if DOI erred in some manner at to the issues it identified in the Lease Cancellation Decision, DOI's proper course of action was to correct any unlawful program terms and apply the corrected terms to future activities under the leases.  For example, if DOI erred in the 2020 ROD in interpreting the 2,000-acre surface disturbance provision (it did not), DOI should have applied the corrected acreage limitation to operations under AIDEA's leases, such as through imposing permit conditions when AIDEA files applications for permits to construct surface facilities.   By instead invalidating Congressionally-mandated leases, DOI committed one wrong to right another asserted wrong, and put itself out of compliance with the December, 2021 due date set in the Tax Act for selling leases.  As of the present (October 2023), there are no such leases.  DOI also failed to offer AIDEA the opportunity to keep its leases and abide by any changes in Coastal Plain Program rules necessary to correct any errors DOI perceived it had made.

52.     When DOI determines to terminate an oil and gas lease for alleged illegality in the inception, such action is "subject to judicial review."  *Boesche v. Udall*, 373 U.S. 472, 486 (1963) (cited by DOI in the Lease Cancellation Decision).   DOI's excessive and unnecessary action to terminate AIDEA's Congressionally-mandated leases on account of DOI's own alleged errors in its analysis concerning various issues ancillary to the non-discretionary issuance of the leases was "arbitrary, capricious, an abuse of discretion, or not in accordance with law," and so must be set aside.  5 U.S.C. § 706(2).

18

**COUNT II**

**THE LEASE TERMINATION WAS CONTRARY TO THE LAW
AND ARBITRARY AND CAPRICIOUS**

53.　The previous paragraphs are incorporated by reference.

54.　For additional reasons, the law and facts do not support DOI's unilateral decision to terminate the leases for alleged illegality at the inception.

**(A).　AIDEA's Leases were not Illegal.**

55.　The alleged legal defects DOI relies upon in cancelling AIDEA's leases do not support DOI's conclusion that the leases were illegal, and the explanation in the Lease Cancellation Decision does not support the decision to terminate leases. As a consequence, the Lease Cancellation Decision was contrary to law and arbitrary and capricious.　Any "inherent authority" the Secretary of the Interior has to manage federal lands only conveys authority to administratively cancel oil and gas leases if those leases were invalid at their inception.　*Boesche,* 373 U.S. at 476.[14]　"[T]he existence of a legal defect is a necessary precondition to the Secretary exercising her authority to administratively cancel the lease."　*Solenex, LLC v. Haaland*, 626 F.Supp.3d 110, 119 (D.D.C. 2022).　AIDEA's leases with DOI were valid at their inception and not illegal.

56.　The issue of how to interpret the Tax Act's clause allowing "up to" 2,000 acres of production and support facilities (Tax Act § 20001(c)(3)) did not justify cancellation of AIDEA leases for purported illegality at the inception of the leases.　DOI in the 2020 ROD correctly interpreted the 2,000-acre clause. The clause allows the leaseholder(s) to

---

[14]　As discussed in Count IV below, any such inherent authority to administratively terminate oil and gas leases for illegality in the inception is subject to additional constraints that may be imposed by statute or agency regulation and such additional constraints are present here.

construct production and support facilities covering "up to" 2,000 acres, leaving the leaseholders discretion to utilize less acreage. Thus, the statutory discretion to disturb less than 2,000 surface acres in the phrase "up to" lies with AIDEA or other Lessees, not DOI. The "up to" language of the clause cannot be read as allowing DOI the discretion to defeat the Congressionally-mandated oil and gas program through DOI capping the leaseholder(s) at some arbitrary figure substantially less than 2,000 acres. Moreover, no provision in the leases addresses interpretation of the 2,000-acre clause.

57.   The issue of the downstream effect of greenhouse gasses also does not justify termination of AIDEA leases. Among other flaws in DOI's new conclusions, the cases cited by DOI in its unilateral Lease Cancellation Decision, *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020), concern leasing on the Outer Continental Shelf, a location where DOI has substantial discretionary control over whether to allow oil and gas projects proceed. *See* 43 U.S.C. § 1344(a)(1).[15] By contrast, the Tax Act mandates DOI administer an oil and gas program and issue leases, and does not employ any such balancing language. Tax Act § 20001(b)(2)(A). Where DOI has discretion to block an activity by declining to issue leases for particular projects, as under the statute governing the Outer Continental Shelf oil and gas drilling program, there might arguably be a reason to require it to conduct a NEPA analysis concerning greenhouse gas effects that could be avoided by declining to issue leases. But the Tax Act mandates that DOI issue the Coastal Plain Program oil and gas leases. Accordingly, there was no

---

[15]   Under that Outer Continental Shelf statute, DOI "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resources values of the outer Continental Shelf and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1)

1566210.V3

opportunity for DOI to avoid the alleged greenhouse gas effects through declining to issue leases. Based on this, any alleged shortcoming in the NEPA analysis regarding that issue is not an agency error. *Public Citizen*, 541 U.S. at 76-78; *see* 42 U.S.C. § 4336e(10)(B)(vii).

58.    The other alleged deficiencies in the 2020 ROD and 2020 EIS, including alleged deficiencies in analysis of the claimed impacts on subsistence hunting and fishing, are also not grounds for termination of the AIDEA leases for illegality. DOI's discussion of these subjects in the Lease Cancellation Decision is conclusory, unsupported, and arbitrary and capricious. BLM also considered ANILCA section § 810's required analysis of impacts to subsistence hunting and fishing in both Appendix E of the FEIS and again in its ROD. 2020 ROD, pp. 24. Moreover, DOI in the 2020 ROD cautioned that further NEPA and ANILCA § 810 analysis would need to be conducted before actual oil and gas ground-disturbing operations would be approved, when the leaseholder submitted follow-up applications for permission to engage in exploration and drilling activities. *Id*., pp. 2, 27. This is another reason that issuing the leases did not violate NEPA or ANILCA § 810.

59.    Further, the lease cancellation decision also was a change of agency position, as compared to DOI's position in 2020, when DOI found it proper and lawful to issue the leases to AIDEA. Although agencies can change positions from their prior stances, such changes must include reasoned explanations for the change must be supported by the record before the agency. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). These requirements were not met here.

60.    Finally, as discussed in Count I above, none of DOI's purported errors in the 2019 FEIS, 2020 ROD, and related documents justify the grossly excessive remedy of

21

unilaterally terminating the Congressionally-mandated leases.  This is particularly true when the lesser remedy of correcting any alleged deficiencies in program rules was available to DOI, and would not have made DOI out of compliance with the statutory mandate to offer leases by December, 2021.

<p align="center">(B).   <strong><u>DOI's Stated Reasons for Lease Termination Were Pretextual.</u></strong></p>

61.     The stated grounds for both the earlier lease suspension and the subsequent lease termination were pretextual.  DOI's decisions to suspend and then cancel AIDEA's Coastal Plains leases arose from President Biden's directives in Executive Order 13990, issued on his first day in office.  In campaigning for office, then-Candidate Biden stated unequivocally on the record that he would never allow oil and gas drilling in ANWR.  Asked "[h]ow do you feel about drilling in the Arctic National Wildlife Refuge," he responded on the record: "[t]otally opposed to it.  Completely, totally opposed to it … No more drilling on federal lands period."[16]  Later, in a press conference on September 6, 2023, announcing the lease cancellation, DOI Secretary Haaland stated that she would not allow drilling in ANWR.  She did not state that she was temporarily halting drilling so that issues could be studied before more leases were issued.  Instead, she said (future tense) that drilling will not occur: "no one will have rights to drill for oil in [ANWR]."  Development of the facts will likely reveal additional pronouncements by President Biden, Secretary Haaland, and other senior officials showing that, although DOI might go through the motions of issuing documents and holding proceedings purporting to implement the Tax Act's Coastal Plains

---

[16]     https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge   (Feb. 9, 2020).

<p align="center">22</p>

Program, the President and Secretary will never allow drilling in ANWR to actually occur. DOI's assertions of pre-lease legal defects (both at the time of lease suspension and at the time of lease cancellation) were a pretext to paper over a predetermined political decision to defeat AIDEA leases and to never allow drilling.  Additionally, given the very short period of time between the August 7, 2023 ruling in the Moratorium Litigation upholding lease suspension and the lengthy September 6, 2023 Lease Cancellation Decision, development of the facts will likely reveal that DOI had already determined to issues the Lease Cancellation Decision while it was representing in the Moratorium Litigation that it was only temporarily suspending AIDEA's leases while it evaluated whether it lawfully issued those leases.

62.    Agency action must be taken with reasoned explanation and <u>genuine</u> justifications.  Although judicial review is sometimes limited to an agency's stated reasons for the action, courts have authority to scrutinize those justifications to evaluate whether the stated reasons are pretextual or mere distractions, and to remand with vacatur agency decision where pretext is established.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019).  Here, President Biden's and Secretary Haaland's pronouncements that they will never allow oil and gas drilling in ANWR contradict rather than compliment their subordinates' statements in the Lease Cancellation Decision and accompanying draft SEIS that the Leasing Program may resume after more environmental analysis is completed and certain alleged errors fixed.  That contradiction distinguishes this case from the more typical case in which an agency's stated reason for an action align with agency leadership's political preferences.  Because the reasons stated for lease termination in the

Lease Cancellation Decision were pretextual, the court should vacate that decision and remand it to DOI.  5 U.S.C. § 706(2); *Dep' of Com.*, 139 S.Ct  at 2576.

<div align="center">***</div>

63.    DOI's cancellation of AIDEA's valid lease agreements is not authorized by law and was an abuse of discretion and was arbitrary and capricious decision-making. The court should set aside the lease cancellation.  5 U.S.C. § 706(2).

<div align="center">

**COUNT III**

**DOI FAILED TO PROVIDE AIDEA WITH DUE PROCESS**

</div>

64.    The preceding paragraphs are incorporated by reference.

65.    DOI asserts in its Lease Cancellation Decision that it has authority to administratively terminate oil and gas leases for illegality at their inception.  If so, the Supreme Court has indicated that this authority comes with an essential safeguard, specifically, DOI must provide the leaseholder with "full rights of participation" in the administrative proceeding by which DOI decides whether or not there was illegality in the inception of the lease.  *See Boesche*, 373 U.S. at 486 (pointing to this safeguard provided by DOI in that case as supporting the Court's ruling).   Additionally, the due process clause of the Constitution ensures that adequate procedural protections are followed prior to the deprivation of a protected right, such as a leasehold interest.  U.S. Const. Art. V.  In the context of agency adjudicatory and licensing decisions, due process "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976) (quotation omitted).  The "laws under which… agencies operate prescribe the fundamentals of fair play.  They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion." *Fed.*

<div align="center">24</div>

*Commc'ns Comm'n v. Pottsville Broad. Co.,* 309 U.S. 134, 143 (1940).   Under these principles, a party who is adversely affected by an administrative decision must be afforded proper notice of the action that is contemplated; he must be afforded a meaningful opportunity to participate in the decision-making proceeding, and the action ultimately rendered must express a reasoned conclusion.   The agency must also actually provide any procedural participation opportunities required by statute or rule or that an agency announces it will provide.

66.    DOI's cancellation of AIDEA's leases occurred without DOI first providing AIDEA with an administrative summons, invitation to comment, or other administrative process affording AIDEA an opportunity to defend its leases, including to defend them against allegations that DOI's purported improprieties in issuing the leases should result in the termination of the leases for illegality.   Thus, DOI both failed to comply with the procedural safeguards recognized in *Boesche,* and deprived AIDEA of due process of law.

67.    Moreover, DOI led AIDEA to believe AIDEA would have an opportunity to defend the legality of its leases by submitting comments on a Draft SEIS that DOI was preparing.   DOI then surprised AIDEA by unilaterally terminating AIDEA leases on the same day DOI sought comment on the Draft SEIS.   As discussed above, in June and August, 2021 DOI informed AIDEA of its decision to prepare a SEIS to evaluate whether or not to terminate AIDEA's leases for alleged illegalities involving DOI's prior NEPA analysis.   A procedural requirement for the use of a SEIS in decision-making is the publication of a draft SEIS, an invitation to the public to comment on the draft SEIS, and agency consideration of that comment before reaching a final decision.   40 CFR 1502.9, 1503.1, and 1503.4; *see* 42 U.S.C. § 4336a(c).   As discussed above, DOI confirmed in

its Scoping Notice in August, 2021 that it would provide that public comment opportunity on the draft SEIS.  Thus, DOI was obligated to actually provide that process to AIDEA.  Instead, DOI abruptly terminated the leases for illegality, just as the public comment opportunity on the draft SEIS began, and before AIDEA could submit argument and evidence in defense of its leases.

68.     A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions [made] … without observance of procedure required by law…" 5 U.S.C. § 706(2).  Because DOI failed to comply with the procedural safeguards recognized in *Boesche* and failed to provide AIDEA with due process before terminating its leases, the Lease Cancellation Decision must be set aside.

## COUNT IV
### DOI'S CANCELLATION OF AIDEA'S LEASES VIOLATED DOI'S REGULATIONS GOVERNING THE LEASE TERMINATION PROCESS

69.     The previous paragraphs are incorporated by reference.

70.     Congress may "withdraw[ ]" the inherent authority of DOI to administratively cancel oil and gas leases for alleged illegality at the inception, *Boesche*, 373 U.S. at 476. Accordingly, Congress and DOI may take lesser steps to restrict or constrain the use of that authority, as has occurred here.  The regulations implementing the Naval Petroleum Reserves Production Act of 1976 ("NPRA") that Congress applied to the ANWR Coastal Plain in the Tax Act include 43 C.F.R. § 3136.3, which governs the cancellation of leases. *See* Tax Act, Pub. Law 115-97, § 20001(b)(3).  That adopted NPRA regulation provides: "Producing leases *or* leases known to contain valuable deposits of oil or gas may be canceled *only* by court order."  § 3136.3(b) (emphasis added).  Although AIDEA's leases

26

were not yet producing leases, they were "leases known to contain valuable deposits of oil or gas," as discussed above and below, and could only be terminated by court order and could not be terminated administratively by DOI.

71.     Under DOI and judicial precedent, AIDEA is not required to show that it or anyone else has successfully drilled for oil on the leased land in order for the leased lands to qualify as lands known to contain valuable deposits of leasable resource.  It is enough that the facts engender a belief on the part of a reasonable person that valuable oil is present:

> The meaning of the statutory phrase "known to contain valuable deposits [of a leasable substance]" can be understood from decisions of the Supreme Court defining the phrase "known to be valuable [for a leasable substance]." Actual discovery of … deposits … on the land sought is not required in order that the land may be regarded as "known to contain valuable deposits" …. Competent evidence may consist of proof of the existence of the mineral on adjacent lands as well as proof of geological and other surrounding and external conditions, and all that is required is that the evidence show that the known conditions were plainly such as reasonably to engender the belief that the lands contain the mineral in such quantity and of such quality as to render its extraction profitable and justify expenditures to that end.

*Delta Chemical Co*., 76 IBLA 111, 1983 WL 35057 (Dept. Interior Bd. of Land Appeals, 1983) (citing *U.S. v. Southern Pacific Co*., 251 U.S. 1, 13-14 (1919), *Diamond Coal Co. v. U.S*., 233 U.S. 236, 239-40 (1914), and *U.S. v. U.S. Borax Co*., 58 I.D. 426, 433 (1943)).

72.     As discussed above, USGS found that: (a) the vast majority of oil within the ANWR Coastal Plain is in the western portion of the Plain, which is the non-deformed area, (b) this oil exists in sufficient quantities and situation to be both technically and economically recoverable at current market prices, (c) oil has been actually been found in wells drilled on State lands just to the west and north of the western end of the Coastal Plain, and (d) the western end of the Coastal Plain is the portion closes to the existing oil

27

and gas infrastructure centered around Prudhoe Bay.   AIDEA's leases from DOI covered much of the western portion of the ANWR Coastal Plain, including all or almost all of the land inside ANWR adjacent to the oil discoveries just outside ANWR. In light of these facts, AIDEA reasonably spent substantial sums to lease the favorable locations at the western end of the Coastal Plain.  These and other facts establish a belief on the part of reasonable person that the lands in the western Coastal Plain that AIDEA leased likely contain valuable oil, which satisfies the standards set forth in *Delta Chemical Co., U.S. v. Southern Pacific Co*., and *U.S. v. U.S. Borax Co., supra*, to qualify as land known to contain valuable deposits of a leasable resource.

73.      Because AIDEA's leases were for land known to contain valuable deposits of oil, they can only be terminated by court order. 43 CFR § 3.136.3(b); *see* Pub. Law 115-97, § 20001(b)(3).  DOI's administrative termination of AIDEA's lease without a court order was contrary to law, made without observance of proper procedure, and must be set aside. 5 U.S.C. § 706(2).

## COUNT V
## DOI FAILED TO COMPLY WITH 5 U.S.C.  § 558

74.      DOI has contended that AIDEA's leases, in addition to being leases, were also "licenses" as the term "license" is defined in the APA.[17] The APA broadly defines the

---

[17]   In its summary judgment brief in the Lease Moratorium Case, DOI stated:  "The APA definition of 'licensing' … includes 'agency process respecting the grant, renewal, denial, revocation, suspension . . . or conditioning of a license[.]' 5 U.S.C. § 551(9); *see also id*. (8) (stating 'license' includes 'the whole or a part of an agency permit, certificate, approval . . . or other form of permission'). ***The leases fall squarely within these definitions***, and are neither issued nor suspended through rule making."   DOI summary judgment brief, p. 29, n. 10 (Case No. 3:21-cv-00245-SLG, USDC Alaska, Dkt. Entry 63) (emphasis added).

28

term "license" to include any form of "permission" from any federal regulatory agency to engage in regulated activity of any type, whether or not real estate or oil and gas is involved.   5 U.S.C. § 551(8).

75.      In real estate and substantive oil and gas law, the term "license" more narrowly refers to a non-exclusive, permissive authorization to use the land of another that is revocable and does not rise to the level of being a lease, and so is not an interest in land.  Because AIDEA's leases, were called "leases," by DOI; were issued by DOI based on a directive from Congress expressly requiring DOI to conduct at least two 400,000-acre "lease sales" by December 22, 2024; were issued in exchange for valuable consideration paid by AIDEA; provided for a non-revocable and extendable ten-year term; and conferred many exclusive rights, benefits and obligations upon the parties; AIDEA contends that these conveyances were unequivocally "leases" as that term is ordinarily used in real estate and substantive oil and gas law.   Any other interpretation is strained and unsupported.  However, because DOI now asserts that these conveyances were "licenses," AIDEA alternatively pleads that DOI has not even followed the proper legal requirements for termination of licenses.

76.      If DOI is correct that AIDEA's leases were APA licenses, DOI failed to comply with the procedural and substantive safeguards the APA requires an agency to provide to a licensee before the agency cancels or revokes an APA license.  5 U.S.C. § 558.

77.      Specifically, before "the institution of proceedings" to cancel an APA license, an agency must provide the licensee with both (1) notice of the reasons for which the agency is contemplating cancelling the license, and (2) an opportunity to respond and

defend the license.  5 U.S.C.  § 558(c)(1) and (2).    DOI did not provide AIDEA with sufficient notice of the reasons why DOI was considering cancellation of AIDEA's leases / APA licenses and DOI did not provide AIDEA with an opportunity to respond before instituting proceedings to cancel.  Worse, as discussed above, DOI informed AIDEA that it would be using a supplemental EIS process under NEPA to evaluate the legality of AIDEA's leases, meaning that AIDEA would have an opportunity to comment on a draft SEIS before DOI made a final decision. Then, however DOI unexpectedly and without notice issued the Lease Cancellation Decision on the very same day that it issued a draft SEIS and sought public comment, and thus before AIDEA could file comments. DOI led AIDEA to believe it would have an opportunity for AIDEA to fully respond in comments on the to-be-issued draft SEIS to DOI's concerns regarding AIDEA's leases / APA licenses, but failed to provide that opportunity.

78.    Additionally, § 558 also requires that the agency, before instituting proceedings to cancel an APA license, must provide the holder of the APA license with the "opportunity to … achieve compliance with lawful requirements," i.e. to cure any matters that might otherwise justify cancellation of the APA license.  5 U.S.C. § 558(c)(2).  The matters DOI in its Lease Cancellation Decision stated justified lease cancellation were purported defects in how DOI in its 2020 ROD and 2019 EIS had analyzed the environmental impact and subsistence hunting and fishing impact of oil and gas development in ANWR.  As discussed in Count II above, those defects were purported rather than real.  But if the defects were real, they were entirely curable through DOI fixing its own errors as regulator through imposing additional restrictions on AIDEA's activities under the leases, to further protect the environment and subsistence hunting and fishing.

AIDEA as the holder of the leases / APA licenses could then complete any cure that might be required, by complying with any such supplemental restrictions lawfully ordered by DOI. Instead of providing an opportunity to cure as required by § 558(c)(2), DOI canceled the AIDEA leases / APA licenses for purported defects that, if real, were curable, and so DOI failed to comply with APA § 558(c)(2).

79.    DOI's cancellation of AIDEA's leases / APA licenses contravened 5 U.S.C. § 558, and so must be set aside, 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue:

1.    A declaratory judgment invalidating DOI's cancellation of AIDEA's leases;

2.    An order directing, on a preliminary and final basis, that Defendants ~~to~~ proceed with leasing, exploration, and development of the ANWR Coastal Plain as prescribed in the Tax Act, § 20001; and

3.    All other relief within the Court's jurisdiction to grant which this Court deems just, equitable, and according to law; including but not limited to attorneys' fees and costs.

DATED this ~~18th~~ 16th day of ~~October~~January, 2024.

BIRCH HORTON BITTNER & CHEROT

Attorneys for Plaintiff ALASKA INDUSTRIAL
DEVELOPMENT AND EXPORT AUTHORITY

Of Counsel:

David Karl Gross, ABA #9611065*
Zoe A. Eisberg, ABA #1911094*
Brian V. Gerd, DC Bar  #9001929*
Birch Horton Bittner & Cherot
510 L Street, Suite 700

By:

*/s/ James H. Lister*
James H. Lister, DC Bar 447878
Birch Horton Bittner & Cherot
Suite 350, 1150 Connecticut Ave.
Washington, DC.  20036
202-862-8368 (phone)

31

Anchorage, AK  99501                    202-659-1027(fax)
907-276-1550 (phone)                    jlister@bhb.com
907-276-3680 (fax)
dgross@bhb.com
zeisberg@bhb.com
bgerd@bhb.com

*Pro Hac Vice Motions are being prepared*

32