IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:24-cv-1017-EGB |
| v. | ) | (Senior Judge Bruggink) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>STATE OF ALASKA'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

QUESTIONS PRESENTED........................................................................................ 2

BACKGROUND ........................................................................................................ 3

    A.    Congressional Mandate to Lease in the Coastal Plain ............................. 3

    B.    The 2021 Lease Sale .............................................................................. 5

    C.    Executive Actions to Unwind the Lease Sale ........................................ 5

    D.    *AIDEA I* Litigation ............................................................................... 6

    E.    Cancellation of the AIDEA Leases and the *AIDEA II* Litigation.......... 7

    F.    Cancellation of the Knik Arm and Regenerate Alaska Leases ............... 7

    G.    The Instant Litigation............................................................................. 8

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT .............................................................................................................. 9

I.    Section 1500 Does Not Bar the State's Claims........................................ 9

    A.    *AIDEA II* Is Not a Suit Brought in Another Court by the Same Plaintiff. ........... 10

        1.    The State of Alaska and AIDEA Are Not the Same Party........................ 10

        2.    The United States' Privity Argument Has No Basis in Section 1500's Text and, in Any Event, Is Unavailing. ......................................... 13

    B.    There Are Not Similar Operative Facts Across *AIDEA II* and this Suit. .............. 19

        1.    The Issues of Fact and Law Are Different. ................................. 19

        2.    *AIDEA II* Has No Res Judicata Effect on this Lawsuit............................ 21

            (a)    Act or Contract Test ....................................................... 22

            (b)    Evidence Test ................................................................. 23

        3.    This Suit and *AIDEA II* Involve Different Evidence. ............................... 24

        4.    This Suit and *AIDEA II* Have No Meaningful Logical Relationship........ 24

II.     The State Asserts a Viable Breach of Contract Claim With Respect to the Knik Arm and Regenerate Alaska Leases................................................................... 25

III.    The United States Breached the Covenant of Good Faith and Fair Dealing. .................. 28

IV.     The United States Took the State's Property Interest Without Just Compensation. ......... 31

CONCLUSION.............................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbas v. United States*,
124 Fed. Cl. 46 (2015) ................................................................................35

*Ables v. United States*,
2 Cl. Ct. 494 (1983) ....................................................................................27

*Acetris Health, LLC v. United States*,
949 F.3d 719 (Fed. Cir. 2020).....................................................................23

*AG Route Seven P'ship v. United States*,
57 Fed. Cl. 521 (2003) ................................................................................14

*Al-Aulaqi v. Panetta*,
35 F. Supp. 3d 56 (D.D.C. 2014).................................................................28

*Alaska Airlines v. Johnson*,
8 F.3d 791 (Fed. Cir. 1993).........................................................................33

*Alaska Comm. Fishing & Agric. Bank v. O/S Alaska Coast*,
715 P.2d 707 (Alaska 1986)........................................................................10

*Alaska Indus. Dev. & Exp. Auth. v. Biden*,
685 F. Supp. 3d 813 (D. Alaska 2023) ..........................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................8, 9

*Askew v. Sec'y of HHS*,
No. 10-767V, 2012 U.S. Claims LEXIS 602 (Fed. Cl. May 17, 2012)..........6

*Barlow & Haun, Inc. v. United States*,
118 Fed. Cl. 597 (2014) ..............................................................................23

*Barlow & Haun, Inc v. United States*,
87 Fed. Cl. 428 (2009) ................................................................................33

*Beberman v. United States*,
129 Fed. Cl. 539 (2016) ..............................................................................20

*Beberman v. United States*,
755 F. App'x 973 (Fed. Cir. 2018) (per curiam) .........................19, 20, 21, 22

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004)..........................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................9

*Benchmark Res. Corp. v. United States*,
    74 Fed. Cl. 458 (2006) .....................................................................32

*Biden v. Nebraska*,
    600 U.S. 477 (2023)..........................................................11, 17, 18

*Burrus v. State Lottery Comm'n of Indiana*,
    546 F.3d 417 (7th Cir. 2008) ...........................................................17

*Cary v. United States*,
    552 F.3d 1373 (Fed. Cir. 2009).........................................................9

*Cent. Expl. New Orleans, Inc. v. United States*,
    103 Fed. Cl. 70 (2012) .....................................................................33

*Centex Corp. v. United States*,
    395 F.3d 1283 (Fed. Cir. 2005).......................................................31

*Chevron U.S.A., Inc. v. United States*,
    110 Fed. Cl. 747 (2013) ...................................................................29

*Connected Glob. Sols., LLC v. United States*,
    160 Fed. Cl. 420 (2022) ...................................................................28

*D'Andrea Bros. LLC v. United States*,
    109 Fed. Cl. 243 (2013) ...................................................................30

*Danzig v. AEC Corp.*,
    224 F.3d 1333 (Fed. Cir. 2000).......................................................27

*Devon Energy Corp. v. United States*,
    45 Fed. Cl. 519 (1999) .....................................................................32

*Dobyns v. United States*,
    915 F.3d 733 (Fed. Cir. 2019).........................................................30

*Dotcom Assocs. I, LLC v. United States*,
    112 Fed. Cl. 594 (2013) .............................................................30, 31

*Estes Express Lines v. United States*,
    739 F.3d 689 (Fed. Cir. 2014)...........................................................8

*First Nationwide Bank v. United States,*
    431 F.3d 1342 (Fed. Cir. 2005)......................................................................31

*Foster v. United States,*
    No. 34-75, 1978 U.S. Ct. Cl. LEXIS 833 (Oct. 18, 1978).......................................32

*Fox Logistics & Constr. Co. v. United States,*
    145 Fed. Cl. 236 (2019) ............................................................................30

*Franconia Assocs. v. United States,*
    536 U.S. 129 (2002) ................................................................................27

*Fresenius Med. Care Cardiovascular Res. Inc. v. Puerto Rico,*
    322 F.3d 56 (1st Cir. 2003) ........................................................................17

*Glass v. United States,*
    63 F. App'x 486 (Fed. Cir. 2003) ..................................................................16

*Ind. Mich. Power Co. v. United States,*
    422 F.3d 1369 (Fed. Cir. 2005)....................................................................27

*Inter-Tribal Council of Ariz., Inc. v. United States,*
    956 F.3d 1328 (Fed. Cir. 2020).....................................................................8

*Kawa v. United States,*
    77 Fed. Cl. 294 (2007) .........................................................................15, 18

*Kisor v. McDonough,*
    995 F.3d 1347 (Fed. Cir. 2021)....................................................................13

*Klamath Irrigation Dist. v. United States,*
    113 Fed. Cl. 688 (2013) ............................................................19, 22, 24, 25

*Maritrans Inc. v. United States,*
    342 F.3d 1344 (Fed. Cir. 2003)....................................................................34

*Matthews v. United States,*
    No. 10-648C, 2013 U.S. Claims LEXIS 400 (May 7, 2023)...................................14

*Metcalf Constr. Co. v. United States,*
    742 F.3d 984 (Fed. Cir. 2014)......................................................................30

*Moor v. Cnty. of Alameda,*
    411 U.S. 693 (1973) ................................................................................17

*Murphy v. NCAA,*
    584 U.S. 453 (2018) ................................................................................14

*Nalco Co. v. Chem-Mod, LLC*,
    883 F.3d 1337 (Fed. Cir. 2018)................................................................8, 9

*Philbert v. United States*,
    779 F. App'x 733 (Fed. Cir. 2019) ...............................................................9

*Precision Pine & Timber, Inc. v. United States*,
    596 F.3d 817 (Fed. Cir. 2010).....................................................................31

*Rent Stabilization Ass'n of City of New York v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993)...........................................................................18

*Res. Invs., Inc. v. United States*,
    785 F.3d 660 (Fed. Cir. 2015)................................................................9, 22

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)...................................................................................15

*S.J. v. Hamilton Cnty.*,
    374 F.3d 416 (6th Cir. 2004) .....................................................................17

*Snyder & Assoc. Acquisitions LLC v. United States*,
    133 Fed. Cl. 120 (2017) .......................................................................33, 34

*Southland Royalty Co. v. United States*,
    22 Cl. Ct. 525 (1991) .................................................................................33

*Stockton E. Water Dist. v. United States*,
    583 F.3d 1344 (Fed. Cir. 2009).............................................................33, 34

*Stowell v. Chamberlain*,
    60 N.Y. 272 (1875) ....................................................................................23

*Sullivan v. United States*,
    625 F.3d 1378 (Fed. Cir. 2010)..................................................................28

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940)...................................................................................16

*Superior Waste Mgmt. LLC v. United States*,
    169 Fed. Cl. 239 (2023) .............................................................................18

*Sw. Airlines Co. v. Saxon*,
    596 U.S. 450 (2022)...................................................................................10

*Tohono v. O'odham Nation*,
    563 U.S. 307 (2011)........................................................................14, 22, 23

*Trusted Integration, Inc. v. United States*,
    659 F.3d 1159 (Fed. Cir. 2011)................................................................23

*U.S. Home Corp. v. United States*,
    108 Fed. Cl. 191 (2012) ...........................................................................19, 22

*Univ. of Rhode Island v. A. W. Chesterton Co.*,
    2 F.3d 1200 (1st Cir. 1993).....................................................................17

*Yang Hong v. Mayorkas*,
    No. 2:20-cv-1784-RAJ-TLF, 2021 U.S. Dist. LEXIS 256541 (W.D. Wash.
    June 8, 2021)...........................................................................................25

*Yeskoo v. United States*,
    34 Fed. Cl. 720 (1996) ............................................................................14

**Statutes**

16 U.S.C. § 3142 ............................................................................................3

28 U.S.C. § 1500 ...................................................................................... *passim*

Administrative Procedure Act, 5 U.S.C. §§ 551-559 ....................................... *passim*

Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. 96-487, 94
    Stat. 2371, December 2, 1980 .................................................................3, 12

Alaska Stat. § 44.88.020 ................................................................................10, 11

Alaska Stat. § 44.88.070 ................................................................................11

Alaska Stat. § 44.88.080(5)............................................................................11

Alaska Stat. § 44.88.085(a)............................................................................11

Alaska Stat. § 44.88.120 ................................................................................11

Alaska Stat. § 44.88.120(a)............................................................................11

Alaska Stat. § 44.88.120(b)............................................................................12

Alaska Stat. § 44.88.178 ................................................................................11

Alaska Stat. § 44.88.190(b)............................................................................12

Mo. Rev. Stat. § 173.385(14).........................................................................11

Naval Petroleum Reserves Production Act of 1976, Pub. L. 94-258, 90 Stat. 303 .................4, 16

Tax Cut and Jobs Act § 20001(b)(2)(A), Pub. L. 115-97, 131 Stat. 2054, 2235–37 (2017) ...................................................................................................................4

Tax Cut and Jobs Act § 20001(b)(5), Pub. L. 115-97, 131 Stat. 2054, 2235-37 (2017) ...................................................................................................................4

**Other Authorities**

26 C.F.R. § 1.614-1(a)(1) ...............................................................................................32

26 C.F.R. § 1.614-1(a)(2) ...............................................................................................32

29 C.F.R. pt. 1620 ....................................................................................................20, 21

30 C.F.R. § 3136.1 ..........................................................................................................26

43 C.F.R. pt. 3130, subpart 3136 ....................................................................................27

43 C.F.R. § 3132.1 ..........................................................................................................16

86 Fed. Reg. 41,989 (Aug. 4, 2021) .................................................................................6

1 William & Meyers Abridged Oil & Gas Law § 801 (2024) ........................................30

2 Kuntz, Law of Oil and Gas § 18.2 (2024) ...................................................................12

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...............................................................................................................13

C-SPAN, *Joe Biden on the Arctic Refuge* (Feb. 9, 2020), https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge .................................28

*Establishing the Arctic National Wildlife Range*, 25 Fed. Reg. 12,598 (Dec. 9, 1960) ...........................................................................................................................3

Exec. Order No. 13990 of January 20, 2021, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*, 86 Fed. Reg. 7,037 (Jan. 25. 2021) ..............................................................................5, 6, 28

Fed. R. Civ. P. 12(b) .......................................................................................................18

Fed. R. Civ. P. 12(b)(1) ....................................................................................................8

Fed. R. Civ. P. 12(b)(6) ...............................................................................................8, 26

Fed. R. Evid. 201(b) .......................................................................................................28

Ninth Circuit, *Frequently Asked Questions*,
 https://www.ca9.uscourts.gov/general/faq/#:~:text=For%20a%20civil%20app
 eal%2C%20approximately,months%20after%20briefing%20is%20complete
 (last visited Dec. 5, 2024) ........................................................................................25

Restatement (Second) of Contracts § 205 .....................................................................30

Restatement (Second) of Contracts § 311 .....................................................................26

Secretarial Order 3401 ................................................................................................5, 6

U.S. Const. amend V..........................................................................................24, 32, 33

## INTRODUCTION

This case presents a straightforward breach of contract claim involving a contracting party (the United States) and a third-party beneficiary (the State of Alaska). The State of Alaska (the "State") was harmed by the United States' cancellation of oil and gas leases it had issued to three separate entities: the Alaska Industrial Development and Export Authority ("AIDEA"), Knik Arm Services, LLC ("Knik Arm"), and Regenerate Alaska, Inc. ("Regenerate Alaska"). By law, the State was to receive a significant portion of the United States' revenues under the leases from lease bonuses, rentals, and royalties. Because the United States breached and cancelled the leases, the State has been deprived of its promised benefits. The Tucker Act makes the United States liable to pay the State for its damages.

The leases at the heart of this dispute were awarded to AIDEA, Knik Arm, and Regenerate Alaska in January 2021 for development of oil and gas on lands located in the Coastal Plain of the Arctic National Wildlife Refuge ("ANWR"). The State is statutorily entitled to half of the revenue that the United States receives from issuance and development of these leases. But within two weeks after the Department of Interior ("DOI") issued the leases, and immediately following a change in presidential administration, the President of the United States ordered a "temporary" halt on all oil and gas leasing activities in the Coastal Plain. Through subsequent Executive action, the leases faced further indefinite suspensions until DOI ultimately cancelled AIDEA's seven leases and effectively repudiated (and then rescinded) the leases held by Knik Arm and Regenerate Alaska.

The United States moves to dismiss this suit (the "Motion"), as it pertains to the AIDEA leases, for lack of subject matter jurisdiction under 28 U.S.C. § 1500 ("section 1500"). Section 1500 strips this Court of subject matter jurisdiction of a suit only when the *same* "plaintiff or his assignee" brings a suit in another forum over the same operative facts. 28 U.S.C. § 1500.

Ignoring this unambiguous text, the United States asks this Court to adopt a new interpretation of section 1500 to conclude that, where an independent, state-created entity initiates litigation elsewhere, that litigation bars the state itself from bringing suit before this Court to recover damages that are distinct from any harm suffered by the other plaintiff entity. Not only does the United States' interpretation disregard the statutory text, the State and AIDEA are in any event distinct legal entities with different rights and authority and divergent interests in the cases being litigated. Accordingly, and for the additional reasons discussed herein, section 1500 does not bar the present suit.

In addition to moving to dismiss this matter for lack of subject matter jurisdiction, the United States makes cursory arguments asking the Court to dismiss the State's breach of contract claim as it pertains to Knik Arm and Regenerate Alaska, breach of the covenant of good faith and fair dealing claim, and takings claim, for failure to state a claim. Because none of Defendant's arguments find support in the law, the United States' motion should be denied.

## QUESTIONS PRESENTED[1]

1.  Whether 28 U.S.C. § 1500 deprives this Court of jurisdiction to consider the State of Alaska's claims for contract-based damages arising from the United States' cancellation of AIDEA's leases, even assuming such cancellation was lawful, while AIDEA—a public corporation with a separate and distinct legal existence from the State—is litigating in another forum the question of the United States' authority under the Administrative Procedure Act ("APA") to cancel the leases.

---

[1] Pursuant to Rule of the Court of Federal Claims 5.4(a)(3), the State of Alaska provides its own concise statement of each question presented.

2. Whether the State of Alaska's Complaint states viable breach of contract claims pertaining to leases issued to Knik Arm, LLC and Regenerate Alaska, Inc. by alleging that the United States improperly rescinded and cancelled those leases and that the United States anticipatorily repudiated its contractual obligations under those leases.

3. Whether the State of Alaska's Complaint states a plausible claim for relief by alleging that the United States breached the implied covenant of good faith and fair dealing when it cancelled the Coastal Plain leases.

4. Whether the State of Alaska states a plausible takings claim when the United States' conduct deprived the State of all economically viable use of its royalty interest in the leases, which is a well-recognized real property interest.

**BACKGROUND**

Plaintiff's Complaint sets forth a more complete recitation of this case's factual background. *See* dkt. at 1. The summary provided here focuses on allegations most relevant to the United States' Motion.

### A.    Congressional Mandate to Lease in the Coastal Plain

Over sixty years ago, the Arctic National Wildlife Range was established in northern Alaska. *Establishing the Arctic National Wildlife Range*, 25 Fed. Reg. 12,598 (Dec. 9, 1960); (Compl. ¶ 15). Twenty years later, in 1980, Congress expanded the Range and renamed it the Arctic National Wildlife Refuge through the Alaska National Interest Lands Conservation Act ("ANILCA"); (Compl. ¶ 15). ANILCA carved out a portion of Alaska's northern coast, known interchangeably as the "Coastal Plain" and the "1002 Area," from ANWR's wilderness designation. 16 U.S.C. § 3142 (ANILCA § 1002); (Compl. ¶¶ 15–17). Through ANILCA, Congress directed DOI to study the potential development and production of oil and gas from the Coastal Plain. (Compl. ¶ 18.) DOI finished its report in 1987, recommending energy

development. *See* DOI, Fish and Wildlife Service, Geologic Survey, and Bureau of Land Management, Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment, Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement (1987); (Compl. ¶ 19). It would take another thirty years until Congress provided the requisite authorization for oil and gas leasing to commence in the Coastal Plain. (Compl. ¶ 21.)

In the 2017 Tax Cut and Jobs Act ("Tax Act"), Congress directed DOI to initiate an oil and gas leasing and development program in the Coastal Plain. Tax Act § 20001(b)(2)(A), Pub. L. 115-97, 131 Stat. 2054, 2235–37 (2017); (Compl. ¶ 21). The Tax Act directed the Secretary of the Interior (the "Secretary") to conduct at least two lease sales of at least 400,000 acres each. Tax Act § 20001(c)(1); (Compl. ¶ 22). The first lease sale was required to be performed by December 22, 2021. Tax Act § 20001(c)(1); (Compl. ¶ 22). The second is to occur no later than December 22, 2024. Tax Act § 20001(c)(1); (Compl. ¶ 22). The oil and gas leasing and development program in the Coastal Plain is administered "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 ("NPRPA")." Tax Act § 20001(b)(3); (Compl. ¶ 23).

The Tax Act establishes a 16.67% royalty rate for leases within the Coastal Plain. Tax Act § 20001(b)(5); (Compl. ¶ 24). The State of Alaska receives 50% "of the amount of adjusted bonus, rental, and receipts derived from the oil and gas program and operations on Federal land authorized under [section] 20001(b)(5)(A)." Tax Act § 20001(b)(5)(A); (Compl. ¶ 24). Accordingly, the State is entitled to a royalty of 8.335% of the revenues generated through production of oil and gas under the leases. Tax Act § 20001(b)(4), (b)(5)(A); (Compl. ¶ 24).

### B.    The 2021 Lease Sale

In January 2021, DOI conducted its first mandatory lease sale in the Coastal Plain. (Compl. ¶ 27.) Three separate entities successfully pursued bids over nine tracts within the Coastal Plain. (*Id.* ¶¶ 28–29.) AIDEA secured lease agreements for seven tracts, paying approximately $14.4 million in lease bonuses to the United States. (*Id.* ¶ 28.) The State was entitled to fifty percent of the bonuses paid by AIDEA, totaling approximately $7.2 million. (*Id.*) The State was also entitled to fifty percent of the first-year lease rentals for these seven tracts, which lessees pay prior to lease issuance, here totaling approximately $5.5 million, meaning the State received approximately $2.75 million of the first year's lease rentals. (*Id.*)

One lease was secured by Knik Arm. (*Id.* ¶ 29.) The State's entitled portion of the Knik Arm bonus totaled approximately $800,000, and the State's portion of the first-year lease rentals totaled approximately $240,000. (*Id.*)

The ninth and final lease was secured by Regenerate Alaska. (*Id.*) Alaska's entitled portion of the Regenerate Alaska bonus totaled approximately $390,000, and the State's share of the first-year rentals totaled approximately $120,000. (*Id.*)

Totaling all nine leases together, the State was entitled to approximately $8.39 million in bonuses and $3.1 million in first-year rentals. (*Id.* ¶ 30.) These amounts are in addition to the State's entitlement to fifty percent of future annual rentals and fifty percent of the royalties paid to the United States for future production revenues. (*Id.* ¶ 31.)

### C.    Executive Actions to Unwind the Lease Sale

Two weeks after the first lease sale, and immediately following a change in presidential administrations, the President issued Executive Order 13990, which "place[d] a temporary moratorium on all activities" related to the implementation of the oil and gas leasing program in the Coastal Plain. (Compl. ¶ 33.) Five months later, in June 2021, the Secretary issued Secretarial

Order 3401 which "temporarily" halted all oil and gas leasing activities in the Coastal Plain. (Compl. ¶ 34.)

The same day as Secretarial Order 3401, DOI's Principal Deputy Assistant Secretary for Land and Minerals Management issued a notice to leaseholders of a "Suspension of Operations and Production" of the leases. Attached hereto as Exhibit A[2]; (Compl. ¶ 35). The Suspension took effect immediately. (Ex. A; Compl. ¶ 35.) In August 2021, the Bureau of Land Management ("BLM") published a notice of intent to prepare a Supplemental Environmental Impact Statement for the Coastal Plain program. 86 Fed. Reg. 41,989 (Aug. 4, 2021); (Compl. ¶ 36).

**D.    *AIDEA I* Litigation**

In 2021, facing an indefinite "temporary" suspension of oil and gas leasing activities, AIDEA sued the President and his relevant federal executive agencies, challenging Executive Order 13990 and Secretarial Order 3401's implementation of the moratorium on Coastal Plain oil and gas leasing activities. *Alaska Indus. Dev. & Exp. Auth. v. Biden*, No. 3:21-cv-245-SLG (D. Alaska) ("*AIDEA I*"); (Compl. ¶ 44). The State intervened in and joined AIDEA's suit. No. 3:21-cv-245-SLG at dkt. 21; (Compl. ¶ 44). *AIDEA I* focused on the legality of the United States' *temporary* moratorium of all oil and gas leasing activities on the Coastal Plain. At the time of filing *AIDEA I*, no Coastal Plain leases had been cancelled. (Compl. ¶ 44.) Accordingly, this was a garden variety APA challenge to an administrative action.

The District of Alaska denied AIDEA's and the State's Motions for Summary Judgment, holding that the United States did not violate the law when it implemented a "temporary" moratorium of all oil and gas leasing activities within the Coastal Plain. *Alaska Indus. Dev. &*

---

[2] This Court considers exhibits attached to a complaint and matters of public record when deciding a motion to dismiss. *Askew v. Sec'y of HHS*, No. 10-767V, 2012 U.S. Claims LEXIS 602, at *16 (Fed. Cl. May 17, 2012).

*Exp. Auth. v. Biden*, 685 F. Supp. 3d 813, 831–32 (D. Alaska 2023); (Compl. ¶ 45). AIDEA has

appealed the district court's order to the U.S. Court of Appeals for the Ninth Circuit. *AIDEA I*,

3:21-cv-245-SLG at dkt. 98. The State is not a party to the *AIDEA I* Ninth Circuit appeal.

### E.    Cancellation of the AIDEA Leases and the *AIDEA II* Litigation

Weeks after the district court's decision, DOI increased pressure on the lessees to agree to

rescind their leases, with the threat of cancellation looming as the only alternative. When the

pressure campaign failed to convince AIDEA to rescind, DOI unilaterally cancelled AIDEA's

leases. Attached hereto as Exhibit B; (Compl. ¶ 46). The Deputy Secretary's letter cancelling

AIDEA's leases informed AIDEA that DOI would refund AIDEA for its lease sale bonus bids

and first-year rentals, which totaled approximately $12.8 million. (Ex. B; Compl. ¶ 46.) Since the

United States cancelled the AIDEA leases, DOI's Office of Natural Resources Revenue has

withheld, or "clawed back," the State's share of bonuses and rentals received for these leases

from other, unrelated royalty payments to the State. (Compl. ¶ 43.)

The letter stated that the lease cancellation decision was a final decision by DOI and was

not subject to appeal. (Ex. B; Compl. ¶ 46.) AIDEA then initiated a second lawsuit, *Alaska Indus.*

*Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 3:24-cv-51-SLG (D. Alaska) ("*AIDEA II*");

(Compl. ¶ 48 n.2). The State is not a party to *AIDEA II*. (Compl. ¶ 48 n.2.). As with the *AIDEA I*

challenge, *AIDEA II* sounds primarily in the APA and challenges administrative actions.

### F.    Cancellation of the Knik Arm and Regenerate Alaska Leases

Whereas AIDEA resisted DOI's pressure campaign to rescind its leases, Knik Arm and

Regenerate Alaska relented. In 2022, in the face of escalating rhetoric reflecting that the United

States had no interest in honoring their leases, Knik Arm and Regenerate Alaska entered into

agreements with BLM to rescind and cancel their leases. (Comp. ¶ 37.) BLM agreed to refund to

Knik Arm and Regenerate Alaska their bonus and rental payments. (*Id.*) The State was never consulted before these agreements were made. (*Id.*)

Federal law provided for neither rescission nor cancellation in these circumstances. Nonetheless, DOI refunded lessees' payments. (*See id.* ¶ 38.) Worse, DOI then recaptured the State's revenues, effectively clawing back its unlawful refund payments from other, unrelated monies owed to the State. (*Id.*)

### G.    The Instant Litigation

On July 2, 2024, the State brought this suit against the United States as a third-party beneficiary of the nine Coastal Plain leases issued to AIDEA, Knik Arm, and Regenerate Alaska, seeking relief for breach of contract, breach of the covenant of good faith and fair dealing, and, in the alternative, takings. *See* dkt. at 1. This suit seeks the State's owed share of proceeds from the nine leased tracts within the Coastal Plain.

### STANDARD OF REVIEW

The United States moves to dismiss under both Rule 12(b)(1) and (b)(6). When deciding whether this Court has subject matter jurisdiction under Rule 12(b)(1), the Court "accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). As plaintiff, the State bears the burden to demonstrate subject-matter jurisdiction by a preponderance of the evidence. *Inter-Tribal Council of Ariz., Inc. v. United States*, 956 F.3d 1328, 1337 (Fed. Cir. 2020).

Under Rule 12(b)(6), "a complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1347 (Fed. Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court "accepts all well-pleaded factual allegations as true and construes all reasonable inferences

in favor of the plaintiff." *Id.* (citing *Iqbal*, 556 U.S. at 678). "[T]he complaint must allege facts

'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Cary v.*

*United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 557 (2007)).

## ARGUMENT

### I.    SECTION 1500 DOES NOT BAR THE STATE'S CLAIMS.

By its plain text, section 1500 bars suits before this Court only when the *same plaintiff or*

*its assignee* has litigation pending elsewhere involving the same operative facts. Because the

State is not litigating the same operative facts in another forum and because it has not assigned

its interest as a third-party beneficiary to the lease contracts to another party, section 1500 does

not apply to this suit.

Section 1500 "limits [this Court's] jurisdiction when at the time of the . . . filing there was

a pending action against the United States in another court involving the same subject matter."

*Res. Invs., Inc. v. United States*, 785 F.3d 660, 662 (Fed. Cir. 2015). Specifically, section 1500

states:

> The United States Court of Federal Claims shall not have jurisdiction of any
> claim for or in respect to which *the plaintiff or his assignee* has pending in
> any other court any suit or process against the United States or any person
> who, at the time when the cause of action alleged in such suit or process
> arose, was, in respect thereto, acting or professing to act, directly or
> indirectly under the authority of the United States.

28 U.S.C. § 1500 (emphasis added). Based on this express text, this Court treats a section 1500

analysis as a two-step inquiry: (1) whether there is another suit already pending in another court

*by the same plaintiff*, and (2) whether the two suits are "for or in respect to" the same *operative*

facts. *See Philbert v. United States*, 779 F. App'x 733, 736 (Fed. Cir. 2019) (per curiam). Here,

the Court may stop at step one because AIDEA and the State are legally and functionally distinct.

And, even if the Court were to reach step two, section 1500 would still not preclude this suit

because *AIDEA II* and the present case do not involve the same operative facts.

### A.    *AIDEA II* **Is Not a Suit Brought in Another Court by the Same Plaintiff.**

"As always, we begin with the text." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022).

By its terms, section 1500 bars only claims in this Court that the "plaintiff or his assignee" has

pending in another court. 28 U.S.C. § 1500. It is undisputed that these express terms are not

satisfied here: (1) AIDEA is the only plaintiff in *AIDEA II*, while the State, and not AIDEA, is

the only plaintiff in this case; (2) neither the State nor AIDEA has assigned its claim to the other

in either case, and the State has never assigned its interest in the leases to AIDEA.[3] As such,

section 1500 has no application to this suit.

### 1.    **The State of Alaska and AIDEA Are Not the Same Party.**

Defendant's argument that AIDEA "should be considered the state of Alaska" is contrary

to state and federal law. (Mot. at 9.) The Alaska Supreme Court has explained that the "mere

creation of an entity by the state does not make that entity an instrumentality of the state," nor

does "the mere retention of some oversight by the state over such an entity . . . transform it into a

state agency." *Alaska Comm. Fishing & Agric. Bank v. O/S Alaska Coast*, 715 P.2d 707, 711

(Alaska 1986). Against this backdrop, Alaska's statutory creation of AIDEA makes clear it was

intended to be, and in fact is, legally distinct from the State itself.

Most significant, the statutory provision that creates AIDEA expressly declares that

AIDEA "is a public corporation of the state . . . but *with separate and independent legal*

*existence*." Alaska Stat. § 44.88.020 (emphasis added).  This separate legal existence is necessary

---

[3] Because the United States does not argue that the State has assigned its interest in the leases to
AIDEA or vice versa, the assignment prong of section 1500 is not further discussed.

for AIDEA to accomplish statutory purposes that include, among other things, "providing various means of financing and means of facilitating the financing . . . of industrial, manufacturing, energy, export, small business, and business enterprises . . . in the state"; "owning and operating or providing development of project financing for the enterprises and other facilities [benefitting from AIDEA's economic development fund]"; and "cooperating and acting in conjunction with other organizations, public and private, the objects of which are the promotion and advancement of export trade activities in the state . . . ." *Id.* § 44.88.070.

To accomplish these purposes, Alaska statutes give AIDEA authority to act apart from the State itself, such as to own real property as well as sell or convey such property, *id.* §§ 44.88.190(b) & 44.88.080(8); "to acquire an interest in a project as necessary or appropriate to provide financing for the project," *id.* § 44.88.080(5); and to create its own subsidiaries, *id.* § 44.88.178.[4] AIDEA is even authorized to enact regulations outside of the State's Administrative Procedure Act. Alaska Stat. § 44.88.085(a). These independent powers again reinforce AIDEA's authority to act independently from the State.[5]

Finally, Alaska statutes demarcate and distinguish AIDEA's interests from the State's interests. Most relevant to this dispute, an Alaska statute expressly provides that real property in

---

[4] To the extent the United States attempts to compare AIDEA to the Missouri Higher Education Loan Authority ("MOHELA") that was the subject of *Biden v. Nebraska*, 600 U.S. 477, 489 (2023), *see* Mot. at 13, MOHELA lacks these powers. *See, e.g.*, Mo. Rev. Stat. § 173.385(14) (only allowing MOHELA to acquire, hold, and dispose of *personal* property).

[5] Defendant isolates language in Alaska Statute § 44.88.120(a) that "AIDEA, subject to limited exceptions not applicable here, 'constitutes a political subdivision and an instrumentality of the state as provided in this chapter.'" Mot. at 9 (quoting Alaska Statute § 44.88.120(a)). But Defendant ignores that the "limited exceptions" expressly recognize that AIDEA is neither a political subdivision nor a municipal corporation. Alaska Stat. § 44.88.120(a). Moreover, Defendant's reliance on this discrete statutory provision—Alaska Statute § 44.88.120, titled "Operation of Certain Statutes Excepted"—disregards the express language in AIDEA's creating statute declaring that AIDEA has "separate and independent legal existence" from the State. *See* Alaska Stat. § 44.88.020.

which AIDEA holds an interest *cannot* "be considered land owned in fee by the state or to which the state may become entitled" *Id.* § 44.88.190(b). Because oil and gas leases are interests in real property, *see, e.g.*, 2 Kuntz, Law of Oil and Gas § 18.2 (2024), AIDEA's interests in the Coastal Plain leases cannot be shared by the State. For this reason alone, the State and AIDEA are not the same party in their respective cases. Other distinctions between AIDEA's and the State's interests also exist in Alaska statutes. AIDEA's "funds, income, or receipts [] may not be considered or constitute money of the state[.]" *Id.* And, AIDEA cannot "pledge the faith or credit of the state," *id.* § 44.88.120(b), which makes sense: because AIDEA is not an arm of the State, it cannot indebt the State for its independent investments and for potential judgments against it.

Alaska's legislature went to great lengths to provide AIDEA with a separate legal existence from the State. And that separate authority is being exercised in the current litigation matters addressing AIDEA's Section 1002 leases. AIDEA, without the State, initiated the lawsuits in *AIDEA I* and *AIDEA II*, as described above. Although the State intervened and participated in *AIDEA I*,[6] the State elected not to pursue an appeal in that case (while AIDEA is pursuing an appeal), and the State has never been a party in *AIDEA II*. Given this reality and the express language of section 1500—which requires that the *same plaintiff* be a party in both cases considered for section 1500 purposes—the United States' invocation of section 1500 must be rejected.

---

[6] In fact, the United States accepted that the State and AIDEA are separate entities when the State intervened in *AIDEA I*. *See* 3:21-cv-245-SLG at dkt. 9 (Jan. 19, 2022) (attached hereto as Exhibit C). Presumably, if the United States then believed that AIDEA and the State are one and the same, it would have argued against the State's intervention in *AIDEA I* because AIDEA was already a party.

### 2. The United States' Privity Argument Has No Basis in Section 1500's Text and, in Any Event, Is Unavailing.

Implicitly recognizing that the actual words in section 1500 are not satisfied here, the United States asks the Court to read additional words into that section to create a new rule not expressly authorized in the statute—namely, that this Court is deprived of jurisdiction of claims pursued elsewhere by a separate party that is in privity with a plaintiff seeking relief in this Court. In essence, the United States asks the Court to transform the simple words "plaintiff or his assignee" into the very different phrase "plaintiff or his assignee or someone else with whom plaintiff is in privity." The Court should reject this argument for several reasons.

First, where a statutory phrase is unambiguous, the Court is bound to apply the unambiguous text. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, [a court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous.'"). Here, there is no plausible argument—and indeed the United States does not even attempt to make such an argument—that the phrase "plaintiff or his assignee" is ambiguous. The Court should reject Defendant's non-textual interpretation on that basis alone.

Second, even were the Court to engage in further analysis of the statute's meaning, canons of constructions preclude the United States' interpretation. It is well worn that "the expression of one thing [in a statute] implies the exclusion of others." *Kisor v. McDonough*, 995 F.3d 1347, 1349 (Fed. Cir. 2021); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). Here, Congress specifically added to the term "plaintiff" the one additional class of persons that Congress intended be included in section 1500's ambit—an "assignee." Congress could have included additional classes—such as

- 13 -

someone in privity with plaintiff—but chose to limit section 1500 only to "plaintiff or his assignee." As such, canons of construction compel a rejection of the United States' attempt to add yet one more category to section 1500's jurisdiction limitation. Moreover, the United States does not, and could not plausibly argue, that "privity" carries the same meaning as "assignee." *See, e.g.*, *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 533 (2003) (explaining "the clear position of the law that assignees lack privity of contract, even if a valid assignment has occurred").

Aware that its argument lacks textual support, the United States asks the Court for an expansive interpretation of the phrase "plaintiff or his assignee" by invoking the Supreme Court's reading of a "broad prohibition" in section 1500 in *Tohono v. O'odham Nation*, 563 U.S. 307, 313–14 (2011). (Mot. at 7, 10.) But the *Tohono* Court did not interpret or address the first prong of section 1500—the unambiguous term "plaintiff or his assignee"; instead, *Tohono* interpreted section 1500's second prong—"any claim for or in respect to," i.e., the question of how similar suits or claims need to be to be within section 1500's jurisdictional prohibition. *Tohono*, 563 U.S. at 311. Indeed, the Court in *Tohono* specifically held that the phrase any "claim for or in respect to" is ambiguous, *id.* at 325, and so used extra-textual methods of interpretation to ascertain that phrase's meaning. *Tohono* did not find that the different phrase "plaintiff or his assignee" is ambiguous and, absent such ambiguity, there is no reason to apply any construction to that phrase other than its straightforward meaning. After all, this Court "is one of limited jurisdiction and cannot 'rewrite a statute' . . . in order to effectuate a particular result." *Matthews v. United States*, No. 10-648C, 2013 U.S. Claims LEXIS 400, at *10–11 (May 7, 2023) (quoting *Yeskoo v. United States*, 34 Fed. Cl. 720, 731 (1996)); *see also Murphy v. NCAA*, 584 U.S. 453, 481–82 (2018).

Tellingly, the United States cannot point to a single case where this Court has previously held that section 1500 extends not only to the same plaintiff across suits, but also *any party* that is alleged to be in privity with a plaintiff before this Court. (*See* Mot. at 8–14.) Because "the language at issue has a plain and unambiguous meaning," the Court's "inquiry must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

Even if the Court were to adopt the United States' non-textual interpretation—creating a new rule never previously adopted by any court—the State and AIDEA are not in privity with one another with respect to any claims at issue here or in *AIDEA II*. Contrary to the United States' expansive characterization of privity, this Court has explained that "[p]rivity requires, at a minimum, a substantial identity between the issues in controversy and showing the parties in the two actions ***are really and substantially in interest the same***." *Kawa v. United States*, 77 Fed. Cl. 294, 308 (2007) (internal quotation and citation omitted) (emphasis added). Far from showing that AIDEA and the State have the substantially "same" interests in this case and in *AIDEA II*, the United States' Motion argues merely that both AIDEA and the State have "a legal interest in the same transactions and properties." (Mot. at 11.) Each having a legal interest in the same transactions or properties is very different from both entities having substantially the "same" interests. Were the Court to adopt the United States' definition of privity, parties with diametrically adverse interests would be in privity with one another simply because they each have a "legal interest in the same transaction."

Here, it is clear the State and AIDEA do not have the substantially same interests in this case or in *AIDEA II*. AIDEA, as the lessee, is a party to the leases with an interest in developing the leased lands and obtaining revenues from production of oil and gas from those lands. Meanwhile, the State remains a third-party beneficiary of the United States' royalty and revenue

interests in the leases. Case law and common sense explain that the same party cannot hold both roles under the same contract. *Glass v. United States*, 63 F. App'x 486, 488 (Fed. Cir. 2003) ("One cannot be both a direct party to a contract and a third party beneficiary of that same contract."). Moreover, AIDEA's and the State's interests are not only distinct—they are divergent: AIDEA is the *lessee* of the leases, while the State is entitled to the *lessor's* share of royalties. Finally, the State could never have the same interests as a lessee like AIDEA because the State is prohibited from holding leases issued under the Tax Act. *See* 43 C.F.R. § 3132.1 (prohibiting, in the implementing regulations of the Naval Petroleum Reserves Production Act of 1976 ("NPRPA"), states from holding oil and gas leases in the National Petroleum Reserve-Alaska but allowing public corporations to hold such leases); Tax Act § 20001(a)(3) (requiring that the Secretary administer the oil and gas leasing program in a manner similar to the administration of lease sales in the NPRPA). The United States fails to explain how the State and AIDEA can be considered to be in privity—i.e., have the "same" interest in this case and in *AIDEA II*—when, by law, the State cannot hold the same lease interest as AIDEA does and when AIDEA, as the lessee, could never pursue damages for the State's losses as a third-party beneficiary of the lessor's royalties.

Instead of acknowledging and addressing this divergence of interests between the State and AIDEA, the United States invokes case law that addresses the different and non-controversial point that a plaintiff cannot litigate a claim against one federal agency and then attempt to litigate the same claim against another federal agency. (*See* Mot. at 11–12 (citing cases).) But that case law applies specifically to agencies within the United States government. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940) ("Where a suit binds the United States, it binds its subordinate officials."). The United States cites no authority

applying that principle to find privity between a State and a distinct public corporation created by the State that has divergent interests in the cases at issue.

In fact, relevant case law undercuts the United States' argument. The Supreme Court has long held that, when considering citizenship for diversity purposes, a state cannot be its own "citizen," but a political subdivision of a State "is a citizen of the State" "unless it is simply the arm or *alter ego* of the State." *Moor v. Cnty. of Alameda*, 411 U.S. 693, 717 (1973). Following this principle, federal courts have frequently held that other state-created entities, such as public corporations, hold a "sufficiently independent character" to be treated as a citizen *of the state*, as opposed to being an *arm of the state* itself. *See, e.g.*, *Univ. of Rhode Island v. A. W. Chesterton Co.*, 2 F.3d 1200, 1211 (1st Cir. 1993) (public university); *Burrus v. State Lottery Comm'n of Indiana*, 546 F.3d 417, 423 (7th Cir. 2008) (state lottery commission); *S.J. v. Hamilton Cnty.*, 374 F.3d 416, 422 (6th Cir. 2004) (juvenile training facility); *Fresenius Med. Care Cardiovascular Res. Inc. v. Puerto Rico*, 322 F.3d 56, 75 (1st Cir. 2003) (state-created public corporation operating a hospital). If such entities are not considered the arm of a state for diversity jurisdiction purposes, it would be illogical to nevertheless consider such entities to be substantially the "same" as the state for purposes of determining res judicata-based privity.

The United States' reliance on an unrelated standing analysis in *Biden v. Nebraska* is also misplaced. In that case, the Supreme Court held that the State of Missouri had standing to challenge the President's cancellation of certain student loan debt because the harm suffered by a state-created entity, the Missouri Higher Education Loan Authority ("MOHELA"), was the same harm inflicted on the state. *Biden v. Nebraska*, 600 U.S. 477, 489–91 (2023). The Supreme Court's standing analysis was fact-intensive and hinged on the finding that "[t]he plan's harm to MOHELA is also a harm to Missouri" because of the specific way in which the state utilized

MOHELA "to invest in or finance student loans" and to "service loans and collect reasonable fees for doing so." *Id.* at 490. The standing determination was fact-based and case-specific; the Supreme Court did not rule that the State of Missouri and MOHELA were one and the same for all legal purposes. To the contrary, the Court recognized that "MOHELA, as a public corporation, has a legal personality separate from the State." *Id.* at 492.

Here, as discussed above and unlike in *Biden v. Nebraska*, it cannot be said that the harm to AIDEA resulting from the United States' lease cancellations is the same harm suffered by the State. To the contrary, AIDEA, as lessee, suffered a distinct harm that, by law, the State itself could not suffer (because the State cannot be a lessee); while the State's injury as a third-party beneficiary by law cannot be pursued by AIDEA as a party to the lease. *See supra* I.A.1. In any event, "[s]tanding and subject matter jurisdiction are separate questions." *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 224 (2023) (emphasis removed, quoting *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 n.2 (2d Cir. 1993)). As such, and given the very different facts in this case, there is no reason to conflate the Supreme Court's analysis of standing in a 6-3 high profile decision with this Court's analysis of jurisdiction under section 1500. It would be particularly inappropriate to do so on a Rule 12(b) motion to dismiss when, at the very least, "there remain factual issues with respect to whether" the State and AIDEA are in privity for purposes of the claims here and in *AIDEA II. Kawa*, 77 Fed. Cl. at 309 (denying motion to dismiss asserting res judicata because of "factual issues" regarding the question of privity).

To be clear, the Court should not even reach the issue of privity given that it has no place in section 1500's text. But if the Court entertains such an analysis, it should find that the State and AIDEA are not in privity here due to their distinct interests in this case and in *AIDEA II*.

**B.    There Are Not Similar Operative Facts Across *AIDEA II* and this Suit.**

Not only is section 1500 inapplicable to this matter because the State and AIDEA are not the same entity, and the State has never assigned its rights relevant to this lawsuit to AIDEA, the two suits also do not share similar operative facts and so fail the second prong of section 1500.

There is no uniform definition in this Court or in the Federal Circuit on what constitutes "substantially the same operative facts." *See Klamath Irrigation Dist. v. United States*, 113 Fed. Cl. 688, 699, 702 (2013) ("Recent cases offer a mixed bag on what is 'operative' for purposes of section 1500."). One decision of this Court has distilled the varying analyses into four factors:

(1)    Are the issues of fact and law raised by the two claims largely the same?
(2)    If an adverse merits decision were rendered on the earlier claim, would the doctrine of res judicata [– as interpreted when section 1500 was enacted in the 1860s –] bar a later-filed claim?
(3)    Will the plaintiff rely on substantially the same evidence to support each of the two claims?
(4)    Is there any other logical relationship between the two claims?

*Id.* at 708; *but see U.S. Home Corp. v. United States*, 108 Fed. Cl. 191, 196 (2012) (explaining that the res judicata factor is only a "secondary inquiry"). Each of these questions leads to the conclusion that there are different operative facts across *AIDEA II* and the instant suit.

**1.    The Issues of Fact and Law Are Different.**

The Federal Circuit has explained that while two suits may "ar[i]se out of a related sequence[s] of facts," the operative facts can still be so different as to not be considered "equivalent" for section 1500. *Beberman v. United States*, 755 F. App'x 973, 977 (Fed. Cir. 2018) (per curiam) ("*Beberman II*"). The issues of fact and law presented in the instant suit are different from *AIDEA II* as, regardless of any overlap in factual background, each suit raises distinct questions: (1) here, whether the United States breached its contractual obligations to the State and a determination of the State's injuries; and (2) in *AIDEA II*, whether the Secretary has the authority to cancel oil and gas leases in the Coastal Plain.

The United States cites to *Beberman v. United States*, 129 Fed. Cl. 539 (2016) ("*Beberman I*"), for the notion that both *AIDEA II* and the instant suit have "more than sufficient" factual overlap. (Mot. at 15.) But the United States fails to note that the Court of Federal Claims' holding was *rejected* by the Federal Circuit in another suit filed by Beberman raising "substantially similar" arguments. *See Beberman II*, 755 F. App'x at 976–78 (explaining the facts analyzed by the trial court "do not provide enough overlap to conclude that the claims arise from substantially the same operative facts"). Beberman was a Foreign Service Officer for the State Department stationed in Venezuela. *Id.* at 974. She first filed suit for damages and equitable relief in the U.S. District Court for the District of the Virgin Islands, alleging age discrimination. *Id.* While her lawsuit was pending, Beberman, who was now stationed in Equatorial Guinea, was denied tenure by the Foreign Service and ordered to move to Washington, D.C. *Id.* Beberman filed an emergency motion for a temporary restraining order and/or preliminary injunction to prevent her forced relocation to Washington, D.C.; the district court denied Beberman's motion, concluding that if she prevailed on her lawsuit, she would be "adequately compensated by money damages and equitable relief." *Id.* at 974–75. The U.S. Court of Appeals for the Third Circuit affirmed the district court. *Id.* at 975.

While Beberman's appeal to the Third Circuit was pending, she filed a separate lawsuit before this Court regarding an alleged violation of the Equal Pay Act related to the forced relocation from Equatorial Guinea to Washington, D.C. *Id.* On appeal, the Federal Circuit found the two lawsuits distinct for section 1500 purposes. While there were similar facts "relevant to each case," the Federal Circuit explained that they were relevant for "substantially different reasons" and were seeking different relief. *Id.* at 978. The Federal Circuit noted that "[i]n the Third Circuit appeal, Ms. Beberman was seeking an injunction . . . because she was contesting

the legitimacy of her tenure denial and the allegedly age-based discriminatory animus that caused that denial." *Id.* And in the Third Circuit appeal, Beberman only mentions lost benefits as "part of the irreparable harm" requiring injunctive relief. *Id.* at 979. But "[i]n the instant case, those benefits are mentioned as damages . . . Unlike in the Third Circuit appeal, these benefits are relevant to Ms. Beberman's Claims Court [Equal Pay Act] claim *regardless of the legitimacy of the tenure denial*[.]" *Id.* (emphasis added).

The Federal Circuit's holding is instructive: *Beberman II* cautions courts from summarily finding sufficient factual overlap simply because two suits involve the same or similar parties and similar facts, and instead requires a more exacting inquiry of whether those facts are relevant for "substantially different reasons." *Id.* at 978. *AIDEA II* challenges the Secretary's legal authority to issue the lease cancellations. *AIDEA II*, 3:24-cv-51-SLG at dkt. 11. Here, like *Beberman II*, the State is seeking damages resulting from the cancelled leases as the leases' third-party beneficiary, "regardless of the legitimacy" of the cancellations. *Beberman II*, 775 F. App'x at 979. And, as in *Beberman II*, while there are similar facts "relevant to each case," they are relevant for "substantially different reasons." *Id.* at 978. In *AIDEA II*, the lease cancellations are relevant to determine whether the Secretary has the authority to cancel the leases as a matter of law. Here, the lease cancellations are relevant only to determine whether the United States breached the leases to the third-party beneficiary of those contracts, the State. While *AIDEA II* and this suit "share some of the same facts," they are not "'based on substantially the same operative facts'" for section 1500 purposes. *Id.* at 980 (quoting *Tohono*, 563 U.S. at 317).

## 2.    *AIDEA II* Has No Res Judicata Effect on this Lawsuit.

This Court has employed two different res judicata analyses—both as they would have been interpreted when section 1500 was enacted in the 1860s—to determine whether the later-filed Court of Federal Claims suit would be barred by the res judicata effects of the previously-

filed lawsuit. *Klamath Irrigation*, 113 Fed. Cl. at 712; *but see U.S. Home*, 108 Fed. Cl. at 196 (explaining that the res judicata factor is only a "secondary inquiry"). Under either test, *AIDEA II* would not affect this Court's role in resolving this litigation.

(a)    Act or Contract Test

The first res judicata test used by this Court is the "act or contract" test, which makes "distinction[s] between demands or rights of action which are single and entire, and those which are several and distinct, . . . that the former immediately arise out of one and the same act or contract, and the latter out of different acts or contracts." *Klamath Irrigation*, 113 Fed. Cl. at 712. The Federal Circuit has emphasized that "[t]he nineteenth century act or contract test is narrower than the modern transactional test." *Res. Invs.*, 785 F.3d at 667; *see also Klamath Irrigation*, 113 Fed. Cl. at 714 ("[B]oth historical tests . . . informing the section 1500 inquiry[] focus on whether the legally-determinative facts in the two suits were roughly the same.").

Here, the demands across suits are different: in *AIDEA II*, AIDEA is exclusively litigating the Secretary's legal authority to cancel its leases whereas here the State is demanding owed damages for the breached lease contracts, regardless of the cancellations' legality. As such, even if the cancellations are held to be legal in *AIDEA II*, the State would still have its claim here that such cancellation was a breach of the United States' obligations to the State and that the State is owed damages. Thus, *AIDEA II* has no res judicata effect on this litigation under the act or contract test.[7]

---

[7] The United States asserts that "even if AIDEA does not prevail, preclusion principles would still apply and narrow, if not eliminate, the issues in this case." (Mot. at 12.) The United States is wrong. If AIDEA does not prevail in *AIDEA II*, and that court holds that the United States properly cancelled AIDEA's leases, the State may still assert breach of contract claims. *See Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 613–14 (2014).

(b)    *Evidence Test*

Under this alternative articulation of the relevant res judicata analysis, "two suits involve the same claim if 'the same evidence support[s] and establish[es] both the present and the former cause of action.'" *Acetris Health, LLC v. United States*, 949 F.3d 719, 728 (Fed. Cir. 2020) (alterations in original) (quoting *Tohono*, 563 U.S. at 316); *see also Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1170 (Fed. Cir. 2011) ("[T]he overlapping evidence need[s] to be both relevant to *and legally operative to prove* the prior claim before res judicata would act as a bar to the subsequent claim.") (emphasis added). The Federal Circuit has previously cited persuasive historical authority explaining that "[i]f the evidence which will sustain the second [suit] would have authorized a recovery in the first [suit], . . . the first judgment is an absolute bar to the second." *Trusted Integration*, 659 F.3d at 1169–70 (quoting *Stowell v. Chamberlain*, 60 N.Y. 272, 276 (1875)).

The legal questions at the heart of *AIDEA II* and this suit require different evidence for the respective courts to resolve the underlying disputes. For example, because *AIDEA II* was brought under the APA and tackles a pure question of law regarding Executive authority, conceivably no evidence will be necessary to resolve it. Here, in contrast, the State will employ economic metrics to prove its damages from the United States' cancellation of the nine leases. And how ever this Court rules on whether the State is owed its share of proceeds under the cancelled leases, it will not impact the *AIDEA II* Court's task in determining whether the cancellations were legal in the first place.

This Court has previously explained that

> it would seem unlikely that the legally determinative facts in a case that challenges, under the APA, the validity of government action would also suffice to establish that the same action, presumed to be valid, effectuated either a physical or regulatory takings under the Fifth Amendment. The word-processing-driven fact that the two complaints may – or may not – include a lot of similar verbiage should not be

determinative, nor even relevant, under the preclusive doctrines cited by the Supreme Court.

*Klamath Irrigation*, 113 Fed. Cl. at 714 (emphasis added).

The United States points to similar factual allegations presented in the *AIDEA II* operative complaint and this suit's Complaint as conclusory support for the notion it somehow becomes "beyond reasonable dispute" that the two complaints are "based on substantially the same operative facts." (Mot. at 14.) But the United States errs by asking this Court to focus on "similar verbiage" instead of asking *why* these facts are relevant for each lawsuit. *Klamath Irrigation*, 113 Fed. Cl. at 714. Because the two suits require different evidence, this litigation is not barred by res judicata as applied under the evidence test.

### 3.    This Suit and *AIDEA II* Involve Different Evidence.

This suit requires a fact-intensive inquiry into past and future economic loss incurred by the State for the cancelled leases. *AIDEA II*, on the other hand, requires the Alaska federal court to answer a pure question of law regarding Executive authority. As explained above for the evidence historical res judicata test, *supra* I.B.2(b), the two suits require different evidence to answer different questions.

### 4.    This Suit and *AIDEA II* Have No Meaningful Logical Relationship.

This final test "is designed to determine whether there is some logical relationship between the two claims that is not revealed by the first three tests." *Klamath Irrigation*, 113 Fed. Cl. at 717. Notably "this test is not infinitely elastic." *Id.*

Here, there is no logical relationship between *AIDEA II* and this case apart from the considerations already evaluated under the first three tests examining whether the cases are based on the same operative facts. If anything, the tests have highlighted the distinctions between the cases. *AIDEA II* concerns a pure question of law regarding agency authority, while this case

addresses whether the lease cancellations—regardless of their legal validity—comprise a breach of contract and what the State's damages are from such a breach based on economic evidence that will be presented. *See supra* I.B.2., 3. Moreover, the outcome of *AIDEA II* will not affect this Court's resolution of this suit. And forcing the State to wait to pursue its claims for the many months and years it will inevitably take for *AIDEA II* to resolve, at the district court and on appeal, its separate and unrelated questions is the epitome of the axiom that "justice delayed is justice denied."[8]

Because each of the four tests demonstrate the difference in the operative facts for determining this case versus *AIDEA II*, the Court should find that section 1500 does not apply for this additional reason.

## II.    THE STATE ASSERTS A VIABLE BREACH OF CONTRACT CLAIM WITH RESPECT TO THE KNIK ARM AND REGENERATE ALASKA LEASES.

The United States briefly argues that the State cannot state a claim for breach of contract regarding the cancelled Knik Arm and Regenerate Alaska leases because these parties requested that DOI rescind their leases. (Mot. at 15–16.) This half-hearted argument is wrong for several reasons.[9]

---

[8] *See* Office of the Clerk, United States Courts for the Ninth Circuit, *Frequently Asked Questions*, https://www.ca9.uscourts.gov/general/faq/#:~:text=For%20a%20civil%20appeal%2C%20approx imately,months%20after%20briefing%20is%20complete (last visited Dec. 5, 2024) (explaining how a civil appeal can take twelve months from notice of appeal date until oral argument, with another year before an opinion is released); *Yang Hong v. Mayorkas*, No. 2:20-cv-1784-RAJ-TLF, 2021 U.S. Dist. LEXIS 256541, at *10 (W.D. Wash. June 8, 2021) ("On average, appeals to the Ninth Circuit remain pending approximately 12-20 months before oral argument and three months to a year after oral argument before a decision."). And this is before even considering further appellate timelines for petitions for rehearing and petitions for certiorari to the Supreme Court, as well as the potential for further litigation on remand from an appellate court.

[9] Because the United States does not argue that the State failed to plead a breach of contract claim regarding the AIDEA leases, this portion of the State's brief pertains only to the Knik Arm and Regenerate Alaska leases.

Most important, the United States does not even attempt to address what the State's Complaint alleges—i.e., that regardless of the purported cooperation of Knik Arm and Regenerate Alaska in requesting that the leases be rescinded, the United States nonetheless breached those leases. (*See* Compl. ¶¶ 37–43, 60–69.) Based on the Complaint's allegations, which must be accepted as true for purposes of the United States' argument under Rule 12(b)(6), the United States breached the Knik Arm and Regenerate Alaska leases by rescinding and cancelling them for reasons, and using procedures, other than those authorized under the relevant regulations.[10] (*Id.* ¶ 40.) Parties to a contract cannot later agree to discharge a duty owed to a third-party beneficiary unless "a term of the promise creating the duty so provides." Restatement (Second) of Contracts § 311; *accord Ables v. United States*, 2 Cl. Ct. 494, 502 (1983). Here, the Coastal Plain leases expressly state they are subject to the Secretary's regulations, (*see, e.g.*, AIDEA Coastal Plain Leases at 3 (attached hereto as Exhibit D)), which only allow the leases to be relinquished, terminated, or cancelled—not rescinded—and in limited circumstances. *See* 43 C.F.R. pt. 3130, subpart 3136. By rescinding the leases, and then by clawing back the State's portion of the lease bonuses and rentals, the United States breached its obligations to the State as a beneficiary of the lease bonuses and rentals.[11] (Compl. ¶¶ 37–43.) Thus, under this theory of liability, whether or not Knik Arm and Regenerate Alaska purportedly cooperated with the

---

[10] To the extent DOI has characterized rescission of the leases as relinquishment of the leases, DOI's characterization is wrong. A relinquishment is the voluntary surrender of a party's rights under an oil and gas lease where the lessee still *must* "*make all payments due, including any accrued rental, royalties and deferred bonuses*[.]" 30 C.F.R. § 3136.1 (emphasis added). A relinquishment does not provide for a refund to a lessee, particularly for a refund retroactive to the effective date of the lease. *See id.* Instead, relinquishment specifically requires lease terms to remain in force, including obligations to pay rents that are already due at the time of relinquishment. *See id.*

[11] To be clear, the Complaint's concern about the lease rescissions is still a distinct question from the one raised in *AIDEA II*, which addresses under the APA the United States' authority to unilaterally cancel AIDEA's leases.

United States in requesting rescission of the leases is irrelevant. As such, the United States' argument—based solely on the acknowledged fact that Knik Arm and Regenerate Alaska participated in the cancellation of their leases—simply disregards and thus fails to substantively challenge the allegations in the State's Complaint.

Moreover, the State's Complaint sets forth facts demonstrating another plausible theory of liability under the Knik Arm and Regenerate Alaska leases that the United States' Motion does not attempt to address—anticipatory repudiation. Anticipatory repudiation constitutes a "renunciation of a contractual duty *before* the time fixed in the contract for . . . performance." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (alteration in original) (quoting *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002)). Where there are "reasonable grounds [to] support the obligee's belief that the obligor will breach the contract," the obligee has a claim for anticipatory repudiation. *See Danzig v. AEC Corp.*, 224 F.3d 1333, 1337–38 (Fed. Cir. 2000).

The alleged facts demonstrate that, well prior to the purported rescission and cancellation of the Knik Arm and Regenerate Alaska leases, the United States made clear it would not honor the leases by allowing development of the leased lands to proceed. For example, just two weeks after the leases were issued, the United States announced through Executive Order 13990 that the leases would be subject to an indefinite moratorium while an entirely new environmental analysis was conducted for the program. (Compl. ¶ 33.) This announcement was followed by further orders suspending all development activities under the program and official threats that the leases could be cancelled. (*Id.* ¶¶ 34–36.)[12] After well over a year of such delays,

---

[12] Such actions were consistent with the campaign promises made by then-candidate Joseph Biden, who repeatedly stated he was "completely, totally opposed" to drilling in ANWR, and

postponements, and threats that had made clear the United States was not going to honor the

leases, Knik Arm and Regenerate Alaska were left with a Hobson's choice: either participate in

lease cancellation to ensure prompt return of the money paid for the leases, or wait for the United

States to inevitably cancel the leases at an uncertain point in the future with an uncertain

outcome for the lease bonuses and rentals that had been paid. (*Id.* ¶ 37.) Regardless of the choice

the lessees ultimately made, the United States had already repudiated its lease obligations, and

the State as a third-party beneficiary suffered the consequences.[13]

## III. THE UNITED STATES BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING.

The United States' Motion includes another drive-by argument with no legal support, this

time contending that the Complaint fails to state a claim for breach of the covenant of good faith

and fair dealing. In particular, the Motion argues, without further explanation: (1) that the State

failed to allege that the United States thwarted the State's rights as a third-party beneficiary

through any extra-contractual conduct; and (2) that the State's covenant of good faith and fair

dealing claim regarding the Knik Arm and Regenerate Alaska leases fails because those contracts

were cancelled at the lessees' request. (*See* Mot. at 16–17.) It is evident why the United States

cited no support for these arguments: there is none.

---

who promised "no more drilling on federal lands, period." C-SPAN, *Joe Biden on the Arctic Refuge*, (Feb. 9, 2020), https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge. This Court may take judicial notice of publicly available information which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Connected Glob. Sols., LLC v. United States*, 160 Fed. Cl. 420, 425 (2022) (quoting Fed. R. Evid. 201(b)). Another federal court has previously taken judicial notice of a President's speech as "representations of the Government's position." *See Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 68 (D.D.C. 2014) (emphasis removed).

[13] The State asserts its breach of contract claims as a third-party beneficiary of the leases. *See Sullivan v. United States*, 625 F.3d 1378, 1380 (Fed. Cir. 2010) (discussing third-party beneficiary standing); *see also* (Compl. ¶¶ 60–69). The United States' Motion does not challenge the State's standing as a third-party beneficiary for any of its breach of contract claims.

At the outset, the United States does not dispute that the State is a third-party beneficiary of the Coastal Plains leases by virtue of the State's statutory entitlement to a share of the United States' royalty interest. *See id.* at 17; Tax Act § 20001(b)(5)(A). The United States also does not dispute that it owes both lessees and third-party beneficiaries certain express and implied contractual obligations, including a duty of good faith and fair dealing. (*See* Mot. at 17); *see, e.g.*, *Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 804 (2013) (finding covenant of good faith and fair dealing owed to third-party beneficiaries). Yet the United States ignores that, instead of protecting the State's royalty interests by requiring diligent development of the Coastal Plains leases, the United States engaged in a campaign to undermine the leases themselves, culminating in the United States' complete repudiation of the leases. Thus, by rescinding and cancelling the leases, the United States breached its duties to the State as the third-party beneficiary of the leases.

Within each contract is a covenant of good faith and fair dealing, which "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (internal quotation marks omitted). While recognized universally, implied covenants are even more important in oil and gas leases than in typical contract law. *See, e.g.*, 1 William & Meyers Abridged Oil & Gas Law § 801 (2024) ("[I]mplied covenant law remains a vital force in the current law of oil and gas."). Breach of the implied covenant of good faith and fair dealing can be alleged through "subterfuge[]," "evasion[]," and the "evasion of the spirit of the bargain, lack of diligence, and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, [or] interference with or failure to cooperate in the other party's

performance." *Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 596 (2013) (alterations

in original) (quoting Restatement (Second) of Contracts § 205 (Am. L. Inst. (1981)); *see also*

*D'Andrea Bros. LLC v. United States*, 109 Fed. Cl. 243, 260 (2013) ("The implied covenant of

good faith and fair dealing encompasses obligations of diligence, cooperation, and forthrightness,

and a breach of these obligations is a contractual breach."). The implied duty of good faith and

fair dealing is extended to third-party beneficiaries of contracts, *Fox Logistics & Constr. Co. v.

United States*, 145 Fed. Cl. 236, 242–43 (2019), and does not require a violation of an express

provision of the parties' contract, *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019).

The Complaint's allegations more than sufficiently state a claim for breach of the

covenant of good faith and fair dealing with respect to all leases. The Complaint details that,

nearly immediately after the leases were issued, the United States engaged in extended

conduct—the indefinite moratorium and suspension of all leasing activities, followed by threats

to cancel the leases or materially change the development program under which they were

issued, and ultimately cancellation of the leases—that completely deprived the lessees of any

ability to develop the leased lands and thwarted the State from receiving any of the promised

benefits as a third-party beneficiary. (Compl. ¶¶ 65–69.) Such conduct is the epitome of

"eva[ding] [] the spirt of the bargain" and "fail[ing] to cooperate in the other party's

performance." *Dotcom Assocs.*, 112 Fed. Cl. at 596.

Indeed, the Federal Circuit has explained that there is a breach of the implied duty where

the government pursues "some variation on the old bait-and-switch [by] [f]irst . . . enter[ing] into

a contract that awards a significant benefit in exchange for consideration [and] [t]hen . . .

eliminat[ing] or rescind[ing] that contractual provision or benefit through a subsequent action

directed at the existing contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817,

829 (Fed. Cir. 2010); *see also First Nationwide Bank v. United States*, 431 F.3d 1342, 1350 (Fed. Cir. 2005) (finding United States breached covenant where it unilaterally removed tax benefit which changed balance of contract consideration); *Centex Corp. v. United States*, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (same). That is precisely what the United States did here.

Moreover, as alleged in the Complaint, the United States' conduct to thwart the lessees and the State from enjoying the benefits of the bargained-for leases occurred *prior to* any purported agreement by Knik Arm and Regenerate Alaska to cancel their leases. (Compl. ¶¶ 30–36.) And to whatever extent Knik Arm and Regenerate Alaska may have granted releases to the United States as part of the agreement, the State was not a party to the cancellation and granted no such release. As such, the State has stated a viable claim for breach of the implied covenant even with respect to the Knik Arm and Regenerate Alaska leases.

## IV.    THE UNITED STATES TOOK THE STATE'S PROPERTY INTEREST WITHOUT JUST COMPENSATION.

Finally, the United States' Motion takes aim at the State's takings claim, contending that the State fails to state such a claim for three reasons: (1) the State failed to state a cognizable Fifth Amendment property interest; (2) the State cannot allege a taking for a deprivation of a contractual right that is the subject of a contract claim; and (3) the State failed to allege "with any particularity[] the nature of the supposed taking." (Mot. at 17–19.) Each of these arguments is wrong.

First, contrary to the United States' assertion, the State has alleged a cognizable property interest through its statutory right to receive royalties from the leases. The State holds a statutorily guaranteed royalty interest of 8.335% of revenues produced from each of the nine leases. *See* (Compl. ¶ 76); Tax Act § 20001(b)(4), (b)(5)(A). Although the United States mischaracterizes this interest as merely a right to payment, (*see* Mot. at 17), federal law holds

that "[a] right to royalties is a real property interest," *Benchmark Res. Corp. v. United States*, 74 Fed. Cl. 458, 475 (2006); *Foster v. United States*, No. 34-75, 1978 U.S. Ct. Cl. LEXIS 833, at *18 (Oct. 18, 1978) ("A leasehold interest, as well as the entire mineral interest reserved, is an estate in real property that may be the subject of a compensable taking."). This Court has previously found that a plaintiff who owns operating interests and/or overriding royalty interests in a federal oil and gas lease can properly assert a takings claim when those interests are usurped without just compensation. *See Devon Energy Corp. v. United States*, 45 Fed. Cl. 519, 521, 529 (1999).

Such holdings are consistent with, and further supported by, Internal Revenue Service ("IRS") regulations that *define royalty interests as property*. *See* 26 C.F.R. § 1.614-1(a)(1) ("For purposes of subtitle A of the [Internal Revenue] Code, . . . the term property means each separate interest owned by the taxpayer in each mineral deposits in each separate tract or parcel of land."); *id.* § 1.614-1(a)(2) ("The term [property] includes working or operating interests, *royalties*, overriding royalties, . . . .") (emphasis added). Notably, this Court's predecessor has previously looked to these IRS regulations to note that "[t]he Treasury Regulations further define the term 'interest' to include . . . *royalties* . . . ." *Southland Royalty Co. v. United States*, 22 Cl. Ct. 525, 529 (1991) (emphasis added). For these reasons, the United States' reliance on *Alaska Airlines v. Johnson*, which involved a dispute over payments for government employees' air travel, is inapt. (*See* Mot. at 17 (citing 8 F.3d 791 (Fed. Cir. 1993)).) Accordingly, the State has a cognizable property interest.

Second, the United States is wrong in contending that the State cannot assert both contract claims as well as a takings claim in this case. The Federal Circuit has "expressly held . . . that a plaintiff may plead, in the alternative, both a breach of contract claim and a takings

claim in the same complaint." *Cent. Expl. New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 77 (2012) (citing *Stockton E. Water Dist. v. United States*, 583 F.3d 1344 (Fed. Cir. 2009)); *see also Barlow & Haun, Inc v. United States*, 87 Fed. Cl. 428, 438–40 (2009) ("[T]his court's judges routinely allow Fifth Amendment taking allegations to proceed where breach of contract is pled as an alternative—at least until determining whether there has been a breach, and sometimes until the entry of judgment."). If the State succeeds on its breach of contract theory, its taking claim will be rendered moot. *See Stockton E.*, 583 F.3d at 1368. ("[O]f course when a plaintiff is awarded recovery for the alleged wrong under one theory, there is no reason to address the other theories."). But if for any reason the State does not succeed on its contract claims, the State may pursue alternative theories of liability, including through a takings claim. *Cent. Expl. New Orleans, Inc.*, 103 Fed. Cl. at 77.

The United States erroneously relies on *Snyder & Associates Acquisitions LLC v. United States* for the proposition that "[i]f a plaintiff claims he is owed something to which he also claims a contractual right, he cannot also allege a takings claim because he is not alleging that the Government has taken his contract remedy" (Mot. at 18 (quoting 133 Fed. Cl. 120, 126 (2017)).) The United States ignores that, in the very *same paragraph*, this Court explained that it was referencing circumstances where the plaintiff *only* had contract damages and "not a separately existing property interest." *Snyder & Assocs.*, 133 Fed. Cl. at 126 (internal quotation marks omitted). Here, as discussed above, the State has a separate cognizable property interest created by the Tax Act. *See* Tax Act § 20001(b)(4), (b)(5)(A). In any event, the *Snyder* decision relied on case law pre-dating the Federal Circuit's clarification in *Stockton* that pleading "alternative theories for recovery against the Government . . . one for breach of contract and one for a taking . . . is expressly permitted by the Federal Rules." *Stockton E.*, 583 F.3d at 1368. As

the Court in *Stockton* explained, a court may, at most, "defer the taking issue . . . in favor of first addressing the contract issue." *Id.* Accordingly, the State may properly assert, as an alternative theory of liability, that the United States has effected a taking with respect to the State's property interests.

Third, by arguing that the State must allege "the nature of the supposed taking . . . and how it can facially satisfy the elements of a categorical or regulatory takings claim," (Mot. at 18), the United States appears to seek a heightened pleading standard for takings claims but cites no law to support such a requirement. The State is not required, in its Complaint, to give a detailed *legal* explanation of why the alleged facts constitute a taking. But the alleged facts themselves make very clear the State's theory of liability—that is, the United States' conduct constituted a categorical taking of the State's royalty interests. *Compare* Compl. ¶ 77 ("By cancelling the leases and otherwise impeding and preventing development of oil and gas pursuant to Coastal Plain leases, the United States has *deprived the State of all value and use* that it otherwise would derive from its royalty interest and other revenue interests in the Coastal Plain oil and gas." (emphasis added), *with Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("A categorical taking has been defined as one in which all economically viable use, i.e., all economic value has been taken by the regulatory imposition." (internal quotation marks omitted)); *Abbas v. United States*, 124 Fed. Cl. 46, 52 n.2 (2015) ("Regulations that are found to be too restrictive, so that the regulations deprive property of its entire economically beneficial or productive use, are viewed as categorical takings."). In fact, the Motion itself demonstrates that the United States understands very well the Complaint's takings allegations. (*See* Mot. at 18 (conceding that the Complaint explains that the State "has an interest in the royalties under the oil and gas leases, that the United States deprived Alaska of the value and use of the royalty and

other revenue interests, and that the United States has thus committed a taking . . . ." (citing Compl. ¶¶ 75–78)).) As such, the State has adequately alleged a takings claim against the United States.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that the Court deny the United States' motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim.

Submitted this 6th day of December, 2024.

/s/ Mark E. Champoux
Mark E. Champoux, Attorney of Record
Kathleen C. Schroder, Of Counsel
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Mark.Champoux@davisgraham.com
Katie.Schroder@davisgraham.com
Tele: (303) 892-9400

TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl, Of Counsel
Ryan Farnsworth, Of Counsel
Assistant Attorneys General
Department of Law
State of Alaska
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
ron.opsahl@alaska.gov
ryan.farnsworth@alaska.gov

Attorneys for the State of Alaska

## CERTIFICATE OF SERVICE

I certify that on December 6, 2024, the foregoing **STATE OF ALASKA'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS** was served electronically on all parties listed on the CM/ECF system.


/s/ *Joanna Seiner*
Joanna Seiner